UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

JOSEPH A. PAKOOTAS, an
individual and enrolled
member of the Confederated
Tribes of the Colville
Reservation; and DONALD
R. MICHEL, an individual
and enrolled member of the
Confederated Tribes of the
Colville Reservation, and THE
CONFEDERATED TRIBES OF
THE COLVILLE RESERVATION,

               Plaintiffs,

and

THE STATE OF WASHINGTON,

          Plaintiff-Intervenor,

        vs.

TECK COMINCO METALS, LTD.,
a Canadian corporation,

           Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. CV-04-256-LRS

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION
OF STATE OF WASHINGTON'S
CERCLA LIABILITY,** *INTER ALIA*

**BEFORE THE COURT** is the Defendant's Motion For Summary

Adjudication Of The State Of Washington's CERCLA Liability (ECF No. 919).

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-**    **1**

Oral argument was heard on October 31, 2011.  Christa L. Thompson, Esq.,

argued for Plaintiff-Intervenor, State of Washington.  Mark E. Elliott, Esq., and

Amy E. Gaylord, Esq., argued for Defendant Teck Cominco Metals, Ltd. (Teck).

## I. BACKGROUND

Defendant has asserted a counterclaim against the State of Washington

seeking recovery of response costs from the State under the Comprehensive

Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.

Section 9607(a).  (ECF No. 193).  Defendant asks the court to find as a matter of

law that the State is liable as an "arranger."  According to Defendant:

> The State contracted for treatment because the State Mining
> Contracts evidence the State's intention that metal-containing
> ores be excavated and removed (e.g., mined) from State lands
> and be treated (e.g., milled).  The State contracted for disposal
> because waste in the form of tailings and waste rock is inherent
> to the mining and milling processes, the means of disposal
> historically has been to the environment and direct disposal of
> tailings to the Pend Oreille River was in fact occurring when the
> State entered the Contracts for Mining pertaining to the
> Josephine, and the State allowed the practice to continue without
> intervention for decades after entering the contracts.

(ECF No. 922 at pp. 27-28).

Defendant uses the Josephine Mine and Mill as an example to demonstrate

what it asserts is the State's arranger liability.  The applicable mining contracts for

the Josephine Mine and Mill ("Contracts for Mining"), dated September 1, 1937

and August 15, 1940, leased State lands "for the purpose of":

> exploring for and mining and taking out and removing therefrom
> the ore therein contained, containing copper, silver lead, gold and
> other valuable minerals (except coal), which is or which hereafter
> may be found in, on, or under said land, together with the right
> to construct all buildings, make all excavations, opening ditches,
> drains, railroads, wagon roads, concentrators, power plants,
> smelters and other improvements, upon such premises which are or
> may become necessary or suitable for the mining or removal of
> ore containing copper, lead, silver gold or other valuable minerals

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-      2**

(except coal) from said premises with the right . . . to cut and use
the timber found on said premises for fuel and so far as also may
be necessary, for the construction of buildings required in the
operation of any mine or mines hereby leased and also the timber
necessary for drains, tramways, and supports for such mine or
mines:  PROVIDED, that the [lessee] shall pay [the State] . . .
a royalty, the amount of which shall be equivalent to . . .
[a negotiated %] of all moneys received from the sale of all
minerals from said lands covered by this contract and lease
after deducting therefrom the cost of transportation and treatment
. . . .

## II.  DISCUSSION

Provided other elements are met[1], CERCLA liability attaches to "any person who by contract, agreement, or otherwise arranged for disposal or treatment,  of hazardous substances owned or possessed by such person, by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous substances."  42 U.S.C. Section 9607(a)(3).

In *Burlington Northern And Santa Fe Railway Company v. United States* (*BNSF*), 556 U.S. 599, 129 S.Ct. 1870, 1878-79 (2009), the U.S. Supreme Court

---

[1] In order to establish liability for response costs under 42 U.S.C. Section 9607(a), the following must be established: 1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term, 42 U.S.C. Section 9601(9); 2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. Section 9607(a)(4); 3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. Section 9607(a)(4) and (a)(4)(B); and 4) the defendant is within one of four classes of persons subject to the liability provisions of Section 9607(a).  *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 870-71 (9th Cir. 2001)(en banc).

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-    3**

stated:

> It is plain from the language of the statute that CERCLA liability would attach under §9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination. [Citations omitted]. Less clear is the liability attaching to the many permutations of "arrangements" that fall between these two extreme-cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the 'sale' of a hazardous substance are less than clear. In such cases, courts have concluded that the determination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a "disposal" or a "sale" and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions. [Citations omitted].

