UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

JOSEPH A. PAKOOTAS, an
individual and enrolled
member of the Confederated
Tribes of the Colville
Reservation; and DONALD
R. MICHEL, an individual
and enrolled member of the
Confederated Tribes of the
Colville Reservation, and THE
CONFEDERATED TRIBES OF
THE COLVILLE RESERVATION,

      Plaintiffs,

and

THE STATE OF WASHINGTON,

      Plaintiff-Intervenor,

      vs.

TECK COMINCO METALS, LTD.,
a Canadian corporation,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. CV-04-256-LRS

**ORDER GRANTING MOTIONS
TO DISMISS SIXTEENTH
AFFIRMATIVE DEFENSE
(LIABILITY PROPORTIONATE
TO APPORTIONMENT) AND
MOTION FOR PARTIAL
SUMMARY JUDGMENT ON
DEFENDANT'S DIVISIBILITY
DEFENSE, *INTER ALIA***

**BEFORE THE COURT** are the Motion To Dismiss Sixteenth Affirmative

Defense (Liability Proportionate To Apportionment) (ECF No. 957) filed by The

**ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 1**

Confederated Tribes Of The Colville Reservation (Tribes), and the Motion For

Partial Summary Judgment On Defendant's Divisibility Defense (ECF No. 960)

filed by the State Of Washington (State).

These motions were heard with oral argument on January 23, 2012. Paul J.

Dayton, Esq., argued for the Tribes. Kelly T. Wood, Esq., argued for the State.,

Christopher J. McNevin, Esq., argued for the Defendant, Teck Cominco Metals,

Ltd. (Teck).

## I. BACKGROUND

A bench trial is scheduled in September 2012 to determine if Defendant is

responsible for a "release" or "threatened release" of any "hazardous substance"

from the Upper Columbia River (UCR) Site which caused the Tribes and the State

to incur response costs that were "necessary" and "consistent with the national

contingency plan."[1]  Per the Ninth Circuit's 2006 decision, *Pakootas v. Teck*

---

[1] In order to establish liability for response costs under 42 U.S.C. Section

9607(a), Plaintiffs must establish: 1) the site on which the hazardous substances

are contained is a "facility" under CERCLA's definition of that term, 42 U.S.C.

Section 9601(9); 2) a "release" or "threatened release" of any "hazardous

substance" from the facility has occurred, 42 U.S.C. Section 9607(a)(4); 3) such

"release" or "threatened release" has caused the plaintiff to incur response costs

that were "necessary" and "consistent with the national contingency plan," 42

U.S.C. Section 9607(a)(4) and (a)(4)(B); and 4) the defendant is within one of four

classes of persons subject to the liability provisions of Section 9607(a). *Carson

Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 870-71 (9th Cir. 2001)(en

banc).

**ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 2**

*Cominco Metals, Ltd.*, (*Pakootas I*), 452 F.3d 1066 (9th Cir. 2006), it is already established that the UCR is a "facility" under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), and that Defendant can potentially be held liable as an "arranger" for its disposal of slag and liquid effluent into the Columbia River from its smelter in Trail, B.C., Canada, provided there were releases or threatened releases of hazardous substances from that slag and/or effluent after it was deposited in the UCR Site located wholly within the United States.  In sum, it will be determined if Defendant is liable for response costs incurred by the Tribes and the State.

Defendant contests its liability and contends it cannot be held responsible for any release or threatened release of hazardous substances from the UCR Site. Consistent therewith, its expert, Mark W. Johns, Ph.D., opines there is no detectable release of hazardous substances from Teck's barren slag and there is no evidence that dissolved metals from historical liquid effluent releases are located in the UCR.  (ECF No. 966-1 at p. 23).  Moreover, even assuming it is liable, Defendant asserts its liability should be several, not joint and several, because the harm at issue is divisible.[2]

CERCLA was designed to promote the "timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those

---

[2] Divisibility/apportionment is not a defense to liability itself.  It is a judicially created defense to joint and several liability.  While it appears "divisibility"and "apportionment" are terms used interchangeably, what is potentially divisible is the harm, and if the harm is divisible, what is potentially apportioned is liability, assuming there is a reasonable factual basis for apportionment.  *U.S. v. Monsanto Co.*, 858 F.2d 160, 172 (4th Cir. 1988).

**ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 3**

responsible for the contamination." *Burlington Northern and Santa Fe Railway Company v. United States* (*BNSF*), 556 U.S. 599, 129 S.Ct. 1870, 1874 (2009). Imposition of joint and several liability, when appropriate, serves that purpose by making solvent liable parties, rather than the responding government, bear the risk that other liable parties are insolvent and therefore, places the financial burden of CERCLA cleanup on those responsible for the contamination. *United States v. Chem-Dyne Corp.*, 572 F.Supp. 802, 808 (S.D. Ohio 1983). In order to ameliorate the harshness of joint and several liability, those who are found jointly and severally liable may bring a contribution action against other liable parties. 42 U.S.C. §9613. "Equitable considerations play no role in the apportionment analysis; rather, apportionment is proper only when the evidence supports the divisibility of damages jointly caused by the PRPs [Potentially Responsible Parties]." *BNSF*, 129 S.Ct. At 1182 n. 9 (emphasis added). Contribution actions allow jointly and severally liable PRPs to recover from each other on the basis of equitable considerations. *Id.*

Liability under CERCLA is generally joint and several unless the defendant meets it burden to prove the harm is divisible and capable of apportionment. *BNSF*, 129 S.Ct. at 1881. "'The universal starting point for divisibility of harm analyses in CERCLA cases is §433A of the Restatement (Second) of Torts." *Id.*, quoting *United States v. Hercules*, 247 F.3d 706, 717 (8th Cir. 2001). Under that section of the Restatement, "when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused." *Id.* (quoting Restatement (Second) of Torts, § 433A (1976)). "Evidence supporting divisibility must be concrete and specific." *Hercules*, 247 F.3d at 718.

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 4**

1    In a cost recovery action under 42 U.S.C. § 9607, CERCLA's strict liability

2    scheme precludes the need to prove causation in the traditional sense.  The phrase

3    "causes the incurrence of response costs" does not require proof of causation as in

4    a traditional common law tort action, but requires only a nexus.  *Carson Harbor*

5    *Village, Ltd. v. Unocal Corp.*, 287 F.Supp.2d 1118, 1186 (C.D. Cal. 2003).  The

6    nexus that must be shown is, however, "a loose one."  *Id*.  "In the case of an actual

7    release, the plaintiff need only prove that the defendant's hazardous materials were

8    deposited at the site[3], that there was a release at the site, and that the release

9    caused it to incur response costs."  *Id*.  The plaintiff "need not show that

10   defendant's waste was the source of the release or that defendant's waste caused it

11   to incur response costs."  *Id*., citing numerous cases, including *United States v.*

12   *Alcan Aluminum Corp.*, 990 F.2d 711, 721 (2nd Cir. 1993).  Although causation is

13   not required to show liability under CERCLA, the burden the defendant must meet

14   in order to reduce its liability under the doctrine of divisibility (apportionment) is

15   essentially a burden to prove that it caused only some part of the contamination

16   and how much.  *Alcan*, 990 F.2d at 722 ("[C]ausation is brought back into the

17   case-  through the backdoor, after being denied entry at the front door - at the

18   apportionment stage").

19       *BNSF* represents the Supreme Court's most recent foray into the availability

20

21

22

23       [3] It is undisputed that Teck's slag has been deposited- is located- in the

24   UCR Site.  This solid slag material is distinguished from the liquid effluent

25   discharged from Teck's Trail, B.C. Smelter into the Columbia River.  The parties

26   dispute whether any of that effluent remains in the UCR Site.

