1
2
3
4
5

UNITED STATES DISTRICT COURT
6
EASTERN DISTRICT OF WASHINGTON

7
JOSEPH A. PAKOOTAS, an
8
individual and enrolled member of the
Confederated Tribes of the Colville        NO.  CV-04-256-LRS
9
Reservation; DONALD R. MICHEL,
an individual and enrolled member of
10
the Confederated Tribes of the Colville    **FINDINGS OF FACT AND**
Reservation; and the                       **CONCLUSIONS OF LAW**
11
CONFEDERATED TRIBES OF THE
COLVILLE RESERVATION,
12

13                          Plaintiffs,

14    and

15    STATE OF WASHINGTON,

16                          Plaintiff-Intervenor

17
         v.
18
TECK COMINCO METALS, LTD., a
19    Canadian corporation,

20                          Defendant.

21

22    **I.  BACKGROUND**

23
         Defendant Teck Cominco Metals, Ltd. (Teck) has stipulated that it
24
discharged slag and effluent into the Columbia River from its smelter located in
25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -        1**

1    Trail, British Columbia, Canada, and that some portion of its slag and effluent has

2    come to be located in the Upper Columbia River (UCR) Site, a "facility" as defined

3    in the Comprehensive Environmental Response, Compensation, and Liability Act

4    (CERCLA), 42 U.S.C. §9601(9).  The UCR Site includes the reaches of the

5    Columbia River from immediately downstream of the international border to the

6    Grand Coulee Dam.

7         Furthermore, Teck has stipulated that its slag which has come to be located

8    in the UCR Site has leached and continues to leach hazardous substances into the

9    waters and sediments from and at the UCR Site; and that hazardous substances in

10   Teck's effluent have come to be located and continue to move into and through the

11   waters and sediments from and at the UCR Site.   Teck has stipulated that this

12   release or threatened release of hazardous substances at the UCR Site has caused

13   Plaintiff, Confederated Tribes of the Colville Reservation (Tribes), and Plaintiff-

14   Intervenor, the State of Washington (State), to incur at least $1 each in response

15   costs which were necessary and not inconsistent with the National Contingency

16   Plan.  These stipulations satisfy three of the four elements for liability for response

17   costs under CERCLA, 42 U.S.C. § 9607(a).

18        Teck contests whether it is within one of the four classes of persons subject

19   to the liability provisions of §9607(a).  Specifically, it contends that it cannot be

20   held liable as an "arranger" because it did not arrange with another party or entity

21   for the disposal or treatment of its hazardous substances, and that holding it liable

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -      2**

1

2   as an "arranger" would constitute an improper extraterritorial application of

3   CERCLA.  Furthermore, Teck contests whether this court has specific personal

4   jurisdiction over it.

5       The parties designated the portions of the record they requested the court

6   consider in adjudicating these disputed issues (ECF Nos. 1940, 1946 and 1947).

7   On October 10, 2012, they presented oral argument to the court.  The court has

8   considered the entirety of the designated record in formulating its Findings Of

9   Fact.  The Findings Of Fact are based on a preponderance of the evidence

10  submitted by the parties and are otherwise based on the parties' Stipulation (ECF

11  No. 1928).  All objections to exhibits cited in the Findings Of Fact are

12  **OVERRULED** for the reasons specified in Ex. A to ECF No. 1946.  All objections

13  to deposition testimony cited in the Findings Of Facts are **OVERRULED** for the

14  reasons specified in Ex. 1 to ECF No. 1699 (ECF Nos. 1699-1, 1699-2 and 1699-

15  3).  To the extent objections have been registered to those  portions of expert

16  declarations cited in the Findings Of Fact, ECF Nos. 1726 (Bierman); 1728

17  (McLean); 1732 (Queneau); 1746 (Vlassopolous); and Higginson (ECF Nos. 1744

18  and 1765), those objections are **OVERRULED**.

19      At the October 10, 2012 oral argument, the Plaintiffs and Defendant

20  registered objections to certain Findings of Fact and Conclusions of Law proposed

21  by the other.  The court has considered those objections and it should be apparent

22  which objections the court has sustained and which it has overruled.

23

24

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**        **3**

II.  FINDINGS OF FACT

    A.  PERSONAL JURISDICTION AND COVERED PERSON/
        ARRANGER STATUS

1.  Teck is a Canadian corporation registered as an extra provincial company under the laws of British Columbia.  All references to "Teck" incorporate its predecessor entities.  ECF 1928 ¶ 10.

2.  Teck's metal and fertilizer production facilities are collectively referred to herein as the "Trail Smelter" and are located in Trail, B.C., Canada, approximately 10 miles upstream from the U.S.-Canada border.  ECF 1928 ¶ 11.

3.  Teck and its predecessors have operated metal and/or fertilizer production facilities at Trail since 1896.  ECF 1928 ¶ 12.

4.  The Trail Smelter produced slag as a by-product of high-temperature recovery of metals.  Teck's slag consists primarily of silica, lime and iron, as well as base metals, including zinc, lead, copper, arsenic, cadmium, barium, antimony, chromium, cobalt, manganese, nickel, selenium and titanium.  ECF 1928 ¶ 13.

1

2      5.  Between 1930 and 1995, Teck discharged at least 9.97 million tons of

3   slag directly into the Columbia river via outfalls at its Trail smelter.  This discharge

4   was intentional.  ECF 1928 ¶ 14.  According to Teck's General Manager of Lead

5   Operations, Wayne Wyton, Teck discarded approximately 400 tons of slag directly

6   into the Columbia River every day.  Dep. of Wyton, 6/30/10, at 23-24, 69.  *See* Ex.

7   150 (Dep. of William Duncan, 7/22/10, at 239, referring to dep. ex. 248) (Teck

8   scientist estimates discharges of 400 tons per day).  *See also*, Ex. 185, p. 1.

9   (Kenyon dep. at 172, referring to dep. ex. 176.)  Teck concedes the 9.97 million

10  tons of slag discarded into the river contained 7,300 tons of lead and 255,000 tons

11  of zinc.  (Higginson, ECF 1631, ¶¶ 15, 118).  Teck knew that the waste slag

12  contained metals.  Ex. 138 at 2, 5 & 6 (Duncan dep. at 59-69 (referring to dep. ex.

13  224); Ex. 175 at 9 (Kenyon dep. at 99-101, referring to dep. ex. 165); Ex. 185

14  (Kenyon at 172, referring to dep. ex. 176); Ex. 189, (Kenyon at 208-210, referring

15  to dep. ex. 187).

16

17

18

19      6.  At least 8.7 million of the at least 9.97 million tons of slag discharged by

20  Teck from its Trail Smelter has been transported by the Columbia River

21  downstream of the international border into Washington, and some portion of that

22  slag has come to be located at the UCR Site.  ECF 1928 ¶ 17.

23

24

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -        5**

7. In addition to slag, Teck's Trail Smelter generated waste as effluent. The term "effluent" means all non-slag discharges of waste by Teck, excluding air emissions. Effluent was generated by numerous processes over a century of operation, including copper smelting and refining, lead smelting and refining, silver refining, an antimonial lead plant, a bismuth refinery, zinc operations (which included roasting, calcine leaching, fume leaching, electrolysis, melting and casting, cadmium recovery, and the acid plants) and production of fertilizer. ECF 1928 ¶ 15.

