1
2
3
4
5
6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

JOSEPH A. PAKOOTAS, an
individual and enrolled member of the
Confederated Tribes of the Colville
Reservation; DONALD R. MICHEL,
an individual and enrolled member of
the Confederated Tribes of the Colville
Reservation; and the
CONFEDERATED TRIBES OF THE
COLVILLE RESERVATION,

               Plaintiffs,

    and

STATE OF WASHINGTON,

               Plaintiff-Intervenor,

    v.

TECK COMINCO METALS, LTD., a
Canadian corporation,

               Defendant.

NO. CV-04-0256-LRS

**PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 1

## I.    Background

1.    In Phase I of this case, the Court determined that pursuant to the Comprehensive Environmental Response and Liability Act (CERCLA), 42 U.S.C. § 9607 (a)(4)(A), Teck Metals Ltd., f/k/a Teck Cominco Metals, Ltd. (Teck), is liable to the Confederated Tribes of the Colville Reservation (the Tribes) and the State of Washington (the State) in any subsequent action or actions to recover past or future response costs. ECF No. 1955, p. 43.

2.    The Court also determined that Teck is liable as an "arranger" under CERCLA, 42 U.S.C. § 9607(a)(3), and that the Tribes and State each incurred response costs which were necessary and not inconsistent with the National Contingency Plan (NCP). ECF No. 1955, p. 2.

3.    In its Phase I Findings of Fact and Conclusions of Law, the Court determined that it had subject matter and personal jurisdiction and that venue was proper in this court. ECF No. 1955. That determination is incorporated herein.

## II.    Findings of Fact

### A.    History of Tribes' Efforts to Evaluate and Cause Cleanup of Hazardous Substances Disposed of in the Upper Columbia River.

4.    The Tribes is a sovereign Indian Tribe whose government is recognized by the United States.  The Tribes' Reservation borders the Upper Columbia River (UCR) Site, and includes a portion of the river bed.  The Tribes also has reserved rights to off-Reservation resources located in the northern reach of the UCR and adjacent uplands.  ECF No. 2345, Written Testimony of Passmore at ¶ 2.

5.    In 1999, the Tribes petitioned the federal government pursuant to 42 U.S.C. § 9605(d) of CERCLA to "conduct a preliminary assessment of potential hazards to public health and the environment associated with the release or threatened release of hazardous substances in the Upper Columbia River Basin from the Canadian border southward through Lake Roosevelt, to the Grand Coulee Dam (UCR site)."  ECF No. 2345, Passmore Written Testimony, ¶ 2; ECF No. 2309, Joint Pretrial Order at 2.  EPA completed preliminary assessments as of January, 2001. Exh. 5040, p. 2.

6.    In 2001, the Tribes entered into an agreement with the U.S. Environmental Protection Agency (EPA) regarding government-to-government coordination of a site investigation to be conducted at the UCR Site.  Exh. 5040. The Tribes and EPA also executed Amendment 1 to that agreement.  Exh. 5039. Among other things, that amendment recognized the Tribes as "the appropriate non-federal party for making decisions and carrying out program responsibilities affecting the Reservation, the Reservation Environment and health and welfare of the Reservation Populace."  It also provided the Tribes an important role in conducting site investigations under CERCLA, including, *inter alia,* work on "reconnaissance and sampling visits," scoping and sampling strategy development, reviewing and commenting on draft sampling and quality assurance plans, and reviewing and commenting on draft Site Investigation reports. Exh. 5040 at pp.2-3. Gary Passmore testified that the Tribes had in fact participated in this preliminary assessment work.  Passmore Trial Testimony ("TT"), ECF No. 2368, at 115:9-12.

7.    With this assistance from the Tribes, and based on its preliminary assessment, EPA determined that further action was warranted.  In 2003, EPA issued a Unilateral Administrative Order (UAO) to Teck pursuant to 42 U.S.C. § 9606 of CERCLA "directing Teck to perform a Remedial Investigation and

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 3

Feasibility Study (RI/FS) for the UCR site pursuant to an attached Statement of Work." ECF No. 2309, Joint Pretrial Order at 2; Exh. 7020, p. 2. The UAO contained EPA's findings that Teck had deposited hazardous substances at the UCR Site leading to release or threatened release into the environment sufficient to establish CERCLA liability. Exh. 7020 at pp. 3-7. Passmore TT at 118-119. Teck refused to comply, arguing that as it discharged its wastes in Trail, B.C., it was not subject to United States environmental law. *See* Edwards TT, ECF No. 2370, at 441-44; Exh, 7279. Teck rejected application of U.S. environmental law then and it continues to hold that view to the present day. Edwards TT at 443:10-11; 443:21-444:18. EPA did not commence an action to compel Teck to comply with the UAO and its RI/FS requirements. Passmore Written Testimony, ECF No. 2345, ¶ 4.

**B.    Tribes Fund Suit to Force Teck to Comply With UAO.**

8.    In 2004, the Chairman of the Tribes' Business Council, Joseph A. Pakootas, and the Chair of its Natural Resources Committee, Donald R. Michel, brought a citizen suit pursuant to 42 U.S.C. §9659(d)(1) to enforce the UAO against Teck. This suit was funded by the Tribes. Joint Pretrial Order at 8; Passmore Written Testimony, ECF No. 2345, ¶ 4.

9.    Teck moved to dismiss the citizen suit, denying that it was subject to CERCLA because it discharged its wastes in Canada. ECF No. 2309, Joint Pretrial Order at 3. This court denied Teck's motion to dismiss, finding that CERCLA applied to Teck's UCR disposals alleged in this suit. *Id.* Teck appealed this decision and lost in the court of appeals, *Pakootas v. Teck Cominco Metals, Ltd.,* 452 F.3d 1066 (9th Cir. 2006), *cert. denied,* 522 U.S. 1095 (*Pakootas I).* Teck sought *en banc* review (ECF Nos. 115, 133) and ultimately a writ of certiorari from

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 4

the Supreme Court.  These efforts failed, and the outcome was that CERCLA was determined to apply to Plaintiffs' allegations that Teck disposed of its hazardous substances at the UCR site.  *Pakootas I*, 452 F.3d at 1082.

10.    In June 2006, during pendency of the appeal, Teck's U.S. subsidiary, Teck American, Inc. ("TCAI"), and EPA executed a Settlement Agreement providing for a remedial investigation and feasibility study patterned after CERCLA.  RI/FS Agreement, Exhibit 7112; ¶¶ 3, 6.[1]  In this agreement, Teck denied that it had liability under CERCLA.  *Id*. at ¶ 2.  The RI/FS Agreement provided that EPA would withdraw its UAO, but expressly stated that the agreement did not release any claim the United States or any "entity other than a Party" may have against TCAI [or Teck]."  Exhibit 7112, ¶ 70.  Thus, Teck's CERCLA liability remained an issue for adjudication.