The scenario before this court does not fit into either of the "extreme" cases. The State did not enter into these mining contracts for the sole purpose of discarding a used and no longer useful hazardous substance. Naturally occurring ore deposits on State lands which have not been mined have yet to be "used" and remain "useful." Assuming naturally occurring ore deposits constitute a "new and useful product," it was not "unbeknownst" to the State that the entities with which it contracted would excavate and treat the ore in a fashion that would create waste which would require disposal. The case at bar, like so many others, falls between the extremes in that it is a situation where the State arguably had "some knowledge of the buyers' planned disposal" of waste rock and tailings.[2] That does

---

[2] Waste rock is not "treated." It is simply the leftovers from the excavation process and it is "disposed" of. The ore which is separated from the waste rock is "treated" and it is this treatment which creates tailings which are "disposed" of.

**ORDER DENYING MOTION FOR SUMMARY ADJUDICATION- 4**

not, however, mean the State should be held liable as an "arranger." It is necessary to conduct a fact-intensive inquiry to determine whether the arrangement between the State and the entities to whom it leased State lands to mine ore "was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." To assist in this inquiry, it is appropriate to examine the facts in a number of prior judicial decisions involving the question of CERCLA "arranger" liability, including decisions involving mining operations in which it was determined whether a governmental entity could be held liable as an "arranger."

Liability can be based on an arrangement for treatment or disposal. CERCLA, 42 U.S.C. Section 9601 *et seq.*, relies on the definitions of "treatment" and "disposal" contained in the Solid Waste Disposal Act (SWDA), 42 U.S.C. Section 6901 *et seq.*

"Treatment" is:

> [A]ny method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any **hazardous waste** so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of **hazardous waste** so as to render it nonhazardous.

42 U.S.C. Section 9601(29), referring to 42 U.S.C. Section 6903(34) (emphasis added).

"Disposal" is:

> [T]he discharge, deposit, injection, dumping, spilling, leaking, or placing of any **solid waste** or **hazardous waste** into or on any land or water so that such **solid waste** or **hazardous waste** or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-    5**

42 U.S.C. Section 9601(29), referring to 42 U.S.C. Section 6903(3)(emphasis added).

"Arranger liability ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal." *BNSF*, 129 S.Ct. at 1878. Because CERCLA does not specifically define what it means to "arrange for" disposal of a hazardous substance, the Supreme Court has interpreted the phrase to mean someone who "takes intentional steps to dispose of a hazardous substance." *Id*. "While actions taken with *intent* to dispose of a hazardous substance are sufficient for arranger liability, actions taken with mere *knowledge* of such future disposal are not." *Team Enterprises, LLC v. Western Investment Real Estate Trust*, 647 F.3d 901, 908 (9th Cir. 2011), citing *BNSF*, 129 S.Ct. at 1880. (*Italicized* emphasis in text).

In *BNSF*, the Supreme Court reversed the Ninth Circuit's decision, 520 F.3d 918, 948 (9th Cir. 2008), that arranger liability may "attach when disposal of hazardous wastes is a foreseeable byproduct of, but not the purpose of, the transaction giving rise to PRP [Potentially Responsible Party] status." The Ninth Circuit had affirmed the district court's decision that Shell was an arranger because it had "arranged for the sale and transfer of chemicals under circumstances in which a known, inherent part of that transfer was the leakage, and so the disposal, of those chemicals." 520 F.3d at 952. The Supreme Court disagreed:

> While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product. In order to qualify as an

**ORDER DENYING MOTION**
**FOR SUMMARY ADJUDICATION-    6**

arranger, Shell must have entered into the sale of D-D with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in [42 U.S.C.] §6903(3)[definition of "disposal" under the SWDA].

Although the evidence adduced at trial showed that Shell was aware that minor, accidental spills occurred during the transfer of D-D from the common carrier to B & B's bulk storage tanks after the product at arrived at the Arvin facility and had come under B & B's stewardship, the evidence does not support an inference that Shell intended such spills to occur.  To the contrary, the evidence revealed that Shell took numerous steps to encourage the distributors to *reduce* the likelihood of such spills, providing them with detailed safety manuals, requiring them to maintain adequate storage facilities, and providing discounts for those that took safety precautions.  Although Shell's efforts were less than wholly successful, given these facts, Shell's mere knowledge that spills and leaks continued to occur is insufficient grounds for concluding that Shell "arranged for" the disposal of D-D within the meaning of [42 U.S.C.] §9607(a)(3).

129 S.Ct. at 1880 (emphasis in *italics* in text).

The Supreme Court's decision represents a narrowing, if not an outright rejection, of the broad arranger liability earlier espoused by the Ninth Circuit.  The Ninth Circuit stated arranger liability may "attach when disposal of hazardous wastes is a foreseeable byproduct of, **but not the purpose of**, the transaction giving rise to PRP [Potentially Responsible Party] status."  520 F.3d at 948 (emphasis added).  In its decision, the Supreme Court determined that because CERCLA does not specifically define what it means to "arrang[e] for" disposal of a hazardous substance, it is necessary to the give the phrase its ordinary meaning.  129 S.Ct. at 1879.  And the Court specifically noted that "[i]n common parlance, the word 'arrange' implies action directed to a **specific purpose**" and therefore, under the plain language of the statute, "an entity may qualify as an arranger under §9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  *Id*. (emphasis added).  Disposal and/or treatment of hazardous waste cannot be

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-    7**

1  merely "foreseeable."  It must be a specific purpose of the transaction, not merely

2  "inherent" in the transaction.