27   **ORDER GRANTING MOTIONS RE**

28   **DIVISIBILITY AND APPORTIONMENT- 5**

of apportionment under CERCLA.[4]  The apportionment inquiry is a two-step

process.  The first question is whether the harm is "theoretically capable of

apportionment."  *BNSF*, 129 S.Ct. at 1881.  This is a question of law.  Before

evidence can support a reasonable basis for apportioning the harm (which is the

second, factual question), the harm must be "theoretically capable of

apportionment."[5]  In *BNSF*, the Supreme Court spent little time on this first step,

merely observing that "both the District Court and Court of Appeals agreed that

the harm created by the contamination of the Arvin site, although singular, was

theoretically capable of apportionment."  *BNSF*, 129 S.Ct. at 1881.  The Supreme

Court acknowledged, however, that "[n]ot all harms are capable of

apportionment."  *Id*.  There is such a thing as a "single, indivisible harm."  *Id*. and

see Restatement (Second) of Torts, §433A(2) (1966).  "When two or more causes

---

[4]  In *United States v. Iron Mountain Mines, Inc.*, 2010 WL 1854118 at *3

(E.D. Cal. 2010), the district court denied a motion for reconsideration on the

alleged basis that *BNSF* represented an intervening change in law:

> Plaintiffs are correct that *Burlington Northern* does not
> constitute a change in law as required for reconsideration.
> *Burlington Northern* simply reiterated the law as established
> in 1983 in *Chem-Dyne*, and then examined the record to resolve
> a factual question of whether the record supported apportionment.
> *Burlington Northern* did not add a new mandate that District
> Courts must apportion harm.

[5]  "The preliminary issue of whether the harm to the environment is capable

of apportionment among two or more causes is a question of law."  *Hercules*, 247

F.3d at 718, citing *In re Bell Petroleum Services, Inc.*, 3 F.3d 889, 902 (5th Cir.

1993).  "Then, '[o]nce it has been determined that the harm is capable of being

apportioned among the various causes of it, the actual apportionment of damages

is a question of fact.'"  *Id*., quoting *Bell*, 3 F.3d at 896.

**ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 6**

produce a single, indivisible harm, 'courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm." *Id*., quoting Restatement (Second) of Torts §433A, Comment *i*, p. 440 (1963-64).

Teck's expert, Dr. Johns, uses three different methods to apportion Teck's liability for the harm to the UCR Site. At the outset, he apportions by "type" such that he considers only seven metals that could be attributed to Teck's slag, those being the six specifically listed in Plaintiffs' Second Amended Complaints ("SACs")- arsenic, cadmium, copper, mercury, lead, and zinc- and antimony as opined by Plaintiffs' expert, Dimitrios Vlassopoulos. After apportioning by "type," Dr. Johns proceeds to apportion by volume.

Dr. Johns' first method, a "metals loading approach," considers the amount of metals released from Teck's slag in the UCR Site. Dr. Johns assumes, per the analysis of Teck's expert, Jeffrey Bradley, that none of Teck's liquid effluent remains in the UCR Site. He also assumes, per the analysis of Teck's expert, Dr. Arthur C. Riese, that Teck's slag in the UCR Site did not leach any of the SAC metals or antimony. Dr. Johns' conclusion based on this method is that Teck should be apportioned 0% liability. In other words, the conclusion is that Teck is not liable for any releases or threatened releases of hazardous substances from the UCR Site. Apportionment is not an issue because there is no liability in the first instance. Unless liability exists, there is nothing to apportion.

Dr. Johns' second or alternative apportionment method is based on a calculated flux of zinc from slag and sediment in the UCR Site. Dr. Johns opines that Teck should be apportioned, at the most, a .05 percent share of liability for releases or threatened releases of zinc because, according to Teck's experts, zinc is the only "SAC" (Second Amended Complaint) metal to even theoretically release

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 7**

from slag.  This percentage is derived by a volumetric analysis which includes: (1) estimating the volume of Teck slag that might be present in the top five centimeters of UCR Site sediments; (2) estimating the net rate of release of zinc from this volume of Teck slag to surface water at the Site (using Dr. Riese's .03 percent calculated loss); and (3) comparing that estimate with an estimate for the total rate of release of zinc allegedly from all sources to surface water at similarly located areas of the Site.

Although not explicitly set forth as an "opinion" in his expert report, Dr. Johns testified at his deposition to yet another apportionment method, that being a "mass-based approach"  in which he takes into account the six metals specifically pled in Plaintiffs' Second Amended Complaints, plus antimony.  Without regard to whether there has been a release of those metals, he calculates the total amount of those metals contained in Teck's slag which has been deposited in the UCR Site. (See Dr. Johns' Expert Report, ECF No. 1137-1 at p. 85, and Table 11 at ECF No. 1138-1 at p. 113).  This can then be compared to the total amount of those same metals contained in waste originating from sources other than Teck which has been deposited in the UCR Site.  This  too is a volumetric approach to apportionment.

## II. DISCUSSION

### A. What Is The Harm?

Teck contends that "[t]aking together the definition of harm from *BNSF*, Plaintiffs' expert evidence, and the *Pakootas* [*I*] holding, the type of harm which is subject to apportionment in this case is the alleged contamination from the leaching of SAC [Second Amended Complaint] metals allegedly traceable to leaching from Teck slag and effluent."

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 8**

The definition of harm from *BNSF*, to which Teck refers, is contained in the Ninth Circuit's decision, 520 F.3d 918, 939 (9th Cir. 2008)[6], which concluded "that it is most useful for purposes of determining divisibility to view the 'harm' under CERCLA as the contamination traceable to each defendant." Teck asserts that "[t]he harm of the type traceable to a defendant is subject to two limitations: (1) it is limited by the plaintiff's claim, and (2) in this case, it is further limited by the type of release which is legally cognizable to trigger CERCLA liability against Teck." According to Teck, "[b]y limiting the relevant contamination to that which is of a type 'traceable to the defendant(s),' the Ninth Circuit implicitly recognized that the harm to be apportioned is necessarily limited to that pleaded and proved by a plaintiff."

The Ninth Circuit's definition of harm was "**for the purposes of determining divisibility**," not liability in the first instance. (Emphasis added). Divisibility/apportionment becomes an issue only after liability has been determined. As noted, in a cost recovery action under Section 9607, CERCLA's strict liability scheme precludes the need for a plaintiff to prove causation in the traditional sense. "In the case of an actual release, the plaintiff need only prove that the defendant's hazardous materials were deposited at the site, that there was a release at the site, and that the release caused it to incur response costs." *Carson Harbor Village, Ltd.*, 287 F.Supp.2d at 1186. The plaintiff "need not show that defendant's waste was the source of the release or that defendant's waste caused it to incur response costs." *Id*.

CERCLA imposes liability for the cleanup of sites where there is a release or threatened release of hazardous substances into the environment. CERCLA

---

[6] This was the decision subsequently reversed by the Supreme Court.

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 9**

liability attaches when three conditions are satisfied: (1) the site at which there is an actual or threatened release of hazardous substances is a "facility" under 42 U.S.C. Section 9601(9); (2) a "release" or "threatened release" of a hazardous substance from the facility has occurred, 42 U.S.C. Section 9607(a)(4); and (3) the party is within one of the four classes of persons subject to liability under §9607(a). *Pakootas I*, 452 F.3d at 1073-74.

Under 42 U.S.C. Section 9601(9), "facility" is defined as:

> (A) any building, structure, installation, equipment, pipe or pipeline . . ., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . .

At the time the Ninth Circuit decided *Pakootas I*, the only claims before the court where those of individual Plaintiffs Joseph A. Pakootas and Donald R. Michel, and intervenor State of Washington, to enforce the Environmental Protection Agency's (EPA's) Unilateral Administrative Order (UAO). The UAO defined "facility" as the UCR Site, which was described as the "extent of contamination in the United States associated with the Upper Columbia River." Because Teck's slag had "come to be located" at the UCR Site, the UCR Site was a "facility" as defined in Section 9601(9). 452 F.3d at 1074. According to the Ninth Circuit:

> The [UAO] defines the facility as being entirely within the United States , and Teck does not argue that the Site is not a CERCLA facility. Because the CERCLA facility is within the United States, this case does not involve an extraterritorial application of CERCLA to a facility abroad. The theory of Pakootas's complaint seeking to enforce the terms of the Order to a "facility" within the United States, does not invoke extraterritorial application of United States law precisely because this case involves a domestic facility.