8. Teck discharged effluent via outfalls at the Trail Smelter directly into the Columbia River. The discharged effluent contained lead, zinc, cadmium, arsenic, copper, mercury, thallium, and other metals, as well as a variety of other chemical compounds. The components of effluent were discharged in dissolved, colloidal, and particulate form. This discharge was intentional. ECF 1928 ¶ 16. Teck concedes the effluent discarded into the Columbia River from 1923-2005 contained approximately 132,000 tons of hazardous substances, including 108,000 tons of zinc, 22,000 tons of lead, 200 tons of mercury, 1,700 tons of cadmium, and 270 tons of arsenic. Higginson, ECF 1631, ¶118. Teck knew that its discarded effluent contained at least lead, zinc, cadmium, arsenic, copper, and mercury. Wyton dep. at 34. *And see* Ex. 178 (identifying metals in outfalls), (Kenyon dep. at 139-146, referring to dep ex. 158). Ex. 152 (Duncan dep. at 241-245, referring to dep. ex.

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**      **6**

1

2    250); Ex. 169 at 39-48, (Kenyon dep. at 40, referring to dep. ex. 159); Ex. 175,

3    (Kenyon dep. at 99-101, referring to dep. ex. 165).

4

5        9.   Nearly all of Teck's effluent that was discharged via its outfalls at the

6

7    Trail Smelter has been transported by the Columbia River downstream of the

8    international border into Washington, and at least some portion of it has come to be

9    located at the UCR Site.  ECF 1928 ¶ 18.

10

11       10.   There is a single flow path directly from Teck's Trail smelter to the

12

13   United States. Bierman, ECF 1624, ¶ 17.  The Columbia River between Trail and

14   the international border has ample power to mobilize and suspend slag particles

15   even at moderate, average flows.  McLean, ECF 1635, ¶ 52.  The river has the

16   capacity to transport slag, either in suspension or as bed load, in a wide range of

17   flow conditions.  McLean, ECF 1635, ¶ 53.  Based on the river water's velocity in

18   this reach, most sand-sized sediment (including most slag) behaves as wash load,

19   maintained continuously in suspension without depositing on the river bed until it

20   reaches a point of repose in the UCR Site.  *See* McLean, ECF 1635, ¶ 50.  The

21   river's capacity to transport slag means that the river also has the capacity to

22

23   transport Teck's sewer effluent.  McLean, ECF 1635, ¶ 36.

24

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**        **7**

1

2      11.  The transport of slag-sized sediment in the Columbia River at Trail is

3  supply-limited because the river's capacity to transport the material is much greater

4  than the amount that is being supplied.  As a result, the slag has been swept off the

5  river bed surface, exposing the coarse natural cobble and gravel river bed material.

6  McLean, ECF 1635, ¶ 54.

7

8

9      12.  During sediment transport in the gravel and cobble environment of the

10  Upper Columbia River, slag particles are subject to the same abrasive forces and

11  break down creating smaller particles that are more easily transported and creating

12  new fresh surfaces that are exposed to the flow.  McLean, ECF 1635, ¶ 48. Teck's

13  own slag study in 1991 confirmed this.  Ex. 217 (Kuit dep. at 194, referring to dep.

14  ex. 22; Ex. 244 (McKay dep. in LMI, 7/16/10 at 94, referring to dep. ex. 70).  In

15  some locations, river dynamics in the UCR Site cause slag to float on the river

16  surface.  Exs. 643, 646.

17

18

19      13.  The Grand Coulee Dam has an impact on sedimentation within the

20  Upper Columbia River.  As the river transforms from free-flowing to reservoir,

21  Teck's slag and effluent are deposited in the downstream direction, with the sand-

22  sized and silt-sized particles deposited near the upstream end and the finer silt-

23  sized and clay-sized deposited near the dam.  McLean ECF 1635, ¶ 30.  Bierman,

24  ECF 1624, ¶¶ 13, 44.  Vlassopoulos, ECF 1664, ¶ 164.

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -        8**

1

2      14.  Teck's Trail leadership assumed that both slag and effluent went

3    downstream, across the border and into Lake Roosevelt.  Dep. of Wayne Wyton,

4    6/30/10, at 74-75, 137.  Unlike Mr. Wyton, Teck employees generally claimed that

5    they did not know where the slag went after it was discarded into the Columbia

6    River, e.g. Dep. of Kenyon at 218-219.  Teck's documents indicate otherwise.

7    They confirm that for decades its leadership knew its slag and effluent flowed from

8    Trail downstream and are now found in Lake Roosevelt and, nonetheless, Teck

9    continued discharging wastes into the Columbia River.

10

11

12      15.  As early as the Trail arbitration in the 1930s, Teck knew that the United

13    States had observed slag on the beaches of the Columbia River north of Northport

14    (near the Canadian border).  Ex. 226, pp. 5,6,11-14 ((Dep. of Walter Kuit in

15    insurance coverage law suit ("LMI"), 2/23/11, at 46-49, referring to dep. ex. 3))

16    The United States explained in its filing that "[t]he trail smelter disposes of slag in

17    such a manner that it reaches the Columbia river and enters the United States in

18    that stream."  Ex. 225, (Kuit dep., 2/23/11, at 44:10-12, referring to dep. ex. 2).

19    Walter Kuit, testifying in a Rule 30(b)(6) deposition described these allegations by

20    the U.S. government as "a description of "the practice" and confirmed that it is

21

22

23

24

25

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW -      9**

1
2    "consistent with [Teck's[1]] understanding of Teck's and its predecessor's practice."
3    *Id.* 45:5-10.
4
5        16.  In 1974, Teck documents confirmed its understanding that its disposal of
6
7    granulated slag in the Columbia River "settles out" in Lake Roosevelt. Ex. 212,
8    (Kuit dep., 6/8/10 at 124, referring to dep. ex. 9) ("The action of the river will
9    reduce the slag to silt which will carry down to Roosevelt Lake and accumulate in
10   the lake bottom together with naturally occurring silt.") Studies done in the 1970s
11   by Canadian regulatory authorities (and known to Teck) found elevated content in
12
13   the Columbia River.  *See* Exs. 241 (Kootenay Air and Water Quality Study Phase I
14   and II). (Dep. of Douglas McKay in LMI, 7/16/10, at 57-59, 63, 64, 66, referring to
15   dep. ex. 64) and 242.
16
17       17.  By the 1980's, Teck recognized its discharges were having impacts in
18   the Upper Columbia River.  Teck's Manager of Environmental Control, Nigel
19
20   Doyle, authored a summary of Environmental Control at Cominco Ltd. and noted
21   that samples taken downstream of the Trail facility showed that metals were
22   leaching from Teck's slag.  He also noted an absence of aquatic life and observed
23   that may in part be due to metals in Teck's slag and the abrasive effect of
24
25

_____

[1]  Kuit was testifying as Teck's speaking agent.

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -        10**

"constantly moving slag." Ex. 163, pp. 43-44. See also table 8-16, p. 161. (Dep. of Mark Edwards in LMI, 6/17/10, at 141-142, referring to dep. ex. 8.)

18. At approximately the same time, in 1981, Teck recognized that it faced potential claims based on its disposal of its wastes in the Upper Columbia River and Lake Roosevelt. A risk analyst employed by Teck, Jeffrey T.G. Scott, commented in a written memorandum :

> [t]he primary potential for environmental damage and subsequent claims [at Trail] is the discharge of pollutants to the Columbia River. . . .