11.    Pursuant to the Settlement Agreement, Teck agreed to fund and conduct the RI/FS under EPA oversight consistent with the National Contingency Plan (NCP) and EPA guidance, and to fund participation of the Department of the Interior, State of Washington, Colville Tribes and Spokane Tribes in the same.  Exh. 7112, XIII. Costs; ECF No. 2222 at ¶¶ 73-76 (K. McCaig) (TCAI has funded RI/FS costs in excess of $74 million as of September 2015, including participation costs for the Colville Tribes and others).  EPA is the Lead Agency for the RI/FS at the UCR Site.  Passmore TT 115:9-10; ECF No. 2222 at ¶23 (K. McCaig).

12.    Upon entry into the Settlement Agreement, EPA withdrew the UAO.  Exh. 7019 (EPA letter confirming withdrawal of the UAO); ECF No. 2280 at 18 (Passmore Dep. at 51:2-4).

---

[1] Teck acknowledges this RI/FS Agreement is "not considered to be part of CERCLA." Edwards TT at 447:23-24.

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 5

13.    The RI/FS Agreement provided that TCAI would conduct an RI/FS at the UCR Site that, "while not carried out under an administrative or judicial order issued pursuant to the provisions of CERCLA, will be consistent with the [NCP]." Exh. 7112, ¶ 3.  The RI/FS Agreement obligated TCAI to "perform a RI/FS for the Site as outlined in the Statement of Work ('SOW')."  Exh. 7112, ¶ 3.  Although the RI/FS Agreement provided that EPA would withdraw its UAO, Teck continued with its appeal of this court's decision denying its motion to dismiss the UAO enforcement action, and specifically told the Ninth Circuit that the appeal was not moot.  Passmore Written Testimony, ECF 2345, at ¶ 6; Exh. 7019; *Pakootas I,* 452 F.3d at 1071-1072, at n.10.

## C.    Tribes and State Sue to Determine Teck's Liability for Investigation and Cleanup Under CERCLA (Phase I).

14.    In 2008, the State and Tribes filed Second Amended Complaints alleging Teck's liability under CERCLA and seeking declaratory relief establishing its responsibility for their response costs.  Exh. 7032, Tribes' Second Amended Complaint.  In defense of this litigation, Teck persisted in its claim that it was not subject to U.S. environmental law.  In answer to the Second Amended Complaints filed by the State and the Tribes, Teck denied that its slag and effluent had released hazardous substances to the UCR environment.  *See* Exh. 7032 at ¶ 4.3, and Exh. 5176, Teck's Answer to Second Amended Complaint, at ¶¶ 16-17; see also Teck's Memorandum of Law in Support of Motion to Stay, ECF No. 211, at 14 ("Teck Cominco's position is that its slag is not a hazardous substance.").  In addition, Teck denied that it was a liable party under § 9607(a) of CERCLA.  *See* Exh. 7032 at ¶¶ 6.1-6.3, and Exh. 5176 at ¶¶ 48-50.  As well, Teck asserted a defense of apportionment/divisibility, arguing that all or virtually all of the

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 6

hazardous substances found in the UCR Site were deposited by others and it was financially responsible for only a miniscule amount. ECF No. 1127 at 22-25; ECF No. 1872 at 22-28.

15.    Teck then moved for stay of all proceedings pending completion of the RI/FS it was performing under agreement with EPA.  ECF Nos. 210, 211.  It argued that litigation was unnecessary as the ongoing RI/FS would adequately address conditions at the Site.  ECF No. 211 at 15.  EPA rejected Teck's claim in a letter to Teck in which it stated that it would "welcome expeditious resolution of the liability portion of the litigation so that the parties can focus more clearly on studies that will lead to the cleanup plan for the Site, and so that cleanup is not delayed by litigation when the RI/FS is completed."  Exh. 5139 at 2.  The Court noted EPA's view and denied Teck's motion for stay and issued a scheduling order that provided for trial of the declaratory relief claim. *See* Order Denying Defendant's Motion to Stay, Exh. 5151.

**D.    Tribes' Evaluation of Presence of Hazardous Materials in the UCR Site.**

16.    Beginning in 2009, the Tribes' consultant, Environment International (EI), designed and implemented studies of UCR sediment and pore water.  Fraser Written Testimony, ECF No. 2321, ¶ 2.  This included sampling and quality assurance plans, work plans and other documents that documented the investigation and assured its quality.  Fraser TT, ECF No. 2368, at 139-140, 197. EI collected multiple core samples of Columbia River sediments within the UCR Site, and also collected pore water samples from the UCR Site for analysis, all intended to collect "validated empirical data" that was ultimately provided to EPA and used to identify and fingerprint hazardous substances found in the UCR Site. Fraser Written Testimony, ECF No. 2321, ¶¶ 2-3, 15; Fraser TT 150, 156-157.

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

17.    Once the sediment and pore water samples were collected, they were provided to labs for analysis of their metals concentrations, concentration of organic carbon, and their particle size profiles.  Fraser Written Testimony, ECF No.2321, ¶ 4.  The Tribes provided the data results of these analyses to other independent experts to determine whether hazardous substances were present in the UCR Site and from where they originated.  Fraser Written Testimony, ECF No. 2321, ¶ 6-7; Fraser TT, 187-190.

18.    Dr. Dimitri Vlassopoulos, a geochemist, reviewed the data and results derived from these analyses, along with other available UCR Site data.  Fraser Written Testimony, ECF No. 2321, ¶ 7; Exhibit 5053, pp. 76, 80. Dr. Vlassopoulos determined that slag located in the UCR Site possessed a unique lead isotope "fingerprint," which matched that of slag produced by the Trail Smelter.  Fraser Written Testimony, ECF No. 2321, ¶ 7-9.  Dr. Vlassopoulos also analyzed pore water samples collected by EI to identify hazardous substances released in UCR sediments.  Fraser Written Testimony, ECF No. 2321, ¶ 9.  This analysis demonstrated Teck was responsible for the presence of slag and effluent containing hazardous substances in the UCR Site.  Fraser Written Testimony, ECF No. 2321, ¶ 7-9; Exh. 5053, pp. 7-8.  Dr. Vlassopoulos' opinions relied on data analyzed by independent labs, including work done by Bruce Nelson at the University of Washington.  Fraser Written Testimony, ECF No. 2321, ¶ 4, 6-7, 9.

19.    The Tribes funded expert analysis from Dr. Paul Queneau of the quantities and characteristics of the slag and effluent discharged from Teck's Trail Smelter.  Exhs. 5146, 7256, 7260.  His analysis quantified the outputs from Teck's Trail Smelter, as well as providing information on ore used by the smelter necessary for isotope analysis employed to fingerprint the source of hazardous

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 8

substances in the UCR Site. Fraser Written Testimony, ECF No. 2321, ¶ 14; *See also* Vlassopoulos reports, Exh. 5053 at pp. 9-12, 24, and Exh. 7265 at pp. 19, 56.