3        This is apparent from *Team Enterprises*, in which the Ninth Circuit, in light

4  of the Supreme Court's *BNSF* decision, held "that to satisfy the intent requirement,

5  a company selling a product that uses and/or generates a hazardous substance as

6  part of its operation may not be held liable as an arranger under CERCLA unless

7  the plaintiff proves that the company entered into the relevant transaction with *the*

8  *specific purpose* of disposing of a hazardous substance."  647 F.3d at 909.  In

9  *Team*, the Ninth Circuit explained the useful product defense in light of the intent

10 requirement explained by the Supreme Court in *BNSF*:

11              The defense prevents a seller of a useful product from
               being subject to arranger liability even when the product
12             itself is a hazardous substance that requires future
               disposal.  In other words, a person may be subject to
13             arranger liability "only if the material in question constitutes
               'waste' rather than a useful product. "  A plaintiff can overcome
14             the defense by showing that the substance involved in the
               transaction "has the characteristic of waste at the time it is
15             delivered to another party."

16 *Id*., citing and quoting *Cal. Dep't of Toxic Substances v. Alco Pac., Inc.*, 508 F.3d

17 930, 934-36 (9th Cir. 2007) (emphasis added).  The Ninth Circuit further

18 explained:

19              The useful product doctrine serves as a convenient proxy
               for the intent element because of the general presumption
20             that person selling useful products do so for legitimate
               business purposes.  It would be odd, for example, to say that
21             an auto parts store sells motor oil to car owners *for the*
               *purpose* of disposing of hazardous waste.  Conversely,
22             persons selling or otherwise arranging for the transfer of
               hazardous waste (which no longer serves any useful purpose)
23             are more likely trying to avoid incurring liability that might
               attach were they to dispose of the hazardous substances
24             themselves.  In other words, the probable *purpose* for
               entering into such a transaction is to dispose of hazardous
25             waste.

26 *Id*. (*italicized* emphasis in text).

27 **ORDER DENYING MOTION**

28 **FOR SUMMARY ADJUDICATION-    8**

Naturally occurring ore deposits on State lands did not have the "characteristic of waste" when they were "delivered" to the mining companies via the leases. Nevertheless, Defendant seeks to distinguish the *Team* decision, contending that "[u]nlike *Team*, the State did not manufacture or sell a machine that generated hazardous waste as part of its operation" and that "[u]nlike that vapor recovery machine, the ore extracted from State lands was not useful in its existing state- it had to be treated to create another waste stream, tailings, which also were disposed of, and only then was the product of the treatment- the concentrates- sold for profit."

The machine at issue in *Team* was not "useful in its existing state." In order to be "useful," it had to be used for its intended purpose. So used, it produced wastewater containing PCB which was poured down the sewer drain. The production and disposal of waste was inherent in the use of the machine. Still, the Ninth Circuit found there could not be "arranger" liability:"

> Team insists that intent can be inferred from Street's designing its product in such a way as to render disposal inevitable. According to Team, the Rescue 800 generated wastewater containing dissolved PCE, and Team allegedly had "no other choice than to dispose of the contaminated water" by pouring it down the drain. But the design of the Rescue 800 does not indicate that Street *intended* the disposal of PCE. At most, the design indicates that Street was indifferent to the possibility that Team would pour PCE down the drain. This is insufficient.

647 F.3d at 909 (*italicized* emphasis in text).

Defendant asks the court to infer intent by the State from the fact ore must be extracted which produces waste rock, and then what is left  must be treated in order to obtain the metals within, producing additional waste in the form of tailings. This process makes inevitable the disposal of this waste. Consistent with the decision in *Team*, however, this court finds the physical nature of ore and the

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-     9**

need to obtain access to the metals within does not indicate the State intended the disposal of mining waste, but at most was indifferent to whatever disposal method was chosen by the mining companies.

Teck asserts the manufacturer of the machine in *Team* (Street) could not have predicted the disposal of contaminated water down the drain by the purchaser (Team) of that product.  The Ninth Circuit did not reach such a conclusion in *Team*.  It was actually foreseeable, and therefore predictable, that wastewater from the machine would be poured down a drain considering the machine produced such wastewater.  Again, however, foreseeability is not the test.  Disposal of hazardous wastes must be a purpose of the transaction, not merely a foreseeable byproduct of the transaction.  The State did not require the mining companies to dispose of waste rock and tailings in any particular manner.  The mining companies could have impounded the waste rock and tailings.  This option existed when the mining contracts were entered into, even though the contracts did not specify any method of disposal.[3]

Defendant asserts that if the State's characterization of minerals on State lands as "part of the physical world" and not a "waste product" is true, "this entire lawsuit must be dismissed because Plaintiffs accuse Defendant of the arrangement for disposal of the exact same naturally occurring minerals!"  This attempt to equate the State's ore deposits with Defendant's slag is without merit.  Slag clearly is a "waste product."  *Louisiana Pacific v. ASARCO, Inc.*, 24 F.3d 1565 (9th Cir. 1994).  Unlike ore, it does not "consist[] of economically worthwhile concentrations of metals."  (See Defendant's Reply,  ECF No. 1240 at p. 4).