*Id*. In a footnote, the circuit pointed out that:

> Because the EPA and Pakootas in seeking enforcement of the EPA's [UAO] do not characterize either the Trail

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 10**

Smelter or the Columbia River in Canada as a facility, we need not and do not reach whether these sites are facilities for purposes of CERCLA.

*Id*. at n. 4.

The circuit then went on to address the second element of liability which is that there must be a "release" or "threatened release" of a hazardous substance into the environment.  42 U.S.C. Section 9601(22), defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."  *Id*. at 1074-75.

According to the circuit:

Here, several events could potentially be characterized as releases.  First, there is the discharge of the waste from the Trail Smelter into the Columbia River in Canada.  Second, there is the discharge or escape of the slag from Canada when the Columbia River enters the United States.  And third, there is the leaching of heavy metals and other hazardous substances from the slag into the environment at the [UCR] Site. Although each of these events can be characterized as a release, CERCLA liability does not attach unless the "release" is from a CERCLA facility.

Here, as noted, the [UAO] describes the facility as the [UCR] Site; not the Trail Smelter in Canada or the Columbia River in Canada.  Pakootas has alleged that the leaching of hazardous substances from the slag that is in the Site is a CERCLA release, and Teck has not argued that the slag's interaction with the water and sediment of the Upper Columbia River is not a release within the intendment of CERCLA.  Our precedents establish that the passive migration of hazardous substances into the environment from where hazardous substances have come to be located is a release under CERCLA. [Citations omitted].  We hold that the leaching of hazardous substances from the slag at the Site is a CERCLA release. That release- a release into the United States from a facility in the United States- is entirely domestic.

*Id.* at 1075.

Pursuant to a settlement between Teck and EPA, EPA withdrew the UAO and Pakootas and Michel no longer have any pending claims in this matter. Enforcement of the UAO is no longer an issue.  What is at issue now are the

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 11**

1    claims of the Tribes and the State for recovery of response costs and natural

2    resource damages.  The Ninth Circuit did not decide the extraterritorial application

3    issue because it was not necessary for it do so.  That continues to be the case

4    because in their currently operative Second Amended Complaints, the Tribes and

5    the State allege the relevant "facility" is the UCR Site- not the Trail Smelter or the

6    Columbia River in Canada- and that a "release" or "threatened release" has

7    occurred at the UCR Site.  The Tribes and the State have not alleged that a

8    "release" or "threatened release" occurred when waste was discharged from the

9    Trail Smelter into the Columbia River in Canada or when there was a discharge or

10   escape of the slag from Canada when the Columbia River enters the United States.

11   The Tribes and the State intend to prove there has been an actual release or a

12   threatened release of hazardous substances from Teck's slag and/or liquid effluent

13   at the UCR Site.[7]  That release or threatened release into the United States from a

14   facility in the United States is entirely domestic.  Plaintiffs have to prove this in

15   order to establish the necessary nexus between Teck and the contamination in the

16   UCR Site.  The slag and the effluent are not hazardous unless they have released

17   hazardous substances or threaten to do so.  The nature of the slag and the liquid

18   effluent, and the fact the disposal occurred in Canada, make this case somewhat

19   unique.  Although, as acknowledged by the Ninth Circuit, the discharge of the slag

20

21          [7]Teck argues under the amici's interpretation of *Pakootas I*, "every

22   discharge of a liquid, solid, or gas in Canada or Mexico that migrates to the United

23   States and does not instantly stop at the border would be deemed an actionable

24   release the moment it crossed the border."  At issue here are releases or threatened

25   releases from slag and/or liquid effluent that has already come to rest in the UCR

26   Site.  It is actionable at that point and not "at the moment it crossed the border."

27   **ORDER GRANTING MOTIONS RE**

28   **DIVISIBILITY AND APPORTIONMENT- 12**

and the effluent from the Trail Smelter could potentially be characterized as a "release" under CERCLA, in order for that "release" to create CERCLA liability, it would be necessary to characterize the Trail Smelter as a "facility" and that would clearly involve an extraterritorial application of CERCLA.  Likewise, although the discharge or escape of the slag from Canada when the Columbia River enters the United States could potentially be characterized as a "release"under CERCLA, that would require characterizing the Columbia River in Canada as a "facility," and that too would involve an extraterritorial application of CERCLA.

The fact for liability purposes the Tribes and Plaintiffs need to, and intend to, establish that Teck's slag and/or liquid effluent released or threatens to release hazardous substances (certain metals)  from the UCR Site does not, however, limit the scope of the releases or threatened releases from the Site for which Teck can be held liable and, in turn, does not limit the scope of the relevant harm for divisibility/apportionment purposes.[8]  The Ninth Circuit's reference in *BNSF* to

---

[8]  Plaintiffs have retained certain experts, Dimitrios Vlassopoulos and Victor Bierman, to establish that Teck's slag and/or liquid effluent released or threatens to release hazardous substances (certain metals) from the UCR Site.  Vlassopoulos and Bierman have been retained specifically for the purpose of proving there has been a "release" or "threatened release" of any "hazardous substance" from the UCR Site (the "facility").  They have been retained to prove Teck's slag and liquid effluent- which undisputedly was carried across the International Border into the UCR Site- was "hazardous" in that it was not benign or inert, but released hazardous substances (certain metals), or threatens to release those hazardous substances, after being deposited at the UCR Site.  It appears that without this

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 13**

"contamination traceable to the each defendant" as being the applicable harm in the divisibility/apportionment inquiry (which is the secondary inquiry after the initial liability inquiry), simply recognizes it is the defendant's burden to prove it "caused only some part of the contamination and how much." It is not, as Teck asserts, an implicit recognition by the Ninth Circuit "that the harm to be apportioned is necessarily limited to that pleaded and proved by a plaintiff." Teck's reading of the Ninth Circuit's *BNSF* decision would effectively foist the causation burden back onto the Plaintiffs in attempting to establish liability, thereby eliminating the strict liability Congress intended.[9]

According to Teck, pursuant to "apportionment jurisprudence, . . . courts implicitly have considered the harm subject to apportionment to be the contamination of the type pleaded or proven to be traceable to defendant . . . **by plaintiff**." (Emphasis added). The Plaintiffs, however, have no burden with regard to divisibility/apportionment. The burden belongs solely to Teck. Plaintiffs' experts did not evaluate divisibility/apportionment because that is not Plaintiffs' burden. Plaintiffs' experts addressed Teck's liability because that is the threshold inquiry. As such, Plaintiffs' experts concerned themselves only with

_____

proof, slag and liquid effluent are not "hazardous substances" as defined in 42 U.S.C. § 9601(14).

[9] Plaintiffs' liability burden in Phase I does not require them to fingerprint Teck's slag and/or liquid effluent as the source of the contamination in the UCR Site. It does not require them to prove that Teck's slag and/or effluent was the source of a particular release of hazardous substances (certain metals). Plaintiffs' burden is to prove there was **a** release or threatened release of **any** hazardous substance from the UCR Site which caused it to incur response costs.

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 14**

1  actual and/or threatened releases of metals from Teck's slag and/or liquid effluent,

2  rather than all of the contamination in the UCR Site from whatever source.

3  Plaintiff's experts may have addressed only sediment contamination in the UCR

4  Site, but they need address no more than that to potentially establish liability for

5  response costs ("a release or threatened release of any hazardous substance").

6  They did not need to address contamination of surface water, groundwater, etc.,

7  although Plaintiffs certainly have alleged these other types of contamination in

8  their Second Amended Complaints.  On the other hand, it is the Defendant's

9  burden  to rule out other types of contamination so that the totality of the harm can

10  be considered in a divisibility/apportionment analysis.

11      Teck contends that in their Second Amended Complaints, the Plaintiffs have

12  alleged a single harm limited to six metals and, as a matter of law, this harm is

13  capable of being apportioned (it is divisible).  What the Tribes and the State plead

14  in their Second Amended Complaints is as follows:

15  From approximately 1906 to mid-1995, Teck Cominco
16  generated and discharged into the Columbia River certain
    hazardous substances in slag, as a solid form, and in liquid
17  waste, **including, but not limited to**, arsenic, cadmium,
    copper, mercury, lead, and zinc.