> Any increase in the quantities of mercury or other heavy metals found in the aquatic environment downstream from Trail would most likely be assumed to have originated from Cominco, Ltd. operations.

Ex. 544 at p. 48.

19. Teck's Environmental Control Manager, Nigel Doyle, was "pleased with the overall accuracy and objectivity of Mr. Scott's report" and specifically agreed with "Scott's comments concerning mercury." He observed that "[t]here is no question in my mind that this is the single most vulnerable area if Americans ever find the time and money to do exhaustive research on the lake sediments in FDR Lake." In his view, Teck was "at risk in terms of the deposition of heavy metals

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**       **11**

1

2   which has taken place over the last 70-80 years." Ex. 213, pp. 1-2. (Kuit dep.,

3   6/8/10, at 132-139, referring to dep. ex. 11.)

4

5

6       20.  David Godlewski, Teck's current Vice President, Environment and

7   Public Affairs, testifying as a speaking agent in a Rule 30(b)(6) deposition,

8   confirmed that in 1982 the Trail smelter was discarding effluents and solids to the

9   Columbia River containing known quantities of heavy metals and those materials

10  were transported downriver ending up in the Upper Columbia River in Washington

11  State.  Dep. of David Godlewski in LMI, 6/24/10, at 150:25-151:9.  Teck's senior

12  management understood that movement of slag down stream was the only logical

13  conclusion.  Dep. of Charles Sutherland in LMI, 7/30/10, at 76:9-21 ("[J]ust

14  seemed logical it [Teck slag from Trail smelter] would end up along with all the

15  other sediments in Lake Roosevelt").  *See also  Id.* at 52:2-5.  *See also* Dep. of

16  George Yurko in LMI, 8/5/10, pp. 56, 67-68.

17

18

19      21.  By 1984, Graham Kenyon had taken over Nigel Doyle's job and he

20  shared Doyle's concerns.  Canadian government organizations were beginning to

21  take notice of Teck's waste disposal practices.  Carl Johnson was the Province of

22  British Columbia Ministry of Environment's (MOE's) liaison with Teck.  Dep. of

23  Johnson, 12/15/10, at 8-9.  He had many interactions with Teck in the 1980s

24  regarding efforts to improve its mercury disposal practices.  Johnson dep. at 89-93.

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -      12**

*E.g.* Ex. 106 (referred to as dep. ex. 300.)  In a meeting in 1984, MOE (identified as W.M.B. here) expressed a need to collect cores in Lake Roosevelt to track disposition of mercury.  Ex. 103 (Johnson dep. at 78-81, referring to dep. ex. 297).

22.  Teck knew what would be found in the sediments of Lake Roosevelt. Teck's environment briefing notes authored by Graham Kenyon on April 25, 1990, said "[h]istorical discharges have presumably accumulated in Lake Roosevelt sediments."  Ex. 177 (Kenyon dep. at 127, referring to dep. ex. 167).  By 1991, Kenyon recognized substantial community concern regarding "the effects of accumulated slag in Lake Roosevelt" and, in particular, the international dimension resulting from the fact that "we are in effect dumping waste into another country – a waste that they classify as hazardous material."  Ex. 180 (Kenyon dep. at 161, referring to dep. ex. 172).  Indeed, Kenyon later recognized that Trail had, essentially, been using Lake Roosevelt as a "free" "convenient disposal facility" for its wastes.  Kenyon dep. at 218-219.  *See* Ex. 192 (referred to as dep. ex. 193 at p. 215-216).

23.  In Teck's 1988 Environment Report, it had labeled Lake Roosevelt water quality a "sleeper issue" as U.S., EPA and Washington State agencies were becoming interested, having noted "above normal metal levels in sediments and fish."  Ex. 169 (Kenyon dep. at 40, referring to dep. ex. 159).  By 1989, it had

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW -     13**

1

2    become a "current concern" as various U.S. interest groups were focused on

3    "Cominco slag and gypsum/phosphate discharges as particular concerns."  Ex. 170

4    (Kenyon dep. at 47-50, referring to dep. ex. 160).  In 1990, Teck knew that

5    "Citizens in the Northport [WA] area [had become] increasingly incensed with

6    [Teck's] historical disposal practices in the Columbia River."  Ex. 175, p. 7.

7    (Kenyon dep. at 99-101, referring to dep. ex. 165.)  By 1991, Kenyon knew that

8    Washington State and EPA officials were committed to stopping Teck's discarding

9    of slag into the Columbia River. Ex. 180 (Kenyon at 161, referring to dep. ex.

10   172).  Teck did not stop then, however.  Profits were "excellent" - $100 million per

11   year, Ex. 175, p. 7 - and it continued to discard slag at a rate of 400 tons per day

12   and sewer effluent flowed from its facility 24 hours a day.  Ex. 185. (Kenyon dep.

13   at 172, referring to dep. ex. 176.)

14

15

16

17        24.  Teck never conducted any studies to confirm the presence of its wastes

18   in Lake Roosevelt, but Mr. Kuit did travel to the Upper Columbia River with Carl

19   Johnson, a senior official at BC MOE responsible for liaison with the Teck smelter.

20   Johnson reports that he and Rick Crozier, another MOE employee, traveled to the

21   Upper Columbia River with Mr. Kuit and took samples at various beaches along

22   the Columbia River in the United States.  Dep. of Johnson at 52.  They compared

23   samples taken from the beaches to Teck samples under a microscope and

24   confirmed that it looked like the same material.  Dep. of Johnson at 54-55.  In

25

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW -        14**

conversations with Mr. Kuit and Mr. Mike Walker (also with Teck) "it is pretty well agreed that what we were seeing was slag." Dep. of Johnson at 55.

25.  Teck also knew that metals from its non-slag effluent were transported to the UCR.  Those metals are now found in the sediments of the UCR.  Some scientists used events in which effluent was spilled from the Trail smelter to measure movement to a testing station adjacent to the Canadian border and confirmed that it reached the border in approximately two hours.  Dep. of Duncan at 210-213.  *See* Ex. 142 (Duncan at 210-213, referring to dep. ex. 230).  An expert retained by Plaintiffs, Dr. Victor Bierman, has reviewed this data and confirmed that it proves the transport of metals contained in effluent from the Trail smelter to the UCR. Decl. of Bierman, ECF 1624, ¶¶ 30,

26.  The British Columbia Ministry of Environment (MOE) also concluded that mercury spilled from Trail was moving into downstream sediments, including sediments in the United States.  Ex. 21 (Beatty Spence dep. at 31-33, 41-44, referring to dep. ex. 278).  Reducing mercury discharges was "one of the highest priorities" for MOE.  Ex. 22 (Beatty Spence dep. at 45-48, referring to dep. ex. 279).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -**      **15**

1

2      27.  Walter Kuit, who served under Mr. Doyle, in an e-mail discussing

3   mercury discharges, confirmed the assessment of Mr. Doyle twenty years earlier,

4   commenting that "if the chickens come home to roost, the non-slag contributions

5   over time, particularly from the early 80s back, would be more of a factor than

6   slag. "  Ex. 220 (Kuit dep., 6/8/10 at 217, referring to dep. ex. 28).  It was that very

7   potential liability Mr. Kenyon sought to head off decades later when he recognized

8   Teck had treated Lake Roosevelt as a "free" disposal facility and urged that Teck

9   fund measures to improve conditions in the river, rather than face potential

10   extended litigation under the U.S. Superfund Law.  Ex. 192 (Kenyon dep. at p.