20.    The Tribes also retained experts to determine the movement of Teck's slag and effluent within the Columbia River. In April 2010, the Tribes' hydrology expert, Northwest Hydraulic Consultants (NHC), conducted extensive subsurface and shoreline sampling of sediments along 55 kilometers of the Canadian reach of the Columbia River. Fraser Written Testimony, ECF No. 2321, ¶ 10-11; Exh. 5055, pp. 4-5, 90. NHC analyzed samples to evaluate metals concentrations and particle size, which enabled it to determine the movement of slag to the United States border. Fraser Written Testimony, ECF No. 2321, ¶ 10-11; Exh. 5055, pp. 4-5, 90. The Tribes retained another expert, LimnoTech, to review available data and determine whether once slag crossed the border, it would have moved within the UCR Site. Fraser Written Testimony, ECF No. 2321, ¶ 11; Exh. 5056, pp. 17, 27. This led to a report from LimnoTech demonstrating that Teck's slag had moved into the UCR Site, as well as an extensive database used by other experts to locate the signal for Teck slag in the UCR. LimnoTech report, Exh. 5056 at pp. 17-37.

21.    Dr. Vlassopoulos and Dr. Joseph Ryan also analyzed sediment and pore water samples to determine whether metals are released from Teck's slag and effluent under conditions comparable to those of the UCR Site. Fraser Written Testimony, ECF No. 2321, ¶ 12. Dr. Vlassopoulos' work demonstrated hazardous substances are released from Teck's slag into the UCR environment. Fraser Written Testimony, ECF No. 2321, ¶ 12; Exh. 5053, ¶ 2.2. Dr. Ryan's analysis demonstrated effluent discharged by Teck into the UCR Site released mercury into the UCR environment. Fraser, ECF No. 2321, ¶ 13; Exh. 5054, pp. 3-4.

22.     The Tribes' field investigations and laboratory analyses, taken together with expert scientific review of data derived from those analyses, demonstrated Teck's slag and effluent had moved into the UCR Site and had released hazardous substances to the environment. Passmore Written Testimony, ECF No. 2345 at ¶¶ 9-10, 12; Fraser Written Testimony, ECF No. 2321 at ¶¶ 2-14.

**E.     Tribes Presents Results of Scientific Investigation to EPA and Uses It to Prove Teck's Liability Under CERCLA.**

23.     In Phase I, the Tribes and State presented the results of their investigation of UCR Site conditions in the form of expert reports.  Exhs. 5053-5056. These reports included copies of the coring and pore water studies funded by the Tribes and all of the materials the experts considered.  Fraser TT, ECF No. 2368 at 190-191.  The Tribes' expert reports, including the field investigation, were also presented to EPA in 2010.  Fraser TT at 202-204.  Presentation included the sampling and quality assurance plans used in collecting the information.  Fraser TT at 196-97.  This information will be valuable in future analysis of the fate and transport of hazardous substances in the UCR Site. It is kept in a SharePoint site and is eligible for inclusion in the Administrative Record that will be prepared at the end of the RI/FS.  Fraser TT, ECF No. 2370, at 469-470.  It has also been used to guide and improve ongoing EPA RI/FS studies, Fraser TT at 471-472, and may be used to judge the nature and extent of contamination at the Site.  Fraser TT at 472-473.

24.     Teck identified its own expert witnesses who testified that while Teck's slag and effluent may have moved into the UCR Site, none of it released any hazardous substances to the environment.  Riese Declaration, ECF No. 1626, p. 2, ¶ 6.  Teck's expert, Dr. Riese, opined that "metals either were not leaching or

being released from Teck barren slag, or simply were not measureable." ECF No. 1131-1, at ¶ 7. Dr. Johns further claimed that all of Teck's effluent had passed through the river system and has not come to be located in the sediment of the UCR where it could release [hazardous] metals." ECF No. 1140-1, at ¶ 17. As a result, Dr. Johns apportioned zero percent of the harm in the UCR Site to Teck's slag and effluent. ECF No. 1140-1, at ¶¶ 16-17. Had the opinions of Drs. Riese and Johns prevailed, it would have resulted in several – not joint and several – liability for Teck between zero and 0.05% of cleanup costs. *See* Exh. 5162, pp. 7-8.

25.    This clash of expert witnesses regarding the presence of Teck's slag and effluent in the UCR Site and release to the environment became the subject of protracted litigation, including depositions and motion practice. Summaries of this litigation are presented in Exhs. 5136-5138.

26.    The State and the Tribes answered Teck's liability and divisibility experts with rebuttal reports from its existing experts, Drs. Vlassopoulos, Queneau, Bierman and McLean, and new experts, Drs. Hennet, Kendall, Blum, Haney, Kern, Medine and Stevens, retained to address Teck's divisibility defense. Their opinions are reported in Exhs. 5053-5056, 7257-7267.

27.    The State and the Tribes moved for summary judgment dismissal of Teck's affirmative defense of apportionment/divisibility and this court granted that motion. ECF No. 1340. As a result, and as stated in this court's subsequent Findings of Fact and Conclusions of Law, ECF No. 1955, Teck was found to be jointly and severally liable under CERCLA.

28.    The costs of investigation and evaluation of Site conditions and rebuttal of Teck's divisibility affirmative defense totaled $3,483,635.90. Exh. 5110. Summaries supporting this exhibit are found at Exhs. 5029-5031.

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 11

29.    One month before trial, Teck stipulated that the UCR Site was a facility, that it deposited 9.97 million tons of slag in the UCR Site (ECF No. 1955 at 5, ¶ 5) and 132,000 tons of hazardous substances in effluent, and those deposits resulted in releases to the environment—the elements of CERCLA liability.  (*Id.* at 6, ¶ 8.)  Teck also stipulated that the Tribes and State had each incurred at least one dollar of response costs.  ECF No. 1407, ¶ 2; ECF No. 1955, at p. 24.  Teck refused to stipulate to personal jurisdiction and that issue was tried to the court.

**F.    The Tribes Proved that Teck's Disposals in the UCR Established Personal Jurisdictions Necessary for Enforcement in this Court.**

30.    Proof of personal jurisdiction required evidence of Teck's knowledge of foreseeable injury in the U.S. resulting from its discharges of wastes at its Trail Smelter.  Teck steadfastly denied knowledge of the fate of its discharges.  In the Phase II trial, Mark Edwards, Teck's Manager of Environment Health and Safety for Trail Operations—a member of Teck's three person UCR team— reaffirmed to this Court his testimony that he "did not know the fate of slag released from Trail operations."  Edwards TT, ECF No. 2370, at 453: 11-19.  Thus, the State and Tribes engaged in extensive document production and located evidence contradicting Teck's denials.  This work yielded key evidence, including the statement of Teck's Environmental Control Manager, Graham Kenyon, in 2003, that Teck had used Lake Roosevelt as a free disposal site for its wastes.  Findings of Facts and Conclusions of Law, ECF No. 1955 at pg. 13, ¶ 22; see generally Findings of Fact and Conclusions of Law, ECF No. 1955, ¶¶ 5-39.

31.    Plaintiffs prevailed and this court entered Findings of Fact and Conclusions of Law finding Teck is a covered person under CERCLA and that it is liable to the Tribes and State for their response costs.  ECF No. 1955.  This

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 12

adjudication that Teck was jointly and severally liable under CERCLA will require Teck to participate in any EPA required cleanup at the Site.  Such a cleanup will minimize or mitigate any damage to the environment resulting from deposit of hazardous substances to the UCR Site.