---

[3] See Defendant's Material Fact No. 26 (ECF No. 923) which is not disputed by the State.

**ORDER DENYING MOTION**
**FOR SUMMARY ADJUDICATION-    10**

*Catellus Development Corporation v. United States*, 34 F.3d 748 (9th Cir. 1994), and *Cadillac Fairview/California, Inc. v. United States of America*, 41 F.3d 562 (9th Cir. 1994), were rendered long before the Supreme Court's decision in *BNSF* and it is possible they may now be viewed somewhat differently in light of the Supreme Court's *BNSF* decision. Regardless of whether that is so, those decisions do not persuade the court to impose arranger liability on the State because of its mining contracts.

In *Catellus*, the Ninth Circuit considered whether a party (General Automotive, Inc.) that sold spent automotive batteries to a lead reclamation plant could be held liable as an arranger under CERCLA for the costs of cleaning up the property where lead-containing remnants of the batteries were eventually dumped. The Ninth Circuit concluded General could be liable as an arranger. Noting CERCLA's definitions of "disposal" and "treatment" with reference to the SWDA, the Ninth Circuit observed that "General could be said to have arranged for the disposal or treatment of spent batteries **only if the spent batteries could be characterized as waste**." 34 F.3d at 750 (emphasis added). The circuit concluded the spent batteries were properly characterized as "waste" under SWDA regulations. *Id*. at 752. General argued it did not "arrange" to dispose of the batteries because it did not control the eventual disposition of their remnants. The Ninth Circuit rejected that argument, stating as follows:

> We have considered continued ownership or control of a hazardous substance to be evidence of arranging for disposal. *Jones-Hamilton* [*v. Beazer Materials & Services*], 973 F.2d [688] at 695. However, we have not required it. Requiring continued ownership or control for section 107 (a)(3) liability would make it too easy for a party, wishing to dispose of a hazardous substance, to escape by a sale its responsibility to see that the substance is safely disposed of. Such a requirement "would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances, a result contrary to the policies

**ORDER DENYING MOTION FOR SUMMARY ADJUDICATION-    11**

1    underlying CERCLA." *United States v. Aceto Agr. Chemicals*
2    *Corp.*, 872 F.2d 1373, 1382 (8th Cir. 1989). **It is sufficient
     that the substance had the characteristic of waste, as we
3    have defined it above, at the point at which it was delivered
     to another party.**

4    *Id.* (emphasis added).

5         As stated above, naturally occurring ore deposits on State lands did not have

6    the "characteristic of waste" when they were "delivered" to the mining companies

7    via the leases and mining contracts.  Hence, the State never owned or possessed

8    "hazardous waste."  The mining contracts contained no provisions addressing

9    ownership of severed ore once the mining companies took possession of the same.

10   It is true the contracts contemplated there would be a treatment of the severed ore

11   to obtain the metals within because the calculation of the State's royalty was based

12   on a percentage of "all moneys received from the sale of all minerals from said

13   lands covered by this contract and lease after deducting therefrom the cost of

14   transportation and treatment."  Even assuming this somehow evidences the State

15   retained a continuing ownership interest in the ore, the ore was not "waste" to

16   which the term "treatment" applies under CERCLA.

17        In *Catellus*, the district court, in addition to holding there was no

18   arrangement for disposal, held the sale of spent batteries could not constitute an

19   "arrangement for treatment" because General did not retain control over the

20   method by which the batteries would be treated.  The Ninth Circuit disagreed:

21        [T]here is no special requirement in treatment cases that
          there be a contract specifying how treatment will take place.
22        As with our interpretation of the arrangement for disposal
          provision, all that is necessary is that the treatment be
23        inherent in the particular arrangement, even though the
          arranger does not retain control over its details.  Thus, when
24        General sold the batteries to Kirk there was an arrangement
          for treatment created.  Treatment is defined as, among others,
25        rendering waste "amenable for recovery, . . . or reduced in
          volume." 42 U.S.C. §6903(34).  When General sold the
26        batteries to Kirk, it was in order that Kirk would treat the

27   **ORDER DENYING MOTION
28   FOR SUMMARY ADJUDICATION-    12**

batteries by making the lead in the batteries "amenable for recovery." The processing by Kirk would also have the effect of "reduc[ing] in volume" the battery material that would have to be discarded.

34 F.3d at 753.[4]

As is evident from *Catellus*, "treatment" assumes treatment of "waste." Ore deposits extracted from the State's land were not "waste." "Waste," in the form of tailings, was created when the mining companies treated the ore deposits in order to extract the minerals from the deposits.