18  . . . .

19  The Tribes have incurred costs in response to releases of
20  hazardous substances into the environment at the Upper
    Columbia River [UCR] Site.  These costs **include** costs of
21  investigating the nature and extent of contamination
    from the hazardous substances from the Cominco smelter,
    **including** arsenic, cadmium, copper, mercury, lead, and
22  zinc), and costs of overseeing investigative activities performed
    by others.

23  . . . .

24
25  The State has incurred costs in response to releases of
    hazardous substances into the environment at the Upper
    Columbia River [UCR] Site.  These costs **include** costs of
26  investigating the nature and extent of contamination

27  **ORDER GRANTING MOTIONS RE**
28  **DIVISIBILITY AND APPORTIONMENT- 15**

from the hazardous substances from the Cominco smelter, (**which include** arsenic, cadmium, copper, mercury, lead, and zinc), and costs of overseeing investigative activities performed by others.

(ECF No. 147 at Paragraphs 4.1 and 4.14; ECF No. 148 at Paragraphs 4.1 and 4.9).

It is apparent the Tribes and the State are seeking to recover response costs from Teck for investigating and cleaning up the entire UCR Site which includes all of the hazardous substances released or threatened to be released from the Site, from whatever source.[10]  A component of this are the costs of investigating the nature and extent of contamination "from the hazardous substances from the Cominco smelter."  It is also apparent the Tribes and State are not limiting themselves to alleging only six metals have leached or could leach from Teck's slag and/or liquid effluent deposited in the UCR Site.  The Tribes and the State have not pled a single divisible harm consisting of only six metals.

Furthermore, the environmental harm pled by the Tribes and the State is not limited to the first five centimeters of the sediment located at the bottom of the

---

[10]  See also Paragraph 1.3 of the State's Second Amended Complaint which indicates it seeks "to recover from Defendant Teck Cominco the costs of remedial or removal actions . . . resulting from the release of hazardous substances into the environment of the Upper Columbia River and Lake Roosevelt . . . ."  This paragraph contains no limitation that the State is seeking to recover only the costs resulting from the release of hazardous substances attributable to Teck.

Paragraph 1.2 of the Tribes' Second Amended Complaint is also not limited. The Tribes seek to "recover from Teck Cominco the costs of remedial or removal actions . . .that the Tribes have incurred and will continue to incur at the Upper Columbia River and Lake Roosevelt where hazardous substances have come to be located . . . ."

**ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 16**

river in the UCR Site.[11]    Paragraph 4.2 of the Tribes' and the State's Second Amended Complaints allege "Teck Cominco's slag, liquid waste, and the hazardous substances contained therein have come to be located in, and cause continuing impacts to, **the surface water and ground water**, sediments, and **biological resources** which comprise the Upper Columbia River and Lake Roosevelt." (Emphasis added).

In this case, the harm is the entirety of the contamination in the UCR Site and what the Plaintiffs seek are recovery of costs to investigate and clean up the entirety of that contamination.  The RI/FS (Remedial Investigation/Feasibility Study), which is currently being conducted, is in response to the contamination of the UCR Site as a whole.   This contamination is not limited to metals which have been released or which threaten to be released from Teck's slag and/or liquid effluent deposited in the UCR Site.[12]   None of Teck's apportionment theories

---

[11]  As noted, Dr. Johns so limits his flux apportionment analysis.

[12]  See Declaration of John Roland (ECF No. 965), State Department of Ecology Project Coordinator for the UCR Site, who says there are approximately 199 contaminants of concern currently being evaluated by the EPA for the ongoing RI/FS sediment sampling and risk evaluation regarding the Site.  The contaminants of concern include non-metal organics such as PAHs (polycyclic aromatic hyrdocarbons) and PCBs (polychlorinated biphenyls).  Roland indicates that "zinc is found consistently commingled with other hazardous substance metals in Site sediments, and also can be found commingled with other types of hazardous substances."  He adds that sampling to date shows the presence of hazardous substances in surface water, sediment and porewater (interstitial water within sediment).

**ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 17**

address the entirety of the contamination.  Instead, they begin with the assumption that the only harm at issue is whatever metals were released from Teck's slag and/or liquid effluent and the same metals which were released from non-Teck sources.[13]  This is a fatal flaw.  Because Teck has not addressed the relevant harm in the first instance, it has failed to establish as a matter of law that the relevant

---

[13] In Phase I, Plaintiffs are not pursuing emissions of airborne particles from Teck's Trail, B.C. Smelter as a basis for **liability** for response costs.  Whether they will be allowed in Phase II to pursue liability for natural resource damages based on such emissions remains to be determined.  (See ECF No. 716).  The fact, however, these emissions are irrelevant to the liability determination, does not render them irrelevant to the divisibility/apportionment inquiry.  With regard to divisibility/apportionment, the question is the nature of liability already established or assumed to exist (joint and several, or merely several).  Answering that question depends on the nature of the harm and whether it is single and divisible or single and indivisible.  Teck bears the burden on divisibility/apportionment and it is obligated to account for the full extent of the harm in the UCR Site, including whatever harm was contributed by its own airborne emissions which may contain some or all of the same metals released or threatened to be release from Teck's slag and/or liquid effluent in the river.  Teck's volumetric analyses have not taken such a contribution into account and, more importantly, have not ruled out the possibility there was such a contribution.  Even if only the river component of the UCR Site is considered, Teck's experts did not take into account atmospheric deposition of hazardous substance particles into the river. (See Paragraph 39 of Johns Declaration at ECF No. 1140-1).

**ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 18**

harm is a single harm divisible in terms of degree. Simply put, because it has failed to account for all of the harm at the UCR Site, it cannot prove that harm is divisible ("theoretically capable of apportionment").

This is evidenced by a comparison of this case with other CERCLA cases, including *BNSF*, in which all of the harm at the particular facilities was accounted for in determining divisibility was possible. In *In re Bell Petroleum Services, Inc.*, 3 F.3d 889, 901-902 (5th Cir. 1993), the contamination to which the government responded involved a single hazardous substance (chromium) that originated from industrial operations at a single plant, although it had spread from that plant in groundwater. The plant had been operated, in succession, by three manufacturers. All of them conducted essentially the same operations that resulted in chromium reaching the aquifer. The Fifth Circuit held as a matter of law that the harm was at least theoretically capable of apportionment and that as a factual matter, the defendants had presented sufficient evidence from which the trier of fact could have determined the relative contribution of each defendant to the harm. *Id*. at 902-04. The Fifth Circuit distinguished cases involving chemical soups presenting possible synergistic effects. *Id*. at 903.

In *Coeur d'Alene Tribe v. Asarco Incorporated*, 280 F.Supp. 1094 (D. Idaho 2003), at issue was the harm to the environment from tailings released as a result of mining activity in the Coeur d'Alene Basin. The court found this single harm to be divisible. It reasoned as follows:

> The Court finds the present case distinguishable from
> *United States v. Monsanto Company*, 858 F.2d 160
> (4th Cir. 1988). In *Monsanto*, there was no evidence
> that each generator was contributing the same type and
> quantity of hazardous substance. *Id*. at 172. In the case
> at bar, sufficient evidence was presented by the Plaintiffs
> that establishes each generator was contributing tailings and
> all of the tailings released contained lead, cadmium and zinc.
> Even though the exact percentages of lead, cadmium and zinc

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 19**

in the tailings from each mill is unknown and differed slightly based on the type of metal being extracted in the milling process, the Court finds the milling methodologies used in the Basin did not differ significantly from mill to mill to preclude divisibility based on the volume of tailings generated.

Clearly, there is a reasonable relationship between the waste volume, the release of hazardous substances and the harm at the site.  The Court makes this statement after acknowledging that estimating releases is not an exact science. . . .  Divisibility of the common harm to the Basin based on causation using volumetric calculations may not be the "perfect" method of divisibility, but it certainly is reasonable based on the historical facts available in this particular case.