11   215-216, referring to dep. ex. 193).

12

13

14

15      28.  Leachability of Teck slag was known to Teck since at least the 1970s.

16   Teck conducted slag leaching tests during the 1970s and 1980s.  A Teck

17   memorandum authored December 16, 1983, documented that "over the past 10

18   years a number of tests have been conducted in which granulated smelter slag has

19   been leached with water.  The object of the tests has been to assess contamination

20   of the water with heavy metals."  Ex. 234 (McKay dep., 6/9/10 at 58, referring to

21   dep. ex. 31).  The test results invariably indicated increased levels of metals in the

22   granulated water.  *Id.*  Plaintiffs' expert Dimitri Vlassopoulos comments, "in none

23   of these past studies - including Teck's own - was Teck slag ever shown not to

24   leach under the conditions tested."  ECF 1663 at ¶ 109.

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**      **16**

29. These results were consistent with Canadian government reports, which Teck had received (and later referenced in its 1990s leaching report discussed below), and which also showed that Teck slag leached in the Columbia River. Trial Ex. 241 and 242 (Kootenay Air and Water Quality Study Phase I and II). Teck defended its practice of slag river deposition, but conceded that slag did leach. *See, e.g.*, Sutherland in LMI, 7/30/10, 27:15-17; Yurko in LMI, 8/5/10, 26:24-27:2; 62:24-63:3; Fletcher, 7/27/10, 41:16-23.

30. Teck was forced to cease slag river discharge when the government of Canada investigated the toxicity of its slag and demanded that it stop. Beginning in the 1990s the Canadian federal government investigated the impact of Teck's waste discharges. In a study completed in July 1992, "Survival and Water Quality Results on Bioassays on Five Species of Aquatic Organisms Exposed to Slag from Cominco's Trail Operations," the Canadian Department of Fisheries and Oceans (DFO) studied the impact of slag on aquatic systems to determine if it was a deleterious substance. Dep. of Nener, 9/29/10, at 20. Ex. 624 (Dep. of Stephen Walden, 6/10/10 at 138-139, referring to dep. ex. 46).

31. Water Quality Biologist for DFO, and primary author of the 1992 study, Jennifer Nener, explained "[t]he study came about because Cominco was discharging slag to the Columbia River, and there had been some preliminary

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -     17**

pieces of work that raised questions about the effects of that slag on the river . . . [b]ecause there were questions about the effects of the slag on the river, we undertook this work to determine whether or not the slag could potentially be a deleterious substance." Nener, 20:3-19. The study showed that slag leached hazardous substances and was toxic to fish. Ex. 624. Nener at 45-47, 53-54, 55-57.

32. On November 18, 1991, Walter Kuit and Graham Kenyon were informed of the results of Nener's study: Fish exposed to slag died. "Toxicity seems attributable to elevated total copper and zinc vs. dissolved metals." Ex. 219 (Kuit dep. at 207, referring to dep. ex. 24).

33. Teck recognized the government's work indicated "that slag samples were apparently toxic to several species of aquatic life ranging from burrowing insects to rainbow trout" and the "[e]ffect was either chemical (zinc/copper) or physical (sharp particles damaging gills) or both." Ex. 629 (Teck's Summary of Meeting with Provincial and Federal Government People on June 16, 1992). (Wyton dep. at 113-114, referring to dep. ex. 80.) Ex. 187. (Tail Slag Fact Sheet authored by Graham Kenyon). (Kenyon dep. at 189, referring to dep. ex. 182.) Teck did no studies of its own to evaluate Nener's conclusions.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -**      **18**

34. Another study conducted for the DFO noted that granulated slag discarded from Teck's Trail facility is "transported downstream, and deposits have been found as far south as Marcus Island and Roosevelt Lake." Ex. 208 (Kuit dep. at 74-75, referring to dep. ex. 5). Based on these studies, Canadian environmental regulators demanded that Teck terminate slag discharge to the River "as soon as is practicable." Ex. 111 (Johnson dep. at 103, referring to dep. ex. 305.) Environmental Quality Section Head for the MOE, Julia Beatty-Spence explains, "even prior to the results of the DFO report on the toxicity of slag and the leachability of slag, there was an understanding that the slag would be removed from the river. However, following those studies, it was more clearly understood that it was a more urgent priority, and so that's why our agency in the 1992 permit put in those requirements for the company to find the technology or the means to finally cease the discharge of slag to the river." Dep. of Beatty Spence, 12/13/10, 82:6-16.

35. In view of this, as a condition of a permit expiring December 31, 1991, the Canadian Government required Teck to report on "the effect of continuing slag disposal into the river." Ex. 180. See also exs. 181, 182, 217. (Kenyon dep. at 161, referring to dep. ex. 172; Kenyon dep. at 167 referring to dep. ex. 173; Kenyon dep. at 169, referring to dep. ex. 174; Kuit 6/8/10 dep. at 194, referring to dep. ex. 22, respectively.) In judging how to respond, Graham Kenyon, Teck's

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW -      19**

Environmental Manager recognized that "we are in effect dumping waste into another country—a waste that they classify as a hazardous material." Ex. 180. Teck requested permission to include in its study the effects of continued river disposal, to "potentially justify" continued disposal of slag in the river. Kenyon dep., 163:3-6. The Ministry of Environment, according to Kenyon, "reluctantly agreed." *Id*. at 162:24-163:2; *see also* Ex. 180. Teck advised the Government of Canada that it would conduct a study of slag disposal options, as required. Teck stated that the study would: "assess the environmental impacts of disposing of the barren slag including: (a) leachability and chemical stability of slag." Ex. 181; Ex. 182 (Canadian Govt. response); *see also* Ex. 183 (Teck note outlining the scope of work addressing environmental issues). (Kenyon dep. at 170-171, referring to dep. ex. 175.) As a result, Teck undertook extensive slag leaching studies under the direction of Douglas McKay, Ph.D. (Metallurgical Engineering). McKay dep., 7/16/10, 52:13-25.

36. In 1991, McKay was primary author of a report analyzing slag leachability. McKay dep., 7/16/10, 52:13-25. McKay confirmed that his studies showed metals leaching from Trail slag: "My report showed that small amounts of metals leached or were released from the slag under the various conditions that . . . we tested for in the report." McKay 1, 7/16/10, 66:13-15. McKay's Preliminary Report noted that "fines" were yielding results higher than accepted limits as

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -       20**

1

2    defined by the SWEP [Special Waste Extraction Procedure] criteria and were

3    "**NOT** inert" (emphasis in original, Ex. 244 (LMI dep. ex. 70 at p. 94)); McKay,

4    7/16/10, 97:22-99:6).  Teck's own work confirmed its slag was not chemically

5    stable and was being transported well into Roosevelt Lake. McKay dep., 7/16/10 at

6    66.  *See* Ex. 244 (McKay dep. in LMI, 7/16/10 at 94-99, referring to dep. ex. 70).

7    *See* Kuit memorandum to senior management, Ex. 217.  (Kuit dep., 6/8/10 at 194,

8    referring to dep. ex. 22.)

9

10

11        37.  The report findings, that Teck's slag in fact leached, became common

12   sense to William Duncan, Senior Biologist for Teck, whose work included

13   assessment of biological impact of Teck slag on the aquatic environment of the

14   Columbia River.  Duncan dep.,  7/22/10, 15:23-18:17.  Duncan commented on the

15   2005 USGS study of Lake Roosevelt by Stephen Cox pertaining to slag

16   leachability and stated, "[s]lag work was interesting and quite well done; no

17   surprises that we didn't already know.  We knew slag would leach copper and zinc

18   in the columns and in the river."  Ex. 145 (Duncan dep. at 192, referring to dep. ex.