**G.    After Court Determines Teck is Liable Under CERCLA, Teck Agrees to First Cleanup Under CERCLA.**

32.    In 2015, EPA engaged in discussions with Teck regarding the need for removal action on properties in the UCR Site with excessive lead levels. Supplemental Sworn Declaration of Bailey at 2, ECF No. 2362.  This would include soil sampling and removal from private property and tribal allotments located within the UCR Site.  By letter of June 16, 2015, Exh. 5186, EPA requested that Teck "enter into a CERCLA agreement with the EPA for the performance of the removal action."  EPA advised of its hope to reach agreement with Teck on removal action in order to avoid the need to take "an enforcement action against Teck." *Id.*

33.    On August 10, 2015, Teck and EPA executed an Administrative Settlement Agreement and Order on Consent For Removal Action, Docket No. CERCLA-10-2015-0140 (AOC), Exh. 5177.  It provides, *inter alia*, that "EPA is entering into this Settlement Agreement pursuant to its authority vested in the President of the United States by Sections 104, 106, and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980," and includes EPA's findings of fact and conclusions of law determining that Teck is a responsible party under CERCLA and jointly and severally liable for the response action and response costs that are the subject of the agreed removal action.

34.    The form of the AOC—expressly issued under CERCLA—contrasts with the RI/FS Agreement, Exh. 7112, entered into in 2006 before the liability finding in this case.  It was a private agreement and expressly excluded application of CERCLA:  "The Parties intend that this RI/FS process, while not carried out under an administrative or judicial order issued pursuant to the provisions of CERCLA. . . ."

**H.    Tribes Accounting of Response Costs.**

35.    Teck has stipulated that the Tribes' claimed response costs totaling $8,253,676.65 were accurately calculated, ECF No. 2363, and has withdrawn its defense of NCP non-compliance based on the accurate accounting requirement.  *Id.* at 3.  Thus, disputes over accurate accounting as required by the NCP are no longer before the court.

**I.    Computation of Tribes' Costs.**

36.    The Tribes' response costs include costs of assessment and evaluation of hazardous substances in the UCR Site and identification of Teck as a responsible party, as well as expert and legal fees incurred in proving Teck's liability under CERCLA.  The Tribes has disclosed its response costs claim in Fed. R. Civ. P. 26(a)(1) disclosures.  Exhs. 5034, 5035, 5184, 7113-7117, 7121-7123. These disclosures compile the costs for which the Tribes claim recovery.  They include invoices (including descriptions of work performed) from, and payments to, its environmental consultant, testifying experts, other non-testifying experts, vendors, and attorneys.  They were also provided to Teck.  The Tribes' current— 11th Disclosure—is Exh. 5184.  This disclosure is reformatted as summaries in

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 14

Exhs. 5027-5033. The evidence of costs and payments on which that disclosure and summaries thereof are based is compiled in Exhs. 5001-5026.

37.    The Tribes incurred $8,253,676.65 in past response costs through 2013.  The Tribes' collection and data analysis of UCR sediment cores and pore water totaled $589,907.77.  Exh. 5110.  The Tribes' total cost of investigating, evaluating and assessing the source of hazardous substances at the UCR Site was $3,483,635.90.  Exh. 5110. This figure includes the Tribes' testifying experts, non-testifying experts and qualifying vendors.

38.    Broken down into constituent categories, response cost subtotals are as follows: (a) Employee Labor and Travel ($20,567.09); (b) Testifying Experts ($1,785,973.61); (c) Consulting Expert and Investigation Services ($1,219,237.87); (d) Other Non-Testifying Experts/Consultants ($278,233.52); (e) Vendors ($465,046.92); (f) Attorney's Fees ($5,032,410.35); and (g) Miscellaneous Costs ($179,755.81). [2]  Exhs. 5027-33, 5184.

39.    As described above, these response costs include expenditures for investigation and evaluation of hazardous substances in the UCR Site.  Exh. 5110 compiles these costs as provided below:

| Collection of Cores and Porewater at UCR Site and Data Analysis[3] | |
|---|---|
| Expert / Consulting Expert | Amount |
| Dimitri Vlassopoulos | $38,991.60 |
| Northwest Hydraulic Consultants, Ltd | 220,018.34 |

---

[2] For whatever reason, the total of these figures is $8,981.225.17.  The figures in Exh. 5184 do, however, total $8,253,676.65.

[3] Through 2013, not including air pathway work.

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 15

| Collection of Cores and Porewater at UCR Site and Data Analysis[3] | |
| --- | --- |
| **Expert / Consulting Expert** | **Amount** |
| Environment International, Ltd. | 330,897.83 |
| **TOTAL** | **$589,907.77** |
| **Total Cost for Investigation, Evaluation and Assessment of Source of Hazardous Substances at UCR Site [4]** | |
| Testifying Experts | $1,785,973.62 |
| Non-testifying Experts | $1,567,934.37 |
| Qualifying Vendors<br>    Fremont Analytical: $49,423.75<br>    TEG Oceanographic Services: $80,274.00<br>    University of Washington Lab: $30.16 | $129,727.91 |
| **TOTAL** | **$3,483,635.90** |

40.    The Tribes has withdrawn the following non-testifying expert costs:

| | |
| --- | --- |
| **AECOM** | **$39,155.88** |
| **Jim Ebert** | **$39,994.24** |
| **Jim Thomas** | **$112.50** |
| **Stan Church** | **$22,832.04** |
| **TOTAL COSTS WITHDRAWN** | **$102,094.66** |

41.    The Tribes retained Short Cressman & Burgess ("SCB") to provide legal services related to addressing the contamination in the UCR Site.  This includes, without limitation:  (1) the Tribes' 1999 petition to EPA for assessment of hazardous substance contamination along the Columbia River extending 150 river miles from the United States-Canadian border; (2) preparation and litigation of the

---

[4] Through 2013, not including air pathway work

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 16

2004 citizen suit filed by Joseph Pakootas and D.R. Michel and funded by the Tribes, seeking enforcement of the 2003 UAO issued by the EPA against Teck, including appellate review in the Ninth Circuit and Supreme Court; (3) preparation and litigation of the amended complaint seeking declaratory relief, cost recovery and natural resource damages filed by the Tribes in 2005; and (4) preparation and litigation of the Second Amended Complaint filed in 2008 which culminated in Findings of Fact and Conclusions of Law from this court establishing that Teck is a liable party under CERCLA, and that the Tribes are entitled to recover past and future response costs.  Sinha Written Testimony, ECF Nos. 2218 and 2253.  SCB's rates are reasonable and consistent with prevailing rates in the community.  *Id*. The amounts charged by SCB were also reasonable.  *Id.*

42.    Teck does not contest the reasonableness of the rates charged or the time expended by the Tribes' counsel.  Joint Pretrial Order at 15, ¶ 27.

43.    The Tribes' claim for attorneys' fees and costs may be reduced to three discrete categories.  Exh. 5109 compiles those costs as shown below:

| Tribes' Attorneys' Fees and Costs Claim[5] | |
|---|---|
| **Time Period** | **Amount** |
| Request for EPA Action through Judgment on UAO Enforcement[6] | $427,996.92 |
| Phase I Declaratory Relief Action | $3,663,900.02 |

---

[5] Not including air pathway work.