*Cadillac Fairview* was also a "treatment" case. Certain rubber companies were supplied styrene by Dow Chemical Company, a portion of which they converted into rubber. The unconverted styrene contained contaminants from the rubber manufacturing process which the rubber companies pumped back to the styrene plant operated by Dow. The contaminated styrene entered a series of distillation columns which separated the contaminants from the styrene. The contaminants were removed from the distillation columns and stored in pits near

---

[4] Nonetheless, the Ninth Circuit affirmed, on a different basis, the district court's judgment that General could not be liable to Catellus for arranging treatment of the batteries. According to the circuit, 42 U.S.C. Section 9607(a)(3) "creates a requirement that the treatment take place at the facility that contains the hazardous substances that are the subject of the clean up effort." 34 F.3d at 753. Because none of the treatment activity arranged by General and potentially causing contamination occurred on Catellus's property (the relevant "facility"), General could not be liable as an arranger of treatment and could only be held liable for arranging disposal that eventually led to contamination of Catellus's property (the relevant "facility"). *Id*.

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-    13**

the styrene plant.  Dow then pumped the recovered styrene back to the plants operated by the rubber companies for use in manufacturing synthetic rubber.  Dow charged the rubber companies nine cents a pound for fresh styrene and credited them seven cents a pound for contaminated styrene returned to Dow for re-distillation.

Cadillac Fairview eventually purchased the property on which the styrene plant had been located and later brought a CERCLA action against Dow and others to recover the cost of removing the styrene and other hazardous substances deposited on the land by Dow.  Dow sought contribution from the rubber companies and the district court granted summary judgment to those companies on Dow's claim for contribution.  On appeal, Dow contended the rubber companies "arranged for . . . treatment" of the contaminated styrene when they pumped it back to Dow for re-distillation.  The rubber companies, on the other hand, contended (and the district court held) they did not "arrange for treatment" of the contaminated styrene because they did not own the contaminated styrene during the re-distillation process after returning the contaminated styrene to Dow, and they did not control the re-distillation process that resulted in the release of the contaminants and associated styrene.

The Ninth Circuit sided with Dow:

> Liability is not limited to those who own the hazardous substances, who actually dispose of or treat such substances, or who control the disposal or treatment process.  The language explicitly extends liability to persons "otherwise arrang[ing]" for disposal or treatment of hazardous substances whether owned by the arranger or "by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity."  Accordingly, we have extended liability under section 107(a)(3) to persons who have sold and therefore no longer own the hazardous substances, [citations omitted], and to persons who have no control over the process leading to release of substances, [citations omitted].

**ORDER DENYING MOTION FOR SUMMARY ADJUDICATION-    14**

*Id*. at 565 (citing *Catellus*, *Jones-Hamilton Co.*, and *Aceto*).  The circuit held:

> The record before the district court was sufficient to support a finding that the rubber companies arranged to transfer contaminated styrene to Dow for completion of the re-distillation process that led to the release of hazardous substances.  Summary judgment for the rubber companies was therefore inappropriate. *See Catellus*, 34 F.3d at 752 ("It is sufficient that the substance had the characteristic of waste . . . at the point at which it was delivered to another party.").
>
> The flow of fresh styrene from Dow to the rubber companies for the manufacture of synthetic rubber, the shipment of contaminated styrene to Dow for removal of contaminants, and the return of fresh styrene to the rubber companies for further production of synthetic rubber, was a prearranged process essential to production of synthetic rubber at the complex.  The rubber companies returned the styrene to Dow only when the styrene became too contaminated for further use in producing rubber.  Dow removed the contaminants and returned the clean styrene to the rubber companies for continued use until it again became contaminated and was again sent to Dow for re-distillation.  Removal and release of the hazardous substances was not only the inevitable consequence, but the very purpose of the return of the contaminated styrene to Dow.

*Id*. at 565-66.

The contaminated styrene returned by the rubber companies to Dow in *Cadillac Fairview* had the "characteristic of waste" at the point of its delivery, just like the spent batteries in *Catellus*.  Again, naturally occurring ore deposits on State lands did not have the "characteristic of waste" when they were "delivered" to the mining companies.

Within the Ninth Circuit, there have been a number of "arranger" cases involving interaction between governmental entities and mining companies, including two from the District of Idaho.  A very recent case is *Nu-West Mining, Inc. v. United States*, 768 F.Supp.2d 1082, 1088 (D. Idaho 2011).  There, the plaintiff mining company sought to impose on the federal government the costs of cleaning up selenium contamination at four mine sites in a national forest.  In