. . . .

The Court finds Defendants have presented concrete evidence to support divisibility in this case.  The cause or source of the hazardous substances in the Basin was the dumping of tailings into the waterways.[14]  The experts on both sides of this case agree that a "reasonable basis" for apportioning is to consider the amount of mining waste discharged into the waterways. All of the tailings contained lead, cadmium and/or zinc and it is the damages from these three primary metals [for] which the Trustees seek relief.  For these reasons, the Court finds divisibility based upon tailings production is reasonable in this particular case.  Asarco is responsible for contributing 22% of the tailings and Hecla is responsible for contributing 31% of the tailings.

*Id.* at 1120-21.

---

[14]  This was part of the court's "Conclusions of Law."  The court did not conclude as a matter of law that "forest fires, channelization, and urbanization" were a source of hazardous substances in the Basin and it limited its divisibility analysis to "tailings."  It is true that one of its "Findings of Fact"(No. 8), 280 F.Supp.2d at 1105, was that "[f]orest fires, channelization and urbanization has impacted the waterways and the soil."  In its Finding of Fact No. 8, the court went on to say that "the largest source of metal loading in the Basin is from mining waste" and that "[s]eparating the damage to the environment from other causes versus the mining waste will be determined in the second phase of trial."

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 20**

In *BNSF*, the Supreme Court found that a single harm was capable of apportionment (divisible), but this was because of unique facts. The parties involved were only of one type, that being owner-operators. Two relatively small parcels of land were involved in *BNSF* (a 3.8 acre parcel and a .9 acre parcel). The total number of PRPs was small (Brown & Bryant and the two railroads). There were no past owners or past owner-operators. Only the railroads and Brown & Bryant owned the properties since the contamination began. The properties were contaminated by a limited number of discrete chemicals, three in total.

*Bell*, *BNSF* and *Coeur d'Alene* are similar in certain key respects and therefore, arrived at the conclusion that the particular single harm involved was divisible and response costs were capable of being apportioned. At the UCR Site, the situation is not akin to that in *Bell* involving a single hazardous substance originating from industrial operations at a single plant that had been operated, in succession, by three manufacturers who conducted essentially the same operations. The hazardous substances in the UCR Site, and specifically in the Columbia River (Lake Roosevelt), are not limited to mining tailings as was the situation in the Coeur d'Alene Basin- tailings containing three metals generated by similar milling methodologies used by two generators.[15] With regard to the UCR Site, there is not evidence that the potentially multiple generators have contributed the same type and quantity of hazardous substances. And certainly, unlike *Coeur d'Alene*, the

---

[15] This court did not find any discussion in *Coeur d'Alene* regarding the presence of other hazardous substances such as PCBs and DDT. Nor did the court find any discussion regarding synergy from commingling of hazardous substances, presumably because that was not an issue. Nor did the court find any discussion regarding airborne emissions, presumably because that also was not an issue.

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 21**

1    court does not have the good fortune of having experts on both sides of the case

2    agreeing that a volumetric analysis alone is a "reasonable basis" for

3    apportionment.  Finally, the UCR Site is nothing like the Arvin site in *BNSF*

4    which involved a limited number of current owner-operators, two small parcels of

5    property, a total of three chemicals and other unique factual circumstances which

6    made the single harm divisible and the apportionment of costs reasonable.

7        The UCR Site is a large, complex site involving potentially multiple

8    generators who have contributed a variety of hazardous substances to the

9    contamination existing at the Site.  Although Teck takes issue with there still

10   being 199 contaminants of concern as indicated by Mr. Roland (See n. 11, *supra*),

11   it does not deny there are contaminants in the Site other than, and in addition to,

12   the metals to which it limited its apportionment analyses.

13

14       **B.  Can The Harm Be Divided?**

15       Teck's failure to account for the entire harm makes it unnecessary to go any

16   further.  Even assuming, however, that Teck had accounted for the entire harm at

17   the UCR Site, it has not offered evidence allowing the court to conclude the harm-

18   a single harm- is divisible in terms of degree.  In turn, this also means Teck has not

19   presented a reasonable factual basis to apportion liability.

20       A single harm is divisible and susceptible to apportionment in a situation

21   where the degree of harm shows true proportionality or dose-dependence.  The

22   question is whether the volume of Teck's contribution to the contamination at the

23   UCR Site is proportional to its contribution to the single harm at the UCR Site

24   such that the harm is susceptible to divisibility.  In other words, is that single harm

25   divisible in terms of degree such that Teck's relative contribution to the total

26   contamination can reasonably be established?

27   **ORDER GRANTING MOTIONS RE**

28   **DIVISIBILITY AND APPORTIONMENT- 22**

Teck contends the harm at issue here is a single, divisible harm.[16]  Citing the Restatement §433 A, cmt. *d*, Teck asserts that "[p]ollution of a river by multiple sources exemplifies a divisible harm" and therefore, "as a matter of law, the contamination of a waterway such as the UCR is theoretically divisible based on the respective quantities of pollution discharged in the river."  This portion of the Restatement notes that:

> [A]pportionment is commonly made in cases of private nuisance, where the pollution of a stream, or flooding, or smoke or dust or noise, from different sources, has interfered with the plaintiff's use or enjoyment of his land. Thus where two or more factories independently pollute a stream, the interference with the plaintiff's use of the water may be treated as divisible in terms of degree, and may be apportioned among the owners of the factories, on the basis of evidence of the respective quantities of pollution discharged into the stream.

The Restatement provides an example of this, Illustration 5, in which oil negligently discharged from two factories onto the surface of a stream deprives a downstream riparian owner of the use of the water for industrial purposes.  "There is evidence" that seventy percent of the oil came from one factory and thirty percent from of the oil came from the other.  On that basis, each factory owner is liable for the corresponding proportion of the plaintiff's damages.

Restatement §433A takes multiple views of pollution cases.  While Illustration 5 indicates the loss of a stream's use for industrial purposes by the combined effect of two oil discharges is divisible if the basis for apportionment is proven, the Restatement says this should be contrasted with Illustrations 14 and 15 at cmt. *i*:

---

[16] An example of "distinct harms" would be where a site consists of non-contiguous areas of soil contamination.  *Coeur D'Alene Tribe v.  Asarco Incorporated*, 280 F.Supp.2d 1094, 1120 (D. Idaho 2003).

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 23**

14.  A Company and B Company negligently discharge oil into a stream. The oil floats on the surface and is ignited by a spark from an unknown source.  The fire spreads to C's barn, and burns it down.  C may recover a judgment for the full amount of his damages against A Company, or B Company, or both of them.

15.  The same facts as Illustration 14, except that C's cattle drink the water of the stream, are poisoned by the oil and die.  The same result.

The distinction between Illustration 5 and Illustrations 14 and 15 has to do with the nature of the harm.  According to the Restatement, §433A cmt. *i*:

> Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division. Death is that kind of harm, since it is impossible, except upon a purely arbitrary basis for the purpose of accomplishing the result, to say that one man caused half of it and another the rest.  The same is true of a broken leg, or any single wound, or the destruction of a house by fire, or the sinking of a barge. By far the greater number of personal injuries, **and of harms to tangible property**, are thus normally single and indivisible. Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.

(Emphasis added).

Those who contribute to the "indivisible" burning of a barn or fatal poisoning of cows are liable, jointly and severally, for all of the damage to which they contributed.  On the other hand, the loss of use or enjoyment of land apparently is inherently capable of logical, reasonable, or practical division.

The court is not bound by the "private nuisance" example in Illustration 5 upon which Teck relies ("use or enjoyment of the land").  Furthermore, it is reasonable to argue that CERCLA liability is different from liability for a private nuisance, the latter which came to be based on a separation between the individual tortious acts of wrongdoers and the combined harmful consequences of those acts.