19   243).  The McKay studies were definitive for Teck and established that Teck slag

20   does, indeed, leach.

21

22

23

24        38.  After the McKay studies, arguments that slag is inert were deemed

25   indefensible.  Walter Kuit, who held the title of Project Manager, Environment,

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**        **21**

1

2    reported to the Operating Vice President at Trail, Roger Watson, on September 19,

3    1991, that Teck's work showed "[s]lag fines are not chemically stable and this is

4    particularly significant if the slag discharge is viewed in the context of river

5    conditions.  Currents will induce a gradient of deposition by particle size with the

6    fines being transported well into Roosevelt Lake."  Kuit 6/8/10, 194:7-195:15.  *See*

7    Ex. 217 (Kuit dep. at 194, referring to dep. ex. 22).  Based on this conclusion, Kuit

8    questioned how Teck could report these results to MOE yet defend continued river

9    discharge of slag.  He concluded that the results could be reported only if Teck

10   "implement[ed] land disposal." *Id.*  Yet, Teck continued to discard slag directly

11   into the River for four more years—on average 400 tons per day.

12

13

14

15        39.  Slag discharge to the Columbia was nearly entirely eliminated in July

16   1995 after start up of the KIVCET furnace implementation.  Only a few hundred

17   tons were discharged in 1996-1997 as Teck stabilized the closed granulation

18   system.  Queneau, ECF 1661, ¶ 115.  KIVCET furnace implementation has not led

19   to elimination of all of the effluent discharges.  As admitted by Teck, "a treatment

20   process has been devised but not implemented due to its high cost, both capital and

21   operating, and cannot be justified as long as we meet our permit."  Queneau, ECF

22   1661, ¶ 120.

23

24

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**        **22**

**B.  FACILITY**

1.  CERCLA hazardous substances, as that term is defined in 42 U.S.C.
§ 9601(14), have been identified in the Upper Columbia River (UCR), which
includes the reaches of the Columbia River from immediately downstream of the
international border to Grand Coulee Dam.  The UCR Site includes that portion of
the Upper Columbia River where certain hazardous substances have come to be
located.  ECF No. 1928, ¶ 8 (Order on parties' stipulation).

2.  The boundaries of the UCR Site are still under investigation, but the
Environmental Protection Agency (EPA) has identified the Site as a "facility"
under CERCLA and initially defined its boundaries as "the areal extent of
contamination in the United States associated with the Upper Columbia River, and
all suitable areas in proximity to the contamination necessary for implementation
of a response action."  ECF No. 1928, ¶ 9 (Order on parties' stipulation).

**C.  RELEASE**

1.  Teck slag that has come to be located in the UCR Site has leached and
continues to leach hazardous substances, including but not limited to lead, zinc,
arsenic, and cadmium, into the waters and sediments from and at the UCR Site.
This leaching occurs into the environment from the UCR Site.  ECF No. 1928, ¶ 19
(Order on the parties' stipulation).

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -        23**

2. Hazardous substances in Teck's effluent, including, without limitation, mercury, cadmium, and zinc, have come to be located at and continue to move into and through the waters and sediments from and at the UCR Site. ECF No. 1928, ¶ 20 (Order on the parties' stipulation)

3. Hazardous substances in Teck's effluent that moved into UCR Site sediments have subsequently leached or otherwise moved via desorption or another geochemical and/or biogeochemical process into and within the waters and sediments from and at the UCR Site. These processes are a leaching or escaping of hazardous substances into the environment from the UCR Site. ECF No. 1928, ¶ 21 (Order on the parties' stipulation).

**D. INCURRENCE OF RESPONSE COSTS**

1. The release or threatened release of hazardous substances at the UCR Site has caused the Tribes and State to incur at least $1 each in response costs. These response costs were necessary and are not inconsistent with the National Contingency Plan. ECF No. 1928, ¶ 22 (Order on the parties' stipulation).

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW -    24**

III.  CONCLUSIONS OF LAW

A.  SUBJECT MATTER JURISDICTION AND VENUE

1.  The Court has jurisdiction over this matter under 28 U.S.C. § 1331.  ECF No. 1928, ¶ 1 (Order on parties' stipulation).

2.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 9613 because the claims arise from, and the releases of hazardous substances occurred at, the UCR Site located in the Eastern District of Washington, Yakima Division.  ECF No. 1928, ¶ 2 (Order on parties' stipulation).

3.  The Tribes and the State makes their claims under 42 U.S.C. § 9607. ECF No. 1928, ¶ 3 (Order on parties' stipulation).

B.  PERSONAL JURISDICTION

1.  The burden of establishing personal jurisdiction rests with the Plaintiffs. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

2.  A federal district court must look to the law of the forum state in determining whether it may exercise personal jurisdiction over an out-of-state defendant.  *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1484 (9th Cir. 1993).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -    25**

3.  Washington's long-arm statute, found at RCW 4.28.185, provides:

> (1) Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person . . . to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any said acts:
>
> . . . .
>
> (b) The commission of a tortious act within this state;
>
> . . . .
>
> (3) Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.

4.  Washington's long-arm statute imposes "no limitations beyond those imposed by due process." *Chan v. Society Expeditions*, 39 F.3d 1398, 1404-05 (9th Cir. 1994).  Thus, the Court "need only determine whether personal jurisdiction in this case would meet the requirements of due process."  *Core-Vent*, 11 F.3d at 1484 (citation omitted).

5.  Specific jurisdiction is analyzed according to a three-prong test: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -       26**

1

2    purposefully avails itself of the privilege of conducting activities in the forum,

3    thereby invoking the benefits and protections of its laws; (2) the claim must be one

4    which arises out of or relates to the defendant's forum-related activities; and (3) the

5    exercise of jurisdiction must comport with fair play and substantial justice, in that

6    it must be reasonable. *Schwarzenegger*, 374 F.3d at 802.

7

8

9        6.  In cases sounding in tort, as here, *Pakootas v. Teck Cominco Metals, Ltd.*,

10    452 F.3d 1066, 1076 (9th Cir. 2006) (*Pakootas I*), courts inquire whether a

11    defendant "purposefully direct[s] his activities at the forum state, applying an

12    'effects' test that focuses on the forum in which the defendant's actions were felt,

13    whether or not the actions themselves occurred within the forum." *Yahoo! Inc. v.*

14    *La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir.

15    2006).  The relevant "actions" here are Teck's disposal of waste into the Columbia

16    River, whether that is deemed to have occurred in Canada and/or in the United

17    States, having "effects" in the UCR Site located in the United States.  These

18    "actions" create personal jurisdiction, while the "effects"- releases of hazardous

19    substances from the waste- create liability under CERCLA.  *Pakootas I*, 452 F.3d

20    at 1078 ("actual or threatened release of hazardous substances triggers CERCLA

21    liability").

22

23

24

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**      **27**

1

2    7. The "effects" test, which is based on the Supreme Court's decision in

3    *Calder v. Jones*, 465 U.S. 783, 789, 104 S.Ct. 1482 (1984), requires that the

4    defendant must have: "(1) committed an intentional act; (2) expressly aimed at the

5    forum state, (3) causing harm that the defendant knows is likely to be suffered in

6    the forum state." *Yahoo!*, 433 F.3d at 1206.  See also  *Core-Vent*, 11 F.3d at 1486.