[6] Based on the Court's summary judgment ruling (ECF No. 2288), fees incurred in relation to the UAO enforcement action have been removed from the claimed amount.

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 17

| Phase II through December 2013 | $411,699.18 |
|---|---|
| **Total** | **$4,503,596.12** |

44.     The first category includes fees incurred before the Phase I litigation attempting to persuade EPA to take action addressing hazardous substances at the Site.  The remainder were incurred attempting to move forward with EPA-directed investigation and cleanup at the Site.  The second category corresponds to fees incurred during Phase I of trial.  These fees were incurred exclusively proving Teck's liability and refuting its divisibility defense.

45.     The third category compiles costs incurred in Phase II proving the Tribes' recoverable response costs.  These fees were incurred compiling and disclosing the Tribes' response cost claim to Teck,[7] and defending against Teck's motion practice and depositions challenging recoverability of these sums.[8]

46.     The work related to the Tribes' response at the UCR Site performed by SCB and the consultants, expert witnesses, and vendors, and the amounts charged for that work, is described in detail in Exhs. 5003-5007, 5012-5014, 5016 and 5020.

47.     The Tribes' Second Amended Complaint demanded prejudgment interest. ECF No. 148 at p.14, ¶ 4.  As of the start of trial, the amount of interest claimed on the Tribes' response costs was $294,694.00.  ECF No. 2363, ¶ 1.

---

[7] *See, e.g.,* Exh. 5014 at p.115 (December 16, 2013 invoice for "Redact G. Passmore's 2013 timesheets and organize set to produce").

[8] *See, e.g.,* Exh. 5014 at p.118 (December 30, 2013 invoice for "Work on response to motion to compel and cross motion").

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 18

### III.    Conclusions of Law

**A.    Subject Matter Jurisdiction and Venue.**

1.    The Court has previously determined that it has jurisdiction over this matter and that venue is proper in this district. *See* Findings of Fact and Conclusions of Law, ECF No. 1955 at p. 25.

2.    This Court has previously determined that the Tribes is entitled to recover its past and future response costs at the UCR Site, pursuant to 42 U.S.C. § 9607(a)(4)(A). ECF No. 1955 at p. 43, ¶ 19.

3.    This Court has previously determined that it has personal jurisdiction over Teck. Findings of Fact and Conclusions of Law, ECF No. 1955 at pp. 25-44.

**B.    Based on This Court's Determination of Teck's Liability for Response Costs Under Section 9607(a), the Burden of Proof Shifts to Defendant to Demonstrate that the Tribes' Costs are Inconsistent with the National Contingency Plan (NCP). *United States v. Chapman*, 146 F.3d 1166, 1170 (9th Cir. 1988).**

4.    Having established liability under § 9607(a)(4)(A), the Tribes need not prove that its response costs were "necessary" or "consistent" with the NCP. The Tribes is required to prove its response costs are within the CERCLA definition of those terms and then the burden of proof shifts to Teck to prove any affirmative defenses of NCP noncompliance. *United States v. Chapman*, 146 F.3d 1166, 1170 (9th Cir. 1998). Teck originally interposed an affirmative defense of NCP noncompliance based on the accurate accounting requirements of the NCP. Teck has since withdrawn that defense and agreed that the Tribes has met any burden it has to prove accurate accounting, Stipulation Regarding Costs Claimed By Plaintiff the Confederated Tribes of the Colville Reservation—Phase II, ECF No. 2363. Teck has asserted other NCP noncompliance affirmative defenses which are discussed below.

1

2

**C.     The Actions for Which the Tribes Seeks Response Costs Meet the Definition of "Removal" Action Or Are "Enforcement Activities" Related To "Removal" Action and therefore, are Recoverable.**

5.     The Tribes' claim arises under 42 U.S.C. §9607(a)(4)(A) which provides that a responsible party is liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan."  Governments have "very broad cost recovery rights," *Chapman*, 146 F.3d at 1174, *citing U.S. v. Northeastern Pharmacy & Chemical Co.*, 579 F. Supp. 823, 850 (W.D. Mo. 1984) (*NEPACCO*). Such rights include the recovery of "attorney's fees" as part of a § 9607(a) claim for "all costs of removal or remedial action." *Id.* Recoverable costs also include "costs of investigating, testing, sampling, and analyzing hazardous substances to determine whether a disposal and release has occurred." *NEPACCO*, 579 F. Supp. at 850.

6.     42 U.S.C. § 9601(25) of CERCLA provides that "[t]he terms 'respond' or 'response' means (sic) remove, removal, remedy and remedial action; all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto."

7.     CERCLA further provides at § 9601(23) that the "[t]erms 'remove' or 'removal' means (sic) . . . such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances," as well as "such other actions as may be necessary to minimize or mitigate damage to the public health or welfare."

8.     The Tribes' response actions originated with its 1999 petition to the EPA pursuant to § 9605 of CERCLA seeking an assessment of hazardous substances contamination along the Columbia River extending 150 river miles

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 20

from the United States-Canadian border.  This petition was accepted and EPA advised the Tribes that it intended to involve it throughout the process. The Tribes' response activities continued under agreement with EPA to participate in site sampling activities and advance the interests of the Tribes' members in connection with remediation of the UCR Site.  The 1999 petition was "enforcement activity" by the Tribes related to "removal" action in which the Tribes participated.

9.    After EPA withdrew its UAO, the Tribes commenced scientific investigation and evaluation of the presence of hazardous substances in the UCR Site, proving that Teck's disposal of hazardous substances at the UCR Site made it a liable party under CERCLA.  This investigation and successful litigation led to a determination by this court that Teck is jointly and severally liable for any cleanup of the UCR Site under CERCLA, and any subsequent agreement with EPA to engage in cleanup activities is an agreement governed by CERCLA.

10.    Teck has stipulated that the Tribes has incurred response costs at the Site.  ECF No. 1407; See Phase I Findings of Fact and Conclusions of Law at p. 24, ECF No. 1955.

11.    This court has previously ruled that the Tribes' funding of the citizen suit to enforce the UAO is not recoverable as response costs.  (See ECF No. 2288 at pgs. 20-21).  This is because the UAO enforcement action was not the Tribes' "enforcement activity," but the "enforcement activity" of Pakootas and Michel.

12.    The costs sought by the Tribes in this action consist of expenses for investigation and litigation in the course of evaluating and demonstrating Teck's liability as a responsible party under CERCLA.

13.    The Tribes' investigative work identifying hazardous substances in the UCR Site, analyzing releases to the environment, and identifying the responsible party, qualifies as "removal" action under the statute because it was "necessary to

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 21

monitor, assess, and evaluate the release or threat of release of hazardous substances" from Teck's slag and effluent, and to "minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23). The Tribes' experts and consultants investigated the presence and movement of hazardous substances in the UCR Site, used sophisticated technology to "fingerprint" slag present in the UCR Site and identify its source as the Trail Smelter, and tested whether contaminants are released from Teck's slag into the environment via leaching. Those actions assessed and evaluated releases of hazardous substances, thereby proving Teck's liability. They are therefore, "removal" actions.