**ORDER DENYING MOTION FOR SUMMARY ADJUDICATION-     15**

1949, after determining that lands in the national forest had phosphate deposits large enough to warrant mining, the government began awarding mining leases through a competitive bidding process.  Through these leases, the government authorized the lessees to mine phosphate ore at the mine sites.  Four mines arose from the leases.  The leases ran for twenty years and the government retained the authority to terminate the leases whenever a lessee failed to comply with any provisions of the chapter of the federal Mineral Leasing Act related to "Leases and Prospecting Permits" and regulations promulgated under that chapter. Furthermore, the federal government issued to the lessees a number of Special Use Permits so that waste rock dumps could be constructed on National Forest lands adjacent to the leased lands.  From 1965 to the present, the federal government had monitored environmental conditions at the mine sites, including water quality sampling and other hydrology studies.  The federal government required the lessees to allow mine inspections to ensure, among other things, that the lessees were properly disposing of mining waste and paying a full royalty to the government.  The government reserved for itself all of the property rights in the mine sites, except that it granted to the lessees the limited right to mine for phosphate, phosphate rock, and related minerals.  The government required the lessees to prospect diligently and to meet certain ore production requirements, and to also pay a royalty fee.  Before any mining could begin, the government required the lessees to obtain approval of plans for mining, waste disposal, and reclamation. The government conditioned its approval of mine plans on requiring the lessees to perform specific reclamation activities at the mine sites, including locating, designing, and shaping waste rock dumps, covering waste dumps with a layer of middle waste shale as a growth medium, and planting specific seed mixtures on the waste.  The four mines operated from roughly the 1960s to the 1990s.  Each of

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-    16**

the mine sites was contaminated with a hazardous substance known as selenium. Selenium is a naturally occurring chemical element found in a rock layer between phosphate ore zones.  The rock layer is known as "middle waste shale" and was hauled out of the mines in the process of digging through the first phosphate ore zone to get to the second.  The middle waste shale was placed on top of every waste rock dump constructed at all four of the mine sites.  It was intended to promote re-vegetation on the dumps, but the selenium leached into the environment.

The district court in *Nu-West* found the federal government was subject to arranger liability under CERCLA because all three elements of the *Shell* test[5] were present, along with the intent element required by *BNSF*:

> The Government owned the source of the hazardous selenium, the middle waste shale.  At all times, the Government had the authority to control the disposal of the mining waste on the land it owned in the Caribou-Targhee National Forest- no mining or waste disposal could occur without its approval. Finally, the Government exercised actual control over the disposal- and showed its intent that the disposal take place- by requiring its lessees to cover the outer surface of the waste dumps with a layer of middle waste shale. . . .  This was required at all four mine sites.  Thus, the Government fits all the criteria listed above for arranger liability.

768 F.Supp.2d at 1088.

Naturally occurring ore deposits, unlike "middle waste shale," are not

---

[5]  An entity is an arranger if it has "direct involvement in arrangements for the disposal [or treatment] of waste."  *U.S. v. Shell Oil Co.*, 294 F.3d 1045, 1055 (9th Cir. 2002).  Elements considered include whether the entity: (1) owns the hazardous substance; (2) had the authority to control the disposal or treatment of that substance; and (3) exercised some actual control over the disposal or treatment of that substance.  *Id*. at 1055-60.

**ORDER DENYING MOTION**
**FOR SUMMARY ADJUDICATION-    17**

"waste."  By definition, the "middle waste shale" in *Nu-West* was "waste."   Here, the State did not own the waste generated following extraction and treatment of the ore, notwithstanding that the mining contracts called for the State's royalty to be calculated based on "the sale of all minerals . . . after deducting therefrom the cost of transportation and treatment."  The contracts contain no provisions addressing ownership of severed ore once the mining companies took possession of the same.  The contracts logically contemplated there would be a process whereby minerals would be separated from the severed ore and logically calculated the value of that ore based on its mineral content which could not be known until treatment occurred.  Deduction of transportation and treatment costs in calculating the State's royalty reflected the realities of the mining industry at the time and was the fairest manner in which the State and the mining companies could be compensated and realize their respective interests from the contracts.[6]

Clearly, the instant case is not like *Nu-West* where the federal government was fully engaged in the waste disposal process and no disposal could occur without its approval.  In *Nu-West,* the federal government had authority to control the disposal process and actually controlled it.  Here, the State did not monitor environmental conditions at the mine sites[7]; it did not require lessees to obtain approval for mining, waste disposal, and reclamation before any mining could begin; and the State did not require its lessees to perform specific reclamation

---

[6] It is noted that in addition to a royalty, the State also continued to receive an annual rent for the lease of its land.

[7] The State did require lessees to allow mine inspections (Defendant's Fact No. 108 at ECF No. 1241), but there is no evidence the State ever conducted any inspections of the Josephine Mine and Mill.

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-    18**

activities, including locating, designing, shaping and covering waste rock dumps. Furthermore, it is undisputed that after the ore was extracted from State lands, all of the treatment and disposal occurred on private lands.[8]  In *Nu-West*, the federal government issued permits so that waste rock dumps could be constructed on National Forest lands adjacent to the leased lands.