> CERCLA liability . . . derives only from the status of the responsible party in relation to the facility that released

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 24**

> hazardous substances.  Arranger liability does not arise
> when the hazardous substance leaves the arranger's
> property . . . .  The liability exists regardless of whether
> the liable party's hazardous substances exceeded some
> threshold quantity that would have occasioned the response
> action.  By tying the liability-creating conduct to the facility
> at which the release and response occur, CERCLA unites
> conceptually the liable parties' separate "torts" and unites
> geographically the "tort" and the "consequence" in a way
> that the private nuisance claims cited in the Restatement
> do not.

Gold, *Dis-Jointed? Several Approaches To Divisibility After Burlington Northern*,
11 Vt. J. Envtl. L. 307, 367 (2009).

        As the Ninth Circuit made clear in *Pakootas I*, 452 F.3d at 1077-78, Teck's
potential liability as an arranger does not arise as a result of Teck's disposal of
slag from its Trail Smelter into the Columbia River.  It arises as a result of actual
and/or threatened releases of hazardous substances from the slag and/or effluent
after it came to rest in the "facility," that being the UCR Site.  Furthermore, if a
CERCLA claim is similar to a nuisance claim, it is more like a public nuisance
claim than a private nuisance claim.  A CERCLA claim is not based on lost "use
and enjoyment" of the facility that is the subject of the cleanup, but on the need to
protect human health, welfare, and the environment.  This is a governmental
function specifically authorized by CERCLA.  CERCLA is concerned with
remedying a harm to "tangible property."

        It is true that the fact hazardous substances are commingled or co-located in
the same site does not automatically preclude divisibility of the harm.  This is
exhibited by the *BNSF* case.  What allowed the divisibility of that single harm,
however, was sufficient evidence to reasonably establish each of the PRP's
proportionate contribution to, and share of, the single harm.  In *BNSF*, the district
court employed three figures in apportioning the Railroads' liability as 9% of the
Government's total response costs: 1) the percentage of the total area of the

**ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 25**

facility that was owned by the Railroads (19%), that being the .9 acre parcel leased by the Railroads to Brown & Bryant; 2) the duration of Brown & Bryant's business divided by the terms of the Railroads' lease (Railroads had leased their .9 acre parcel to Brown & Bryant for 13 years which was only 45% of the time Brown & Bryant operated the Arvin facility (28 years)); and 3) the court's determination that only two of three polluting chemicals spilled on the leased .9 acre parcel required remediation and those two chemicals were responsible for roughly two-thirds of the overall site contamination requiring remediation.  The district court then multiplied .19 by .45 by .66 (two-thirds) and rounded up to determine the Railroads were responsible for approximately 6% of the remediation costs.  129 S.Ct. at 1882.  Allowing for calculation errors up to 50%, the court concluded the Railroads could be held responsible for 9% of the total CERCLA response costs for the Arvin site.

Although the Ninth Circuit reversed the district court's apportionment analysis, the Supreme Court upheld the analysis:

> The District Court's detailed findings make it abundantly clear that the primary pollution at the Arvin facility was contained in an unlined sump and an unlined pond in the southeastern portion of the facility most distant from the Railroads' parcel [.9 acre parcel] and that the spills of hazardous chemicals that occurred on the Railroad parcel contributed no more than 10% of the total site contamination, some of which did not require remediation.  With those background facts in mind, we are persuaded that it was reasonable for the court to use the size of the leased parcel and the duration of the lease as the starting point for its analysis.
> . . . .
>
> Although the evidence adduced by the parties did not allow the court to calculate precisely the amount of hazardous chemicals contributed by the Railroad parcel to the total site contamination or the exact percentage of harm caused by each chemical, the evidence did show that fewer spills occurred on the

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 26**

> Railroad parcel and that of those spills that occurred, not all were carried across the Railroad parcel to the B & B sump and pond from which most of the contamination originated. The fact that no D-D spills on the Railroad parcel required remediation lends strength to the District Court's conclusion that the Railroad parcel contributed only Nemagon and dinoseb in quantities requiring remediation.
>
> The District Court's conclusion that those two chemicals accounted for only two-thirds of the contamination requiring remediation finds less support in the record; however, any miscalculation on that point is harmless in light of the District Court's ultimate allocation of liability, which included a 50% margin of error equal to the 3% reduction in liability the District Court provided [reducing B & B's liability by 3% and increasing the Railroads' liability by 3%] based on its assessment of the Nemagon and dinoseb spills.

129 S.Ct. at 1883.

In *3000 E. Imperial, LLC v. Robertshaw Controls, Co.*, 2010 WL 5464296 at *10 (C.D. Cal. 2010), the district court concluded the facts and reasoning of *BNSF* demonstrated the Supreme Court was concerned with finding evidence to support a relationship between the figures employed in the particular apportionment analysis and the amount of harm caused by the Railroads, "although [the Court] did not seem to require the exact fit which some previous cases had held was necessary." Therefore:

> [A]pportioning liability by the proportion of land owned by the [Railroads] was reasonable in light of evidence that only a few of the spills contributing to the contamination occurred on the [Railroads'] lands as opposed to the remainder of the facility. [Citation omitted]. As for the number of years of operation on the [Railroads'] land, such apportionment was logical since all contamination was caused by spills of various chemicals which occurred continually over the course of 28 years of operation. [Citation omitted]. There was no indication that the company's operations changed over the 28 years, and thus the amount of contamination released would have remained fairly constant each year.

*Id*. The district court in *3000 E. Imperial* found that unlike the situation in *BNSF*

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 27**

where the evidence showed the Railroads' use of the land only contributed to a small amount of the "total contamination," there was no evidence in its case showing the defendants' relative contribution to the total contamination.

Here too, there is no evidence showing Teck's relative contribution to the total contamination at the UCR Site. The volume of its slag deposited in the UCR Site does not establish its relative contribution to the single harm at the Site. There is no evidence this volume of slag is truly proportional to the harm potentially caused by it, particularly so when Teck's experts failed to address possible synergistic effects of commingled contaminants of various types (metals and non-metals). Teck acknowledges its experts did not consider possible synergistic effects, but contends this was appropriate because there was no risk of the same. (See Paragraphs 36, 37 and 38 of Johns Declaration, ECF No. 1140-1). According to Teck, while its slag was physically co-located in the sediment with other slag and tailings in the UCR, it was not "'commingled' in the sense of being chemically mixed with other substances because its experts concluded the slag does not have the propensity to leach under actual UCR conditions. (See Paragraph 11 of Riese Declaration, ECF No. 1131-1). If Teck's slag does not have the propensity to leach under actual UCR conditions, Teck  may well not be liable in the first instance (no actual or threatened release because the slag is "environmentally benign"). When  divisibility/apportionment is considered, however, it is with the assumption that Teck is liable and the question is the nature of the liability:  joint and several, or merely several.  Accordingly, if a nexus has already been established between Teck's deposit of slag in the UCR Site and an actual or threatened release of a hazardous substance from the Site, Teck cannot ignore potential synergistic or disproportionate effects of actual and/or threatened releases of hazardous substances from its slag.

**ORDER GRANTING MOTIONS RE**
**DIVISIBILITY AND APPORTIONMENT- 28**

This court is unable to distinguish the circumstances existing in the UCR Site from the circumstances which existed at the Bluff Road Site in *U.S. v. Monsanto Co.*, 858 F.2d 160 (4th Cir. 1988). In *Monsanto*, a number of "generator defendants" had shipped chemical hazardous waste to the Bluff Road site. Although the generator defendants conceded the environmental damage at Bluff Road constituted a "single harm," they contended there was a reasonable basis for apportioning the harm, observing that each of the off-site generators sent a potentially identifiable volume of waste to the Bluff Road site and, as such, liability should have been apportioned according to the volume they deposited as compared to the total volume disposed of there by all parties. The Fourth Circuit disagreed:

> The generator defendants bore the burden of establishing a reasonable basis for apportioning liability among responsible parties. *Chem-Dyne*, 572 F.Supp. at 810; Restatement (Second) of Torts §433B (1965). To meet this burden, the generator defendants had to establish that the environmental harm at Bluff Road was divisible among responsible parties. They presented no evidence, however, showing a relationship between waste volume, the release of hazardous substances, and the harm at the site. Further, in light of the commingling of hazardous substances, the district court could not have reasonably apportioned liability without some evidence disclosing the individual and interactive qualities of the substances deposited there. Common sense counsel that a million gallons of certain substances could be mixed together without significant consequences, whereas a few pints of others improperly mixed could result in disastrous consequences. Under other circumstances[,] proportionate volumes of hazardous substances may well be probative of contributory harm. In this case, however, volume could not establish the effective contribution of each waste generator to the harm at the Bluff Road site.