7

8

9    8. An "intentional act" has a specialized, limited meaning in the context of

10   the *Calder* effects test.  "We construe 'intent' in the context of the 'intentional act'

11   test as referring to an intent to perform an actual, physical act in the real world,

12   rather than an intent to accomplish a result or consequence of that act."

13   *Schwarzenegger*, 374 F.3d at 806.  Teck intentionally disposed of waste into the

14   Columbia River, thereby satisfying the first element of the *Calder* effects test.

15

16

17   9. "'[S]omething more' than mere foreseeability [is required] in order to

18   justify the assertion of personal jurisdiction, . . . and that 'something more' means

19   conduct that is expressly aimed at the forum." *Brayton Purcell LLP v. Recordon &*

20   *Recordon*, 606 F.3d 1124, 1129 (9th Cir. 2010).  Teck dumped waste in the

21   Columbia River, intending to take advantage of the natural transport mechanism

22   the river offered, with knowledge its waste would repose in Washington State.

23   Teck knew that repose of its waste in Washington State was a natural consequence

24   of river disposal.  Teck persisted in river disposal well past its acknowledgment

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**       **28**

that its waste reposed in Washington State.  Such conduct is "expressly aimed" at Washington State and satisfies the second element of the *Calder* effects test. Teck's actions do not amount to untargeted negligence with effects in the Washington State.  Teck's intentional actions were specifically targeted at Washington State.  The impact of its actions was not "local or undifferentiated." *Fiore v. Walden*, 688 F.3d 558, 578 (9th Cir. 2012).[2]

10.  The third element of the *Calder* effects test requires that the defendant's conduct cause harm which the defendant knows is likely to be suffered in the forum state, interpreted as foreseeability that harm resulting from defendant's conduct would occur in the forum state.  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1232 (9th Cir. 2011);  *Brayton*, 606 F.3d at 1131.  "[T]his element does not require that the brunt of the harm be suffered in the forum, . . . [it] may be established even if 'the bulk of the harm' occurs outside the forum." *Brayton*, 606 F.3d at 1131. The harm Teck caused in the forum state was foreseeable.  It was foreseeable that the effects of Teck's discarding of waste would be felt in the United States in Washington State.

───────────────

[2]  It may be that "purposeful availment" is also established here in that Defendant chose to send its waste on a one-way journey to the UCR Site, constituting a decision to avail itself of the benefits of the UCR Site as a disposal market. *Violet v. Picillo*, 613 F.Supp. 1563, 1577 (D. R.I. 1985).

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW -        29**

11.  Teck knew its disposal of hazardous waste into the UCR was likely to cause harm.  It was told by the Canadian government that its slag was toxic to fish and leached hazardous metals.  It acknowledged its effluent settled to sediments in the UCR and that its slag leached hazardous metals into the aquatic environment, yet persisted with river disposal.  Teck has not been haled into the courts of the Eastern District of Washington solely as the result of "random, fortuitous or attenuated" contacts over which it had no control.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174 (1985).

12.  The second prong for the test for specific jurisdiction requires that the claim be one that arises out of or relates to the defendant's activities in the forum.  *Panavision v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).  This requires a showing of "but for" causation.  *Id*. at 1322.  Plaintiffs seek relief based on the fact that Teck's intentional disposal of waste resulted in contamination of the UCR.  "But for" this intentional disposal, Plaintiffs would not have been injured.  Teck's disposal of waste which caused a release of hazardous substances in the UCR is a "forum-related" activity upon which Plaintiffs' claims rest.

13.  The third prong of the test for specific jurisdiction provides that the exercise of jurisdiction must comport with fair play and substantial justice, i.e., that

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -       30**

it is reasonable.  In determining the "reasonableness" of exercising personal

jurisdiction, the following factors are considered: (1) the extent of defendant's

purposeful interjection; (2) the burden on defendant in defending in the forum;

(3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum

state's interest in adjudicating the dispute; (5) the most efficient judicial resolution

to the controversy; (6) the importance of the forum to plaintiff's interest in

convenient and effective relief; and (7) the existence of an alternative forum.

*Core-Vent*, 11 F.3d at 1487-88.  No one factor is dispositive and the court must

balance all of the factors.  *Id.* at 1488.  There is a presumption that the exercise of

jurisdiction is reasonable when the first two prongs of the specific jurisdiction test

have been met.  After the plaintiff meets its burden to satisfy the first two prongs,

the burden then shifts to the defendant to present a "compelling case" that

jurisdiction is unreasonable.  *Schwarzenegger*, 374 F.3d at 802.


14.  Teck's purposeful interjection is extensive in terms of sheer volume and

duration (millions of tons of waste over many years).


15.  Teck is not unfairly burdened by having to defend itself in the Eastern

District of Washington.  The unavailability to it of a "federally permitted release"

defense to liability under CERCLA because it is a non- U.S. entity reflects the

reality that the contamination in the UCR Site located in the United States can only

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**    **31**

be cleaned up pursuant to a U.S. statute.  Canadian laws and regulations will not compel Teck to clean up contamination it has created in the United States. Moreover, the "federally permitted release," 42 U.S.C. § 9607(j),  is not a "free pass to pollute" for U.S. entities because they remain potentially liable for such pollution under other statutes, including the Clean Air Act and the Clean Water Act.

16.  This court previously ruled that an Indian Tribe is not a "person" under CERCLA and therefore, the Tribes are not subject to a counterclaim by Teck regardless of the extent to which they contributed to the contamination of the UCR Site.  (ECF No. 357).  This too does not unfairly burden Teck.   The fact there may be no rule in Canadian environmental jurisprudence sheltering indigenous tribes from liability for pollution, while allowing them to recover against others for the same conduct, is irrelevant since at issue is the clean up of pollution in the United States.  Furthermore, Teck had an opportunity to prove that the harm in the UCR Site was divisible and apportionable under CERCLA, but failed to do so.  (ECF No. 1340).

17.  The exercise of personal jurisdiction over Teck does not conflict with the sovereignty of Canada because there is no extraterritorial application of

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -        32**

CERCLA.  At issue is the clean up of pollution located wholly within the United States due to releases of hazardous substances occurring in the United States.[3]

18.  The Boundary Waters Treaty Act of 1909 which establishes an International Joint Commission (IJC) for examination and resolution of disputes does not represent an adequate alternative forum for the dispute in this case.  There is no indication an IJC could provide the kind of extensive relief available to Plaintiffs under CERCLA.

19.  Given the proximity of its corporate offices, and especially its smelter, to the Eastern District of Washington, the burden on Teck was not great eight years ago when this litigation commenced.  Denying jurisdiction now, after eight years of litigation, could not be more inefficient to judicial resolution of the parties' dispute.

_____

[3]  The court takes judicial notice of the existence of the documents identified in, and appended to, Teck's "Request For Judicial Notice" (ECF No. 1941).  To that extent, the "Request For Judicial Notice" is **GRANTED**.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -**      **33**

1

2   20. Washington's interest in adjudicating the dispute remains profound, as it

3   pertains to pollution of its natural resources.  This forum remains paramount to the

4   Tribes' and the State's interests in convenient and effective relief.

5

6

7   21.  Plaintiffs have proven by a preponderance of evidence the elements of

8   specific personal jurisdiction.   Said jurisdiction existed when this action was filed

9   in 2004. *Kaiser Alum. & Chem. Corp. v. Catellus Dev. Corp.*, 976 F2d 1338, 1340

10  (9th Cir. 1992); *Sher v. Johnson*, 911 F2d 1357, 1365-66 (9th Cir. 1990).