14.    The Tribes' costs of investigation and expert analysis are costs of "removal" as defined in § 9601(23) and these amounts total $3,394,194.43.[9] The Tribes is entitled to recover this amount as response costs under § 9607(a)(4)(A).

15.    The Tribes' legal fees and other litigation costs are for "enforcement activities" related to the Tribes' costs of "removal" and therefore, recoverable

---

[9] Included in this figure are the amounts for Testifying Experts ($1,785,973.61), for Environment International, Ltd. ($1,219,237.87), for Other Non-Testifying Experts/Consultants ($259,255.04), and for $129,727.91 of the total amount listed for Vendors ($465,046.92). (Exh. 5184). $129,727.91 represents the amount the Tribes paid to "qualifying vendors" who participated in the investigation, evaluation and assessment of the source of hazardous substances at the UCR Site: Fremont Analytical, TEG Oceanographic Services and University of Washington Lab. (Exh. 5110).

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 22

under § 9601(25).  These amounts total $4,859,482.22.[10]  The Tribes is entitled to recover these costs as response costs under § 9607(a)(4)(A).

16.    The Tribes is statutorily authorized to recover enforcement costs, including attorneys' fees.  § 9607(a)(4)(A) authorizes sovereign governments including the United States Government, States, and Indian tribes to recover "all costs of removal or remedial action incurred." § 9601(25) of CERCLA makes clear that the terms "removal" and "remedial action" include enforcement activities related thereto.  (See "Order Re Reconsideration," ECF No. 2392, and "Order Denying Motion For Reconsideration," ECF No. 2409, explaining court's conclusion that the Tribes, as a sovereign entity, is statutorily authorized, unlike private parties, to recover enforcement costs, including attorneys' fees and litigation costs).

17.    The Tribes' response costs were incurred investigating site conditions and proving its claim against Teck for declaratory relief regarding cost recovery under CERCLA.  ECF No. 1955.  Proof of "removal" or "remedial" expense is a prerequisite of such a claim and this court found that the Tribes (and State) incurred "removal" or "remedial" costs as a part of its Phase I Findings of Fact and Conclusions of Law finding Teck liable for past and future response costs under CERCLA.  The court's findings were based on Teck's stipulation to one dollar of response costs, but by the time of trial, the Tribes had incurred more than three million dollars in costs of investigation and evaluation of site conditions which fit

---

[10] Included in this figure are the amounts for Tribes' Attorneys' Fees ($4,393,260.99), Miscellaneous Costs ($110,335.13), and Employee Labor and Travel ($20,567.09).  (Exhs. 5184).  The latter two categories have been treated as litigation costs for "enforcement activities" related to "removal" action.

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 23

within the CERCLA definition of "removal."  Additionally, the Tribes had engaged in response actions seeking and participating in site investigation and assessment since its 1999 petition to EPA for a site evaluation.

18.    Case law on CERCLA declaratory relief actions demonstrates that declaratory relief is commonplace in this circumstance.  "[S]o long as there has been a release of hazardous substances, and the plaintiff spends some money responding to it, a claim for declaratory relief is ripe for review."  *City of Colton v. Am. Promotional Events, Inc.-West,* 614 F.3d 998, 1004-05 (9th Cir. 2010); *see also Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.,* 358 F.3d 661, 668 n.4 (9th Cir. 2004) (explaining that, in a § 9607(a)(4)(A) action, "[a]s soon as [the plaintiff-State] expended its first dollar, it could have sued [the defendant] for this dollar and sought a declaratory judgment of [defendant's] liability for future response costs").

19.    The Tribes need only have incurred expense responding at the UCR Site—regardless of its recoverability—before bringing this action to establish Teck's liability for past and future response costs.  *City of Colton* v. *American Promotional Events,* 614 F. 3d 998 (9th Cir. 2010) (no requirement that a party incur *recoverable* response costs before its claim is ripe); *see also In re Dant & Russell, Inc.,* 951 F. 2d 246 (9th Cir. 1991), and *Wicklund Oil Terminals v. Asarco, Inc.,* 792 F. 2d 887 (9th Cir. 1986).  The Tribes nominally satisfied this requirement by expending $1 in response costs as stipulated by the parties, but it substantively met its burden by taking various pre-litigation response actions.  The costs of bringing this action to establish Teck's liability relate to such pre-litigation response actions and are therefore recoverable enforcement costs.

20.    Although the Tribes' pre-litigation response costs ultimately proved unrecoverable,[11] the costs incurred bringing this action to prove CERCLA liability and secure a right of recovery for future response costs are recoverable. *See Foster v. United States*, 922 F. Supp. 663, 664 (D.D.C. 1996). Thus, attorneys' fees and similar costs "related to" securing the right to recover future response costs from Teck are valid "enforcement costs" under § 9601(25) even though no pre-litigation response costs were recovered.

21.    The Tribes undertook pre-litigation response action to which its enforcement activities relate, in addition to the scientific response work it performed during pendency of litigation to which its enforcement action also relates. The Tribes' 1999 petition to EPA prompted the agency to investigate the UCR Site and was therefore necessary to "monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). In addition, the Tribes worked alongside EPA on the preliminary assessment, including influencing development of sampling and quality assurance plans, physically conducting Site sampling with EPA, and ultimately influencing the Site Investigation report that concluded a problem existed and that further CERCLA action was warranted. Exh. 5039 at p.2-4; Exh. 5040 at p.2-4; Passmore TT, ECF No. 2368, at 115:9-12.

22.    As a result of the Preliminary Assessment, EPA issued a UAO to Teck in 2003 ordering it to address Site contamination. The UAO concluded that the "RI/FS required by this Order is necessary to abate an imminent and substantial

---

[11] The Tribes' pre-litigation response activities were funded with grants and recovery thereof would result in double recovery inconsistent with the NCP. The Tribes' therefore removed all grant-funded costs from its claim by the time of trial.

endangerment because of an action or threatened release of hazardous substances from the Site and protect the public health or welfare or the environment…and will expedite effective remedial action." Exh. 7020, p. 7.

23.    The Tribes' § 9607(a)(4)(A) cost recovery action therefore "relates to" these pre-litigation response activities. 42 U.S.C. § 9601(25). Accordingly, attorneys' fees and litigation costs incurred in this cost recovery action are recoverable under 42 U.S.C. § 9607(a)(4)(A).

24.    The Tribes' § 9607(a)(4)(A) cost recovery action constitutes "enforcement activity" related to "removal" actions consisting of the 1999 Preliminary Assessment and the investigation and evaluation by the Tribes' experts during the course of this cost recovery action as to whether Teck's slag and effluent were releasing or threatening to release hazardous substances in the UCR Site. Those "removal" actions were "necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances" and "necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release."