In *Coeur d'Alene Tribe v. Asarco Incorporated*, 280 F.Supp.2d 1094 (D. Idaho 2003), the court found the United States could not be held liable as an "arranger" for its involvement in mining activities in the Coeur d'Alene Basin during World War II.  In doing so, it relied on the Ninth Circuit's decision in *United States v. Shell Oil Company*, 294 F.3d 1045 (9th Cir. 2002), in which the circuit concluded the United States could not be held liable as an "arranger" for the disposal of "non-benzol" waste associated with the production of aviation fuel during World War II at a site located in Fullerton, California.  In *Shell*, the Ninth Circuit deemed the facts in its case were similar to those in *United States v. Vertac*

---

[8]  Although the mining contracts gave the mining companies the right to construct concentrators and smelters on the leased State lands, there is no evidence they ever did so.  At oral argument, there was a suggestion by Defendant's counsel that waste rock was disposed of on State lands, but this court's review of the record fails to confirm and conclusively establish this was so.  (See Defendant's Fact No. 79 (ECF No. 923) and State's Fact Nos. 20-26, 21, 23, 24 (ECF No. 1142), all of which are not disputed).  Defendant notes that arranger liability is not dependent on the State's ownership of the property where disposal or treatment occurred, citing *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1080 (9th Cir. 2006), and *Cadillac Fairview/California, Inc. v. United States of America*, 41 F.3d 562 (9th Cir. 1994).  (ECF No. 1241 at pp. 61-62).

**ORDER DENYING MOTION FOR SUMMARY ADJUDICATION-    19**

1    *Chem. Corp.*, 46 F.3d 803 (8th Cir. 1995), where the United States was held not to

2    be an "arranger" liable for clean up costs at a plant that had manufactured Agent

3    Orange during the Viet Nam War. According to the Ninth Circuit in *Shell*:

> The facts in *Vertac* are similar to the facts in this case.
> In both cases, products were manufactured for purchase
> by the United States in wartime; in both cases, the
> manufacturing was carried out under government contracts
> and pursuant to government programs that gave it priority
> over other manufacturing; in both cases, the companies
> voluntarily entered into the contracts and profited from
> the sale; and in both cases, **the United States was aware
> that waste was being produced, but did not direct the
> manner in which the companies disposed of it.**

294 F.3d at 1059 (emphasis added).

In *Coeur d' Alene*, the district court quoted this very language in finding

"the United States did not own or possess waste or arrange for its disposal during

World War II and the United States did not exercise actual control over the

disposal of mining tailings." 280 F.Supp.2d at 1132. The facts with which the

court was confronted were as follows:

> During World War II, the United States government
> controlled: the price for the metals via the premium
> price plan and quota system; wages for mining and
> non-mining personnel; the length of the work week;
> and approval of capital improvements, equipment
> and necessary chemicals for processing via the
> priority system. The government provided military
> oversight of the security of the mills and required certain
> changes be made by the mills for their security. Laborers
> were restricted by the government from taking other
> employment and soldiers were offered deferments from
> military service to work in the mines and the mills.
> The mines and the mills were required to submit monthly
> operating reports to the government. The government
> provided financing for the exploration of new sources of
> metals via the exploration premium plan. **The government
> was aware of the tailings generated from the mining and
> milling and of the disposal method used for such tailings**.
> The government threatened seizure of the operations if
> certain conditions were not complied with by the mining
> companies.

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-    20**

1    *Id*. at 1108 (emphasis added).

2        Although the mining contracts at issue in *Coeur d'Alene* apparently did not

3    contain a royalty provision similar to the provision in the contracts involved here,

4    the court does not find that significant for the reasons already discussed.

5    Obviously, the State of Washington was not nearly as involved in the performance

6    of its mining contracts as the United States was involved in the contracts at issue

7    in *Coeur d'Alene*.  Notwithstanding the extent of the United States' involvement

8    in *Coeur d'Alene*, its awareness of the tailings generated from the mining and

9    milling, and the disposal method for the same, was insufficient to persuade the

10   court to find "arranger" liability.  The same is true here.  That the State was aware

11   waste would be generated from the extraction of ore and treatment of the same,

12   and to the extent, if any, it was aware of the particular method of disposal at

13   Josephine Mine and Mill, this is insufficient to deem the State liable under

14   CERCLA as an arranger.  It was not the State's waste and it did not direct the

15   manner in which it was disposed of.

16

17   **III. CONCLUSION**

18        Naturally occurring in-ground ore deposits did not have the "characteristic

19   of waste" at the time they were "delivered" by the State to the mining companies.

20   This is recognized by Defendant who says the "mining wastes [are the] CERCLA

21   hazardous substances."  (ECF No. 922 at p. 19).  It was the extraction of the ore

22   and the treatment of the ore which created the hazardous waste (waste rock and

23   tailings).  The State did not perform this extraction and treatment.  The mining

24   companies did.  Hence, the State was not the source of the pollution.  Ore deposits

25   are not the equivalent of the spent batteries in *Catellus* and the contaminated

26   styrene in *Cadillac Fairview* which were already hazardous wastes before being

27   **ORDER DENYING MOTION**

28   **FOR SUMMARY ADJUDICATION-      21**

sent off to the reclamation and distillation plants respectively.