*Id*. at 172-73.

The Fourth Circuit stated that at a minimum, evidence showing a relationship between waste volume, the release of hazardous substances, and the harm at the site was "crucial to demonstrate that a volumetric apportionment

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 29**

scheme was reasonable."  Because of the numerous hazardous substances found at Bluff Road, "a volumetric apportionment based on the overall quantity of waste, as opposed to the quantity and quality of hazardous substances contained in the waste[,] would have made little sense." *Id*. at 172 n. 25.  It added that "volumetric contributions provide a reasonable basis for apportioning liability only if it can be reasonably assumed, or it has been demonstrated, that independent factors had no substantial effect on the harm to the environment." *Id*. at n. 27.  Independent factors relevant to establishing divisibility of harm include "relative toxicity, migratory potential, and synergistic capacity of the hazardous substances at the site." *Id*. at n. 26.  See also *Bell*, 3 F.3d at 901 ("even where commingled wastes of unknown toxicity, migratory potential, and synergistic effect are present, defendants are allowed an opportunity to attempt to prove that there is a reasonable basis for apportionment . . . ; where such factors are not present, volume may be a reasonable means of apportioning liability").

In a recent case out of the Eastern District of Wisconsin, these independent factors precluded divisibility of harm on the basis of volumetric contributions. *United States v. NCR Corp.*, 2011 WL 2634262 (E.D. Wis. 2011), involved two companies who, pursuant to a UAO issued by the EPA, were dredging and disposing of PCB-contaminated sediment in the Fox River, and installing caps and using sand to cover PCB-laden riverbed sediment in some areas.  The district court concluded "the extent and nature of the environmental harm in the River is not easily correlated with volumes of PCBs discharged by the various parties" because "numerous factors independent of the volume of pollution have affected the Site." *Id*. at *6.  According to the court:

> [I]t is undeniable that what's left in the River bottom *now* (the problem to be addressed by the cleanup) is not necessarily representative of the pollution that was released into the River

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 30**

> decades ago during the period that carbonless copy paper
> was produced. The harm, in other words, is not a stable,
> stationary site but a dynamic one. The sediment that is
> currently at the bottom of the River is in many ways just a
> snapshot of the pollution that has persisted, often by the
> mere happenstance of river depths, currents, etc. Moreover,
> geography and the flow of the river over 50 years have
> created a variety of different areas requiring remediation.
> Some of these areas may be capped, while others must be
> dredged. The depth of the sites and their location largely
> control these decisions. These independent factors preclude
> an apportionment analysis that is based primarily on the
> volumes of the PCBs that the parties discharged.

*Id.* (emphasis in text).

In *NCR*, the district court also concluded that the cost of cleaning up the river bore "little relation to the relative volume of PCBs released into the River" and therefore, "apportioning liability based on volumes would not be advisable." *Id.* at *4. Its reasoning was:

> [S]uppose that dredging one square foot of sediment from the
> river bed costs one dollar. It will cost roughly that same dollar
> whether the PCB levels are 20 parts per million or 200 parts per
> million. The sediment has to be sucked off the river bottom by
> a specially equipped barge and disposed of properly. Transportation
> of the dredged material adds to the cost, and that cost is based on
> distance and volume rather than PCB concentration. Although the
> volumes of PCBs discharged obviously have some correlation with
> the extent of the costs, the relationship between volume and cost is
> a loose one.
>
> . . . .
>
> Implicit in [this] analysis . . . is that the "harm" at issue here is
> the *cost* required to clean up the river. After all, this is not
> a case about the environment or pollution in the abstract, but
> about who should *pay* for cleaning up the Site. These cleanup
> costs- not the pollution itself- are what is subject to
> apportionment, and if these costs do not have a strong causal link
> with pollution volume, then there would seem to be little reason to
> apportion them on that basis. There is some precedent for this
> approach. *See Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*,
> 746 F. Supp.2d 692, 738 (D.S.C. 2010)("A method [of
> apportionment] that does not take . . . the cost of the remediation into
> account does not reasonably account for the harm at the Site"); *Chem-
> Nuclear Systems, Inc. v. Bush*, 292 F.3d 254, 260 (D.C. Cir. 2002)
> (finding that, to show divisibility, party must prove "the amount

**ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 31**

of harm that it caused" was less than $7,660,315 worth of cleanup costs).

*Id*. at *5 (emphasis in text).

Teck contends the Tribes and the State have conflated the concepts of harm and damages in arguing that apportionment is improper because the RI/FS has not yet been completed, a remedy has not been selected, and the costs of cleanup cannot reasonably be determined. Teck asserts "damages" and "harm" are distinct and its liability for the environmental harm to the UCR Site, if any, can be apportioned, even if the amount of Plaintiffs' response costs remain uncertain. According to Teck, "[i]f damages were the same as harm, the defendant would be forced to anticipate and prove plaintiff's damages at the liability phase of trial-reversing both the burden of proof as well as the order of proof of that element- in order to apportion harm."

"[T]he choice as to when to address divisibility and apportionment are questions best left to the sound discretion of the trial court in the handling of an individual case." *Alcan*, 990 F.2d at 723. In bifurcating this case, this court was not asked to address, and did not address, when the issue of apportionment should be raised. The Defendant has chosen to raise the issue in Phase I. Apportionment can be determined at this liability stage (Phase I), but there is no question that the consequences of any apportionment of liability relate ultimately to what a PRP pays in response costs. Thus, in *BNSF*, the Railroads were apportioned "liability as 9% of the Governments' total response cost" for remediaton of the Arvin site/facility. 129 S.Ct. at 1876. The Supreme Court characterized the divisibility inquiry as "whether the Railroads were properly held jointly and severally liable for the full cost of the Government's response efforts." 129 S.Ct. at 1880. And, as noted, in a footnote in the majority opinion, the Supreme Court observed that

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 32**

"apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs." 129 S.Ct. at 1882, n. 9 (emphasis added).[17] *BNSF* recognized that what was ultimately being apportioned were response costs and deemed the district court's analysis a reasonable method for determining that only certain costs were traceable to the Railroads (9%).

Teck does not bear the burden at the Phase I trial to anticipate and prove Plaintiffs' response costs, and indeed Plaintiffs do not have that burden either. Phase I involves one claim by the Tribes and State and that is for a declaration that Teck is liable to pay response costs. If the Tribes and State succeed in obtaining that declaratory relief, thereafter they will not need to re-establish Teck's liability for a particular response cost as it is incurred. All they will need to establish is that a particular cost was incurred in responding to the environmental harm and it is not inconsistent with the national contingency plan (NCP). If Teck's liability is joint and several, it is responsible for 100% of that cost.

Teck treats the divisibility issue as a matter of whether the pollution, the single harm, in the UCR Site can actually be divided, rather than whether the cost of cleaning up the same is divisible based on volume. This court agrees with the *NCR* court that the nature of cleanup costs are an important consideration in determining whether a defendant can prove the harm is divisible and beyond that,

---

[17] Restatement of Torts Section 433A states that "[d]amages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." See also *O'Neil v. Picillo*, 883 F.2d 176, 180 (1st Cir. 1989)(recognizing "basic common law principle that defendants not be held responsible for those costs traceable to others").

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 33**

whether there is a reasonable factual basis for apportionment.  The anticipated cleanup of the UCR Site is all of the hazardous substances found therein, not just the hazardous substances attributable to Teck's waste.  Even if it could be determined that Teck contributed only a certain percentage of the total volume of hazardous substances in the UCR Site, there would not necessarily be a basis to conclude it caused the same percentage of "harm" in the UCR Site, defined as the cost of cleaning up the Site.   See *NCR* at *7[18].  The harm is not the mere disposal or release of hazardous substances, but the consequences thereof.