11  Defendant has failed to establish a "compelling case" that the exercise of

12  jurisdiction is unreasonable.  Teck's conduct and connection with Washington

13  State are such that it should have reasonably anticipated being haled into court

14  here. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct.

15  559 (1980). This court has specific personal jurisdiction over Teck.

16

17

18  **C.  CERCLA LIABILITY**

19  1.  CERCLA is a broad, remedial statute enacted by Congress in order to

20  enable the quick and effective response, by governments, to hazardous waste spills

21  that threaten the environment, and to ensure "that those responsible for any

22  damage, environmental harm, or injury from chemical poisons bear the costs of

23  their actions." S. Rep. No. 848, 96th Cong., 2d Sess. 13 (1980), U.S. Code Cong. &

24  Admin. News 1980, 6119, reprinted in 1 CERCLA Legislative History at 320.

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**     **34**

1

2      2.  The Tribes is a sovereign Indian Tribe whose government is recognized

3   by the United States. The Colville Reservation borders the Upper Columbia River

4   and Lake Roosevelt on its western and southern boundaries. A portion of the Upper

5   Columbia River Site is located within the Colville Reservation. The Tribes has an

6   interest in: a) the health of both Tribal members and non-members who either

7   reside on or do business within the exterior boundaries of the Reservation; and b)

8   the environmental quality of the Reservation's reserved natural resources and those

9   resources within areas of the Columbia River subject to the Tribes' management

10  and control, and areas within the former reservation boundaries in which the Tribes

11  have reserved rights and entitlement of which the resources in and about the Upper

12  Columbia River and Lake Roosevelt are of paramount importance.

13

14

15      3.  The State of Washington has a substantial interest in protecting the health,

16  safety, and welfare of its citizens, and its natural environment, from contamination

17  of the Upper Columbia River and Lake Roosevelt with hazardous substances.  The

18  State also has a significant interest in ensuring the prompt and thorough cleanup of

19  hazardous wastes within the State.

20

21

22

23      4.  In enacting CERCLA, Congress established four groups of responsible

24  parties, all of whom are subject to strict liability, with only a limited number of

25  narrowly construed defenses.  *See* 42 U.S.C. § 9607(a) and (b).

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -      35**

1

2

3      5.  Responsible parties generally include:  (1) owners or operators of

4  facilities; (2) past owners or operators at the time of disposal of hazardous waste;

5  (3) transporters of hazardous wastes: and (4) arrangers, those who arrange for the

6  disposal or treatment of hazardous waste.  *See* 42 U.S.C. § 9607(a).

7

8

9      6.  The Ninth Circuit has held that the application of CERCLA here to Teck

10  is a domestic application of the statute because the claim addresses a facility in the

11  United States from which releases and threatened releases of hazardous substances

12  occurred in the United States.  *Pakootas I*, 452 F.3d at 1078 ("Because the actual or

13  threatened release here  . . . took place in the United States, this case involves a

14  domestic application of CERCLA").  The Ninth Circuit's holding is law of the case.

15  *See Ins. Group Comm. v. Denver & R. G. W. R. Co.*, 329 U.S. 607, 612 (1947)

16  ("When matters are decided by an appellate court, its rulings, unless reversed by it

17  or a superior court, bind the lower court").  The decision in *Pakootas I* has not been

18  reversed, or otherwise invalidated, by the Ninth Circuit or the Supreme Court.  *See*

19  *Morrison v. Nat. Australia Bank Ltd.*, _____ U.S. _____,130 S. Ct. 2869, 2884

20  (2010) (applying extraterritorial versus domestic application inquiry similar to that

21  in *Pakootas I*); *Boumediene v. Bush*, 553 U.S. 723, 798, 128 S.Ct. 2229 (2008)

22  (extraterritorial extension of the United States Constitution was warranted);

23  *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 456, 127 S.Ct. 1746 (2007)

24

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -      36**

(extending the Patent Act to products made abroad would not be a domestic application of the law; the location of production is material); *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 954-55 (9th Cir. 2008) (favorably citing *Pakootas I* for the proposition that "when a statute regulates conduct that occurs within the United States, the presumption [against extraterritoriality] does not apply").

7.  The four elements that Plaintiffs must establish to sustain their claims under 42 U.S.C. Section 9607(a) are:

> (1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term, 42 U.S.C. Section 9601(9);
>
> (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. Section 9607(a)(4);
>
> (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. Section 9607(a)(4) and (a)(4)(B);[4] and
>
> (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 9607(a).

---

[4] For the Tribes and State, the response costs must only be not inconsistent with the national contingency plan.  42 U.S.C. § 9607(a)(4)(A).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -**      **37**

1

2 *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 870-71 (9th Cir.

3 2001) (en banc). ECF No. 1928, ¶ 23 (Order on the parties' stipulation). Three of

4 these four liability elements are established by the parties' stipulation. As

5 described below, the Plaintiffs have proved the fourth element by preponderance of

6 the evidence.

7

8

9 8. The UCR Site is a facility. ECF No. 1928, ¶ 24 (Order on the parties'

10 stipulation). The boundaries of the UCR Site have not yet been settled because the

11 investigation of the geographical extent of where hazardous substances have come

12 to be located is ongoing in the Remedial Investigation / Feasibility Study process.

13

14

15 9. There have been "releases" and "threatened releases" of hazardous

16 substances into the environment from slag and effluent from Teck's Trail smelter

17 that have come to be located at the UCR Site. ECF No. 1928, ¶ 25 (Order on the

18 parties' stipulation).

19

20

21 10. Releases and/or threatened releases of hazardous substances at the UCR

22 Site have caused the Tribes and the State to incur response costs, of which at least

23 $1 for each party was necessary and not inconsistent with the National

24 Contingency Plan. ECF No. 1928, ¶ 26 (Order on the parties' stipulation).

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**    **38**

11.  Section 107(a)(3) of CERCLA, 42 U.S.C. 9607(a)(3), provides that:

> any person who by contract, agreement, or otherwise arranged for disposal … of hazardous substances owned or possessed by such person … at any facility … owned or operated by another party or entity and containing such hazardous substances …, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance … shall be liable ….

12.  Teck is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).  CERCLA defines a "person" to include "corporation[s]" and "commercial entit[ies]."  There is no dispute that Teck is a "corporation."  The Ninth Circuit held the CERCLA definition of "person" extends to Teck, a Canadian corporation, under a two-part test:  (1) the state must have jurisdiction over the party, and (2) the legislature must intend for the term to apply.  *Pakootas I*, 452 F.3d at 1076.  The Ninth Circuit held the second part of the test is satisfied because Congress intended to reach all parties responsible for releases of hazardous substances in the United States.  452 F.3d at 1077 ("Because the legislature intended to hold parties responsible for hazardous waste sites that release or threaten release of hazardous substances into the United States environment, the second  [part of the test] is satisfied here").  The first part of the test is also satisfied because this court holds has specific personal jurisdiction in this matter over Teck.

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**        **39**

1

2      13.  Congress used broad language for arranger liability, reaching persons

3   who "by contract, agreement, or otherwise arranged for" the disposal of hazardous

4   substances.  *United States v. A & F Materials*, 582 F. Supp. 842, 845 (S.D. Ill.