**D.    The Tribes' Attorneys' Fees and Costs are Reasonable.**

25.    The Tribes' claim for attorneys' fees and costs is subject to the reasonableness requirements of *Hensley v. Eckerhart*, 461 U.S. 424 (1983). *Chapman,* 146 F. 3d at 1176. "The most useful starting point for determining the amount of a reasonable fee is the number of hours expended on the litigation multiplied by a reasonable hourly rate." *Hensley,* 461 U.S. at 433. Multiplying the number of hours reasonably expended by the reasonable hourly rate yields the "lodestar" figure. *Carter v. Caleb Brett LLC,* 757 F.3d 866, 868 (9th Cir. 2014).

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 26

26.     Teck does not challenge the reasonableness of hours worked or the hourly rates.  ECF No. 2309 at p.15, ¶ 27. The Tribes seeks to recover attorneys' fees invoiced to it by SCB based on hours worked at its reasonable hourly rates. The Tribes submitted attorney invoices documenting hours worked and rates charged by SCB, Exh. 5020, and testimony regarding their reasonableness, ECF Nos. 2218 and 2253.  The lodestar in this case therefore totals $8,253,676.65.  This amount and the rates charged are reasonable.  The amount of attorneys' fees and litigation costs sought- $4,859,482.22- is proportionate to the amount of costs sought for "removal" action- $3,394,194.43- that being the fees and costs incurred by the Tribes in their investigation and evaluation of the UCR Site to determine whether Teck's slag and effluent were releasing or threatening to release hazardous substances into the Site.

27.     The Tribes' sustained and successful efforts to cause investigation and evaluation of hazardous substances in the UCR Site and prove Teck's joint and several responsibility to clean up such hazardous substances warrants recovery of attorneys' fees and costs incurred in that effort. Where a plaintiff wins the relief requested, it may not be challenged as being disproportionate to the recovery sought, provided the fees were reasonably incurred.  *Hensley,* 461 U.S. at 440. Teck had the option of admitting liability from the beginning or at any point during the investigation, evaluation or litigation.  Instead, as was its right, it resisted responsibility under CERCLA and litigated in support of its position, necessitating the Tribes to incur the attorneys' fees and costs sought herein.  Under *Hensley,* all of the Tribes' fees and costs claimed herein are recoverable.

28.     Teck has challenged various portions of the attorneys' fees and costs claimed, arguing that such legal work was not necessary to the outcome.  The Ninth Circuit has explained that the general rule is "plaintiffs are to be

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 27

compensated for attorneys' fees incurred for services that contribute to the ultimate victory in the lawsuit." *Cabrales v. Cnty. of Los Angeles*, 935 F.2d 1050, 1052 (9th Cir. 1991) ) (citing *Hensley*).  Losing parties cannot "scalpel out attorney's fees for every setback, no matter how temporary, regardless of its relationship to the ultimate disposition of the case." *Cabrales*, 935 F.2d at 1053.  Applying these principles, Teck has not established that any of the costs sought by the Tribes were extrinsic or unrelated to the claims it pursued.  To the contrary, the Tribes has established that the fees sought contributed to the ultimate victory in the lawsuit.

29.    The Tribes may recover fees incurred successfully defending against Teck's sanctions motion.  *Cabrales,* 935 F.2d at 1052.  Teck forced the Tribes to incur these costs by filing the motion. Having lost, it cannot now complain about the costs the Tribes incurred.  *Id.*

**E.    NCP Defenses.**

30.    Teck alleges two violations of the NCP: (1) failure to provide public notice of the Tribes' scientific work; and (2) failure to provide a Quality Assurance and Sampling Plan to EPA concerning its scientific work. Preliminarily, even if a response action is shown to be inconsistent with the NCP, "defendants have the burden of demonstrating that the [response activities], because of some variance of the Plan, resulted in demonstrable excess costs." *U.S. v. American Cyanamid Co.*, 786 F. Supp. 152, 161 (10th Cir. 1999).  Teck has not proved that the Tribes incurred demonstrably excess costs because of either variance from the NCP that Teck alleges.

31.    The NCP, promulgated by EPA as required by CERCLA, 42 U.S.C. § 9605, guides government response activities.  *Washington State Dep't of Transp. v. Washington Natural Gas Co.,* 59 F.3d 793, 799 (9th Cir. 1994) (*WSDOT*), citing

*Matter of Bell Petroleum Services, Inc.*, 3 F.3d 889, 894 (5ᵗʰ Cir. 1993). NCP "provide[s] the organizational structure and procedures for preparing for and responding to . . . releases of hazardous substances . . . ." 40 C.F.R. §300.1. It "identifies methods for investigating the environmental and health problems resulting from a release or threatened release and criteria for determining the appropriate extent of response activities." *WSDOT*, 59 F.3d at 799, quoting *Bell*, 3 F.3d at 894. 42 U.S.C. § 9605(b), provides that "[t]he portion of such [National Contingency] Plan known as 'the National Hazardous Substance Response Plan' [40 C.F.R. §§300.400-440] shall . . . provide procedures and standards for remedial actions undertaken pursuant to [CERCLA]."

32.    Teck has failed to carry its burden of proving the Tribes' "removal" actions were inconsistent with the NCP. As the defendant in a §9607(a)(4)(A) action, Teck bears the burden of proving the Tribes' actions were inconsistent with the NCP. *WSDOT*, 59 F.3d at 799-800. To carry its burden, Teck must prove the Tribes' response was arbitrary and capricious. *Chapman,* 146 F.3d at 1171. In *WSDOT,* the Ninth Circuit made clear that an affirmative showing of NCP inconsistency is required. That a party did not actively attempt to comply with NCP provisions does not preclude recovery. *WSDOT,* 59 F.3d at 802-03.

33.    Every NCP provision cited by Teck provides that the "lead agency shall" undertake certain action. [12] Teck has stated in multiple places that EPA is

---

[12] *See* 40 C.F.R. § 300.415(n)(1) ("a spokesperson shall be designated by the **lead agency**"); 40 C.F.R. §§ 300.415(n)(2)-(4) ("the **lead agency** shall…"); 40 C.F.R. § 300.430(c)(1)-(3) ("the **lead agency** shall…"); 40 C.F.R. § 300.430(c)(4) ("the **lead agency** may"); 40 C.F.R. § 300.415(b)(4)(ii) ("If environmental samples are to be collected, the **lead agency** shall develop sampling and analysis plans…"); 40

the Lead Agency at the UCR Site and the Tribes is not. The Tribes, in Teck's view, is a participating party.  *See* ECF No. 2309, p. 13 ¶ 8; ECF No. 2222, ¶ 23-24.  The NCP provisions Teck relies upon are therefore applicable to EPA—not the Tribes. As a result, the Tribes' actions cannot be inconsistent with these provisions because they do not govern the Tribes' actions.

34.    The provisions cited by Teck, i.e. 40 C.F.R. § 330.430(b)(8), apply to work in furtherance of a remedial investigation and feasibility study.  The Tribes was not leading or implementing an RI/FS. No NCP provision applies to scientific work in aid of enforcement action. It would make little sense to require public comment or EPA review of sampling plans as a condition to work supporting legal action. Such scientific work is tested in the litigation process.