The severed ore did not have the "characteristic of waste," but even if it did, the State did not own or possess it at that point. The State did not own or possess any waste rock or tailings generated by the mining companies' extraction and treatment of ore. With regard to "treatment" specifically, the severed ore did not have the "characteristic of waste" when it was treated. Therefore, the treatment of severed ore does not fall within CERCLA's definition of "treatment." The treatment of the severed ore generated "waste" in the form of tailings.

The State did not actually control disposal and treatment of mining wastes. Furthermore, the State did not have the authority to control, or duty to dispose of or treat, those wastes. This conclusion is warranted based on the mining cases discussed above. The State did not control, or have near the authority to control, mining operations as the governmental entities did in *Nu-West* (arranger liability found) and *Coeur d' Alene* (no arranger liability).

The fact the ore deposits were not hazardous waste when the State entered into the contracts with the mining companies indicates the purpose of those contracts- and the intent of the State- was not to dispose of or treat hazardous waste. It was simply to generate revenue for the State. The State's motive for its "sale" of ore deposits was not "less than clear." *BNSF*, 129 S.Ct. at 1879. The State was not trying to avoid incurring liability for disposal and treatment of hazardous waste. The disposal of hazardous mining wastes which occurred after the ore deposits were extracted and treated by the mining companies was the "peripheral result of the legitimate sale of an unused, useful product." *Id*. at 1880. Accordingly, the State's mere knowledge that waste would be generated from the extraction and treatment of the ore deposits which would require disposal in some

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-    22**

1  fashion, does not prove the State "planned for" disposal. *Id*.[9]  This court

2  concludes  the arrangement between the State and mining companies with regard

3  to the Josephine Mine and Mill was not one which Congress intended to fall

4  within the scope of CERCLA's strict liability provisions.

5      Defendant's Motion For Summary Adjudication Of The State Of

6  Washington's CERCLA Liability (ECF No. 919) is **DENIED.**  It is not apparent

7  there are any disputed issues of material fact with regard to the mining contracts

8  and how they were performed, and hence no factual issues left to be adjudicated at

9  trial regarding the State's alleged CERCLA liability as an arranger for any releases

10 at the Josephine Mine and Mill.  The State did not file a cross-motion for summary

11 judgment, but such a motion is unnecessary if there are no factual issues, the

12

13      [9] Consistent therewith is authority that mere statutory or regulatory authority

14 to control activities involving production, treatment or disposal of hazardous

15 substance is insufficient, *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 810

16 (8th Cir. 1995), and the holding in the *Coeur d'Alene* case that the government's

17 awareness of tailings being generated from mining and milling, and the disposal

18 method used, was insufficient to impose arranger liability.  It does not matter that

19 the mining contracts at issue here contained no provisions requiring impoundment

20 of tailings.  Assuming it is true, it also does not matter that the State made no

21 effort to prevent direct disposal of tailings to the Pend Oreille River until after

22 federal legislation was passed in 1966, at which time it issued temporary permits

23 allowing the practice until the practice was prohibited altogether.  Defendant

24 acknowledges the tailings from the Josephine at issue date from the period 1942-

25 49.

26

27 **ORDER DENYING MOTION**

28 **FOR SUMMARY ADJUDICATION-     23**

opposing non-moving party is entitled to judgment as a matter of law, and the moving party had notice and an adequate opportunity to address the issues. In such a case, it is appropriate to enter summary judgment for the non-moving party. *Cool Fuel, Inc v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982). Defendant had an opportunity in both its reply brief and in its presentation at oral argument to explain if there are any disputed issues of material fact regarding the State's alleged liability as an arranger. Defendant did not do so. Instead, it argued that based on the undisputed facts relating to the Josephine mining contracts and execution of the same, the State should be found liable as an arranger as a matter of law. Accordingly, the State is **AWARDED** judgment on Defendant's CERCLA counterclaim against the State with regard to the Josephine Mine and Mill.

Defendant seeks to impose arranger liability on the State with regard to at least two other mines (Eagle/Reis and Admiral Consolidated). There is no indication the mining contracts with regard to these mines, and execution of the same, are any different from the contracts relating to the Josephine Mine and Mill. Indeed, Defendant acknowledges that all of the mining contracts contain the same standard language. (ECF No. 922 at p. 28). Defendant asserts "there are remaining, unaddressed issues of fact as to other properties which form the basis of Teck's claims against the State, but which are not addressed in Teck's motion," but does not explain what those unaddressed issues of fact are. The court will give Defendant the benefit of the doubt and not award the State summary judgment with regard to these mines, although it should be apparent the court does not intend to try claims regarding these mines if there are no material facts which distinguish those mines from the Josephine Mine and Mill.

//

//

**ORDER DENYING MOTION
FOR SUMMARY ADJUDICATION-      24**

1      **IT IS SO ORDERED.**  The District Court Executive shall forward copies

2  of this order to counsel of record.

3      **DATED** this __29th__ day of November, 2011.

4

5                                   *s/Lonny R. Suko*
                          _____
6                                   LONNY R. SUKO
                                 United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  **ORDER DENYING MOTION
    FOR SUMMARY ADJUDICATION-      25**