## III.  CONCLUSION

Teck has not presented the requisite evidence for the court to conclude, as a matter of law, that the harm at the UCR Site is capable of being divided so as to allow for apportionment of liability.  Therefore, the court must conclude, as a matter of law, that this harm is not capable of being divided.  The harm is not "theoretically capable of apportionment."  *BNSF*, 129 S.Ct. at 1881.  If Teck is found liable following trial, it will be jointly and severally liable for response costs incurred by the Tribes and State which are consistent with the national contingency plan.

The Tribes' Motion To Dismiss Sixteenth Affirmative Defense (Liability

---

[18]  See also *State of Washington v. United States*, 922 F.Supp.2d 421, 430 (W.D. Wash. 1996):

> A better case might be made for division according to each party's contribution of a particular contaminant akin [to] the apportionment that occurred in *Hatco* [*v. W.R. Grace & Co.- Conn.*, 836 F.Supp. 1049 (D. N.J. 1993)], but the parties would have to make an evidentiary showing that their particular waste necessitated a discrete clean-up effort apart from that required for any other party's waste.

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 34**

1  Proportionate To Apportionment) (ECF No. 957), and the State's Motion For

2  Partial Summary Judgment On Defendant's Divisibility Defense (ECF No. 960),

3  are **GRANTED**.  The defense is summarily adjudicated in favor of Plaintiffs and

4  is dismissed as a matter of law.

5        Fed. R. Civ. P. 56 allows a court to grant summary adjudication on a claim

6  or defense.  The standard that applies to a motion for summary adjudication is the

7  same as that which applies to a motion for summary judgment.  Fed. R. Civ. P.

8  56(a); *Mora v. ChemTronics*, 16 F.Supp.2d 1192, 1200 (S.D. Cal. 1998).  The

9  purpose of summary judgment is to avoid unnecessary trials when there is no

10  dispute as to the facts before the court.  *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th

11  Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975).  Under Fed. R. Civ. P. 56,

12  a party is entitled to summary judgment where the documentary evidence

13  produced by the parties permits only one conclusion.  *Anderson v. Liberty Lobby,*

14  *Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d

15  727, 732 (9th Cir. 1985).  Summary judgment is precluded if there exists a genuine

16  dispute over a fact that might affect the outcome of the suit under the governing

17  law.  *Anderson*, 477 U.S. at 248.  The moving party has the initial burden to prove

18  that no genuine issue of material fact exists.  *Matsushita Elec. Industrial Co. v.*

19  *Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986).  Once the moving

20  party has carried its burden under Rule 56, "its opponent must do more than

21  simply show that there is some metaphysical doubt as to the material facts."  *Id*.

22  The party opposing summary judgment must go beyond the pleadings to designate

23  specific facts establishing a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477

24  U.S. 317, 325, 106 S.Ct. 2548 (1986).  In ruling on a motion for summary

25  judgment, all inferences drawn from the underlying facts must be viewed in the

26  light most favorable to the nonmovant.  *Matsushita*, 475 U.S. at 587.  Nonetheless,

27
28  **ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 35**

summary judgment is required against a party who fails to make a showing
sufficient to establish an essential element of a claim, even if there are genuine
factual disputes regarding other elements of the claim. *Celotex*, 477 U.S. at 322-
23.

Summary adjudication is appropriate here because of the evidence the
Defendant has failed to present concerning its divisibility/apportionment defense
(i.e., failure to account for the entirety of the harm at the UCR Site).  While the
court has considered the evidence presented by the Defendant, it has not
"weighed" that evidence or made any determinations regarding the credibility of
Defendant's experts.  It is the failure to present certain evidence- the simple
absence of evidence- which warrants summary adjudication.  There is no dispute
about what the Defendant has presented and what it has not presented.

Granting of the Plaintiffs' motions regarding divisibility/apportionment
renders moot the Defendant's motions challenging Plaintiffs' expert testimony
intended to rebut Defendant's divisibility/apportionment defense, as well as
related motions.  This includes the following: 1) Defendant's Motion To Strike
Expert Report And Testimony Of Jay L. Haney (ECF No. 900); 2) Defendant's
Motion To Strike Expert Report And Testimony Of Ronald J. Kendall (ECF No.
904); and 3) Defendant's Motion To Exclude Expert Report And Testimony Of
Remy J.C. Hennett (ECF No. 908).

All of these motions are **DISMISSED** as being moot with the understanding
it is no longer necessary for any of these Plaintiffs' experts to testify regarding
divisibility/apportionment at the Phase I trial since Defendant will not be
presenting evidence at trial regarding the same.

///

**ORDER GRANTING MOTIONS RE
DIVISIBILITY AND APPORTIONMENT- 36**

Defendant's Motion To Strike Certain Of Plaintiffs' Expert Opinions (ECF No. 912) is **DISMISSED** as moot to the extent it seeks to strike the rebuttal reports of Haney, Kendall, and Paul Queneau, all of which are intended to rebut Teck's divisibility/apportionment defense.

Defendant's Motion To Exclude Expert Report And Certain Testimony Of Plaintiffs' Expert David McLean (ECF No. 924) is **DISMISSED** as moot to the extent it seeks to exclude those portions of McLean's May 2011 rebuttal expert report and proposed testimony based thereon which are related to rebuttal of Teck's divisibility/apportionment defense.

Granting the Plaintiffs' motions regarding divisibility/apportionment renders moot the Plaintiffs' motions challenging Defendant's expert testimony intended to support Defendant's divisibility/apportionment defense, as well as related motions.  This includes the following:  1) Plaintiffs' Motion To Exclude As Inadmissible Jeffrey Bradley's Application Of A One-Dimensional Sediment Transport Model To Quantify Sediment Deposition In The UCR Site Prior To 1942 (ECF No. 949); 2) Plaintiffs' Motion To Exclude Untimely Supplements And Revisions To The January 2011 Report Of Jeffrey Bradley (ECF No. 942); 3) Plaintiffs' Motion To Exclude The Expert Opinions Of Adrian Brown (ECF No. 982); 4) Plaintiffs' Motion To Strike Declarations Of Thomas Dunne And Adrian Brown (ECF No. 1170); and 5) Plaintiffs' Motion To Exclude Testimony Relying On Reports Issued By History Associates, Inc. (ECF No. 946).

All of these motions are **DISMISSED** as being moot with the understanding these Defendant's experts will not testify at the Phase I trial regarding divisibility/apportionment because that defense has been dismissed as a matter of law.

**ORDER GRANTING MOTIONS RE DIVISIBILITY AND APPORTIONMENT- 37**

1    The issue remaining for trial is Teck's liability and more specifically, the

2    issue of release or threatened release of hazardous substances from the UCR Site.

3    The opinions of Plaintiffs' experts, Dimitrios Vlassopolous and Victor Bierman,

4    are directed to that issue.  Separate orders will address Defendant's Motion To

5    Strike Certain Testimony Of Plaintiffs' Experts Dimitrios Vlassopoulos and Victor

6    Bierman (ECF No. 915), Defendant's Motion To Strike Certain Of Plaintiffs'

7    Expert Opinions (ECF No. 912) to the extent it is directed at the rebuttal report of

8    Vlassopoulos, and Defendant's Motion To Exclude Expert Report And Certain

9    Testimony Of Plaintiffs' Expert David McLean (ECF No. 924) to the extent

10   McLean's May 2011 rebuttal expert report and proposed testimony based thereon

11   is related to the issue of Teck's liability.

12       **IT IS SO ORDERED**.  The District Court Executive is directed to enter

13   this order and forward copies to counsel of record.

14       **DATED** this    4th    day of April,  2012.

15

16

17       *s/Lonny R. Suko*

18   ───────────────────────────
                    LONNY R. SUKO
19               United States District Judge

20

21

22

23

24

25

26

27   **ORDER GRANTING MOTIONS RE
28   DIVISIBILITY AND APPORTIONMENT- 38**