5   1984).  Arranger liability "must be given 'a liberal judicial interpretation . . .

6   consistent with CERCLA's overwhelmingly remedial statutory scheme.'"  *Cadillac*

7   *Fairview/California Inc. v. United States*, 41 F.3d 562, 565 n. 4 (9th Cir. 1994)

8   (quoting *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1380 (8th Cir.

9   1989)).  An arranger need not know where its hazardous substances ultimately end

10  up, so long as it was the source of the hazardous substances.  *See Missouri v.*

11  *Independent Petrochemical Corp.*, 610 F. Supp. 4, 5 (E.D. Mo. 1985).

12

13

14      14.  CERCLA does not define "arrange for disposal," but it defines

15  "disposal" by adopting a definition from another federal environmental statute.  42

16  U.S.C. § 9601(29).  "The term 'disposal' … shall have the meaning provided in

17  section 1004 of the Solid Waste Disposal Act [42 U.S.C. §§ 6903]." In turn,

18  section 1004 of the Solid Waste Disposal Act defines "disposal" as: the discharge,

19  deposit, injection, dumping, spilling, leaking, or placing of any solid waste or

20  hazardous waste into or on any land or water so that such solid waste or hazardous

21  waste or any constituent thereof may enter the environment or be emitted into the

22  air or discharged into any waters, including ground waters.  42 U.S.C. § 6903(3).

23

24

25

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW -        40**

1

2    15.  As the Ninth Circuit held, and as is binding on this court as law of the

3    case, CERCLA's arranger liability phrase by "any other party or entity" refers to

4    ownership of the waste at issue.  452 F.3d at 1082.  Thus, a person will be liable as

5    an arranger if it arranged for the disposal of its own wastes or wastes owned by

6    "any other party or entity."  The Ninth Circuit rejected Teck's argument that a

7    CERCLA plaintiff must prove that "any other party or entity" arranged with the

8    owning party for the disposal of wastes.

9

10

11    16.  Addressing arranger liability, the Supreme Court has explained that

12    when a waste (rather than a useful product or potentially useful product) is

13    discarded, intent to dispose need not be proved.  *Burlington Northern & Santa Fe*

14    *Ry. v. United States*, 556 U.S. 599, 609-10, 129 S.Ct. 1870 (2009) ("It is plain from

15    the language of the statute that CERCLA liability would attach under § 9607(a)(3)

16    if an entity were to enter into a transaction for the sole purpose of discarding a used

17    and no longer useful hazardous substance," and further proof of intent is

18    unnecessary).

19

20

21

22    17.  Federal courts applying *Burlington Northern* have inquired whether a

23    generator intended to dispose of waste, as distinguished from intending to sell a

24    useful product.  *See, e.g., Team Enterprises., LLC v. Western Investment Real*

25    *Estate Trust*, 647 F.3d 901, 907-08 (9th Cir. 2011) (no arranger liability for

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -    41**

designer/manufacturer of equipment used to ultimately dispose of waste but not intended or exclusively designed for such). Here, Teck's discarding of its slag and effluent in an unrecoverable manner via sewer outfalls into a river is clear intent to dispose of a waste. No court has held that a generator must intend to dispose of its wastes at a *particular* location to be held liable as an arranger under CERCLA. *See, e.g., O'Neil v. Picillo*, 883 F.2d 176, 183 & n.9 (1st Cir. 1989)). Even if the Tribes were required to prove Teck's intent to dispose of its wastes particularly at the UCR Site, the plainly obvious power of the Columbia River for transport, the absence of slag stockpiling in the river at the point of discard, and Teck's belief and knowledge that some of its wastes had come to a point of repose in the United States, satisfies the inquiry. By no later than the 1930s, Teck had knowledge or should have known that at least some portion of its slag had deposited in the United States between the international border and Northport. Ex. 225 at p. 15 (Kuit dep. in LMI, 2/23/11, at 40, referring to dep. ex. 2; Ex. 226 at p. 5-6 (*id.* at 46, referring to dep. ex. 3); Ex. 227 at p. 5, (*id.* at 54, referring to dep. ex. 4). It "was not only the inevitable consequence, but the very purpose" of Teck's disposal practices that the substances would come to be located at the UCR Site. *Cadillac Fairview*, 41 F.3d at 566.

18. Disposal at the UCR Site occurred when, after Teck actively and intentionally discarded its slag and effluent as waste into the Columbia River at

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -**        **42**

1
2   Trail, at least some portion of that slag and effluent came to a point of repose at the

3   UCR Site.  *See Carson Harbor,* 270 F.3d at 870-71 (analyzing term "disposal").

4   *See also State of Colorado v. Idarado Mining Co.*, 707 F. Supp. 1227, 1241 (D.

5   Colo. 1989), *amended by*  735 F. Supp. 368 (1990), *rev'd on other grounds*, 916

6   F.2d 1486 (defendant "arranged" for disposal of mine tailings by discarding them

7   into river, which brought them downstream to a CERCLA "facility").  *And see*

8   *Appleton Papers, Inc. v. George A. Whiting Paper Co.*, 2012 WL 2704920 (E.D.

9   Wis. July 3, 2012) (potential arranger liability for the locations where waste

10  product had come to be located in the Fox River and not limited to the location of

11  the original introduction to the river).

12
13

14

15      19.  Pursuant to CERCLA, 42 U.S.C. § 9607(a)(4)(A), Teck is jointly and

16  severally liable to the Tribes and the State in any subsequent action or actions to

17  recover past or future response costs at the UCR site.

18

19

20      20.  This Court retains jurisdiction to consider assessment of  reasonable

21  attorney fees, together with other past and future response costs, following entry of

22  the final judgment in Phase I holding Teck liable under CERCLA, 42 U.S.C.

23  § 9607(a)(3).

24

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**      **43**

21.  The following questions are not at issue in Phase I and this Court makes no finding of fact or conclusion of law regarding the following: (a) whether a release or threatened release of hazardous substances to the environment has occurred as a result of aerial emissions from the Trail smelter; (b) the extent to which any party has incurred response costs, if any, as the result of a release or threatened release of hazardous substances; (c) whether any response costs above $1.00 incurred by any party are consistent or not inconsistent with the National Contingency Plan; and (d) whether any release or threatened release has caused damages or injury to, destruction of, or loss of natural resources.

## IV.  RULE 54(b) CERTIFICATION

Pursuant to Fed. R. Civ. P. 54(b), the court directs the District Executive to enter a final judgment pursuant to these Findings Of Fact and Conclusions Of Law which declare that Teck is jointly and severally liable in any subsequent action or actions to recover past or future response costs under § 9607(a)(4)(A) at the UCR site.  This will allow for a prompt appeal of this award of declaratory relief.  There is no just reason for delay because Phase I of this litigation regarding liability for response costs is now concluded.  Phase II will concern liability for natural resource damages.  Efficiency is best served by full appellate resolution of response cost liability, including the availability of the divisibility/apportionment defense, before commencement of Phase II litigation.

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW -    44**

1

2       **IT IS SO ORDERED**.  The District Court Executive is directed to enter

3   these Findings of Fact and Conclusions of Law, enter judgment accordingly, and

4   forward copies of the same to counsel of record.

5       **DATED** this 14th day of December, 2012.

6

7                                           *s/Lonny R. Suko*

8                                   _____
                                            LONNY R. SUKO
9                                      United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW -**        **45**