35.    The Tribes did not act arbitrarily and capriciously regarding its scientific work. It prepared quality assurance and sampling plans and it provided all of its scientific work to EPA, making it available for public review. Fraser TT, ECF No. 2368 at 196:9-13; 197:17-19; ECF No. 2370 at 474:20-475:21.  This is in substance what the rules required. Unlike the remedial work in question in the Ninth Circuit's *WSDOT* decision, which was a precursor and basis for remedial action, the scientific work at issue here had no impact warranting public or EPA review.

---

C.F.R. § 300.430(b) ("Specifically, the **lead agency** shall…"); 40 C.F.R. § 300.430(d)(1) ("The purpose of the [RI] is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives. To characterize the site, the **lead agency** shall…"); 40 C.F.R. § 300.430(d)(2) ("The **lead agency** shall…").

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 30

36.    The relevant NCP provisions do not apply to scientific work performed as part of an action to enforce CERCLA liability against a recalcitrant party.

37.    The existence of Teck's ongoing non-CERCLA RI/FS does not preclude the Tribes from recovering costs incurred investigating Site conditions to minimize or mitigate release.  Teck misplaces its reliance on certain cases for the proposition that once EPA commences Site investigation, costs incurred in any other investigation may not be recovered.  *See U.S. v. Hardage,* 750 F. Supp. 1460, 1514 (W.D. Okla. 1990); *Fallowfield Dev. Corp. v. Strunk*, 1991 U.S. Dist. LEXIS 1699 at *53-54 (E.D. Pa. 1991); *Louisiana-Pacific Corp. v. Beazer Materials & Serv., Inc*., 811 F. Supp. 1421, 1423-25 (E.D. Cal. 1993). First, whereas these cases all involved CERCLA actions, the 2006 RI/FS Agreement is not undertaken pursuant to CERCLA.  The logic that CERCLA effectively preempts all non-EPA site investigations has no bearing on a non-CERCLA action.  Second, every case cited involves *private* PRPs seeking to recover costs, and § 9607(a)(4)(B) limits private cost recovery to "necessary costs of response." Thus, where the government begins response investigations, any private investigation is not "necessary" and therefore, barred from cost recovery.  *Fallowfield Dev. Corp.*, 1991 U.S. Dist. LEXIS 1699 at *53-54; *Louisiana-Pacific Corp.*, 811 F. Supp. at 1423-25 (once EPA began conducting its own investigation, the PRP investigation was "duplicative and thus unnecessary, and accordingly, not recoverable under 42 U.S.C. § 9607(a)(4)(B)").  CERCLA authorizes the Tribes, unlike private parties, to recover "all costs" and imposes no necessity requirement. No provision in CERCLA explicitly bars governments from recovering costs in parallel investigations, and no case has precluded a *government*—not private party—from recovering "all costs" incurred responding to a site. In fact, courts reject PRPs'

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 31

claims that government costs are "duplicative, improper, excessive, and not cost effective." *U.S v. Kramer*, 913 F. Supp. 848, 862-64 (D.N.J. 1995). There is no limitation upon government cost recovery "other than the costs having to arise from removal or remedial actions that are not inconsistent with the NCP, and no reasonableness or necessity of individual costs is explicitly or implicitly required." *Id*. at 863. Furthermore, the Tribes' scientific work was provided to EPA for use in the RI/FS, and has been utilized to achieve greater results. Fraser TT, ECF No. 2370, at 471:6-472:5, 474:2-19. If anything, the Tribes' work supplemented, rather than duplicated, EPA's work.

38.    "Removal" actions, because of their nature, are treated differently than "remedial" actions. *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 934 (6th Cir. 2004). "[C]onsistency with the NCP is not required for recovery of monitoring and investigation costs." *Id*., citing *Donahey v. Bogle*, 987 F.2d 1250, 1255 (6th Cir. 1993), *vacated on other grounds*, 512 U.S. 1201, 114 S.Ct. 2668 (1994). To the extent, however, that NCP compliance by the Tribes was necessary with regard to its "removal" actions, it substantially complied and Teck has failed to establish the expert scientific work performed by the Tribes was "arbitrary and capricious." Teck has failed to rebut the presumption of consistency.

**F.    Prejudgment Interest.**

39.    CERCLA mandates prejudgment interest be included on amounts recovered under 42 U.S.C. § 9607(a). Interest accrues from the latter of: (1) the date payment of a specified amount is demanded in writing, or (2) the date of the expenditure concerned. Filing a complaint to recover response costs is a sufficient "demand" to trigger interest accrual. *Halliburton Energy Servs. v. NL Indus.*, 553 F. Supp. 2d 733, 769 (S.D. Tex. 2008); *United States v. Hardage*, 750 F. Supp.

1460, 1505-06 (W.D. Okla. 1990). A complaint need not specify an exact dollar figure of claimed response costs to constitute a written demand sufficient to trigger interest accrual. *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1019 (8th Cir. 2007) (plaintiff's demand need only give a defendant "full knowledge of their contaminating activities which gave rise to the response costs"); *In re Bell*, 3 F.3d 889, 908 (5th Cir. 1993); *Pentair Thermal Management, LLC v. Rowe Industries, Inc.*, 2013 WL 1320422 (N.D. Cal. 2013) (court awarded prejudgment interest from the date the defendant was served with the First Amended Complaint, even though this pleading did not include a dollar amount and simply requested "all necessary Response Cost incurred by Plaintiff in responding to the released Hazardous Substances" under 42 U.S.C. § 9607(a)). The Tribes filed its First Amended Complaint on November 7, 2005, ECF No. 111, but only claims interest accruing since June 1, 2008, when it filed its Second Amended Complaint, Exh. 7032.

40. Subsequent revisions to amounts claimed do not alter the demand date from which interest is calculated. *Raytheon Aircraft Co. v. United States,* 556 F. Supp. 2d 1265, 1296-97 (D. Kan. 2008). The Tribes has supplemented its Rule 26(a)(1) disclosures regarding response costs multiple times during Phase II. These supplementations do not affect the 2008 demand date from which interest is calculated.

41. CERCLA prejudgment interest is calculated on the outstanding unpaid balance of the amounts recoverable and is based on the rate of interest on investments of the Hazardous Substance Superfund. 42 U.S.C. § 9607(a). EPA publishes the applicable rate on its website annually. The Tribes is entitled to an award of prejudgment interest beginning June 1, 2008 after the Tribes filed its Second Amended Complaint, Exh. 7032, to the date of Judgment.

PHASE II FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 33

**G.    Tribes' Recoverable Costs.**

42.    The Tribes is hereby awarded $8,253,676.65 in past response costs incurred through 2013, along with prejudgment interest to the date of Judgment.

**H.    Questions Not At Issue.**

The following questions are not at issue in Phase II of the trial and this Court makes no finding regarding the following:

(a)  whether a release or threatened release of hazardous substances to the environment has occurred as a result of aerial emissions from the Trail smelter; and

(b)  whether any release or threatened release has caused damages or injury to, destruction of, or loss of natural resources.

DATED this 12th day of August, 2016.


*s/Lonny R. Suko*

_____
LONNY R. SUKO
SENIOR U.S. DISTRICT COURT JUDGE